**STEPHEN J. ODELL, OSB #903530**
MARTEN LAW LLP
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone: (503) 241-2648
E-mail: sodell@martenlaw.com

*Attorney for Applicant-for-Intervention Mt. Hood Meadows OREG., LLC*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **THRIVE HOOD RIVER; OREGON WILD; SIERRA CLUB; OREGON NORDIC CLUB; FRIENDS OF MOUNT HOOD; OREGON KAYAK AND CANOE CLUB;** and **MIKE MCCARTHY**, <br><br>        Plaintiffs, <br><br> v. <br><br> **META LOFTSGAARDEN;** and **UNITED STATES FOREST SERVICE**, <br><br>        Defendants. | Case No. 3:22-cv-01981-AR <br><br> **DECLARATION OF MATTHEW B. DRAKE** |

I, MATTHEW B. DRAKE, in accordance with the provisions of 28 U.S.C. Section 1746, hereby declare as follows:

1. I am the President of MBD Development, LLC, the Manager of Mt. Hood Meadows Oreg., LLC ("Meadows" or "MHMO"), a manager-managed LLC in the State of Oregon, the non-governmental party to the congressionally prescribed and conditioned land exchange

Page 1 – DECLARATION OF MATTHEW B. DRAKE

("Federal Land Exchange") the Forest Service's approval of which Plaintiffs challenge in this action. I have served as a Board Member of MHMO, LLC (and its predecessor entity, Mt. Hood Meadows Limited Partnership) since 1990, and as Manager of MHMO since 2006. As a result, I am intimately familiar with the company's properties and operations, and was one of two principal negotiators (along with my late father, Franklin G. Drake, former President of Mt. Hood Meadows Limited Partnership, who served as the other principal negotiator from 2000-05) in all of the major discussions in which Meadows engaged with the Forest Service related to its evaluation and analysis of the Federal Land Exchange. I make this declaration based upon my own personal knowledge as well as on information provided by other representatives of the company with knowledge of the subjects it addresses. I believe the information in this declaration to be true and correct to the best of my knowledge.

2. As described in more detail below, I have been substantially involved in each of the twists and turns in the long and tortuous route that eventually culminated in the Forest Service's approval of the Federal Land Exchange in May 2022. My involvement encompasses over twenty-one years of efforts and investments of financial resources to help see approval of the exchange come to a fruitful and successful conclusion. At my direction and with my approval, Meadows has spent well more than $500,000 and devoted many hundreds of hours, including significant amounts of time from its Board members, to bring the Federal Land Exchange to final approval in a manner that serves not only its own interests, but the broad array of interests of others who also deeply value Mt. Hood – a truly iconic resource and symbol of our State.

3. More specifically in this vein, I have knowledge of many of the principal developments described in the Amended Complaint ("Complaint") in this action, including the 2002 land exchange that Meadows entered into and has fully consummated with Hood River County

("County Land Exchange"), as well as the state court litigation that Plaintiffs continue to pursue to challenge that County Land Exchange more than two decades after it was fully executed (see Complaint at ¶ 16); a settlement agreement among Plaintiffs, MHMO (for whom I am a signatory to the agreement), and Hood River County dated June 28, 2005 ("2005 Settlement Agreement[1]") (attached as Exh. 1), whereby Plaintiffs agreed to abate their ongoing state court proceedings challenging the County Land Exchange in return for which MHMO and Hood River County agreed to work cooperatively with Plaintiffs to pursue and support a separate land exchange between MHMO and the Forest Service (see Complaint at ¶ 17); Subsections 1202(c)(2), 1205(a), and 1206(a) of the Omnibus Public Land Management Act of 2009, Pub. L. 111-11 (Mar. 30, 2009)(collectively comprising "Original Exchange Act") (attached as Exh. 3) (see Complaint at ¶ 30); and successive legislation that amended the Original Exchange Act, the Mt. Hood-Cooper Spur Land Exchange Clarification Act, Pub. L. 115-110 (Jan. 10, 2018)("Exchange Clarification Act") (attached as Exh. 9) (see Complaint at ¶ 30).

4. I am also generally familiar with the procedures the USDA-Forest Service employed to approve the Mt. Hood Land Exchange in accordance with the Federal Land Policy and Management Act ("FLPMA") and National Environmental Policy Act ("NEPA"). As part of the NEPA process, MHMO submitted comments and technical information throughout each of its major phases: issuance of the Notice of Intent and Scoping, followed by preparation of the Draft Environmental Impact Statement ("DEIS"), and then the Final EIS ("FEIS").

5. On a more personal note, I am a fourth-generation Oregonian. My father successfully competed for and was awarded the Special Use Permit for Mt. Hood Meadows in 1966-1967,

---

[1] The attached 2005 Settlement Agreement does not include the exhibits to that agreement, as they are quite voluminous and unnecessary to support the factual averments in this declaration for which the document is cited.

Page 3 – DECLARATION OF MATTHEW B. DRAKE

which I remember well. In the context of this history and experience, I care deeply about the mountain and have long been wholeheartedly committed to investing in its future and playing a constructive role in ensuring that its resources are both appropriately conserved and used for a wide array of pursuits, including outdoor recreation and environmental awareness.

6. Turning to the specific chronology that ultimately led to approval of the Federal Land Exchange, the initial link in that long chain of events was the distinct, earlier County Land Exchange referenced above that Hood River County and Meadows fully consummated in exchanging deeds to respective properties they had previously owned within the County more than two decades ago, in March 2002. Shortly thereafter, Plaintiffs Thrive (that then went by its previous name of Hood River Valley Residents Committee or the acronym, HRVRC[2]) and Mike McCarthy initiated two separate lawsuits in state court to challenge the County's approval and execution of that exchange. That state court litigation eventually led to six days of mediation discussions among those Plaintiffs, Meadows, and Hood River County. The outcome of that mediation was the above-referenced 2005 Settlement Agreement that Meadows, Plaintiffs Thrive and McCarthy, and the County executed on June 28, 2005. See Exh. 1. At a broad scale, the 2005 Settlement Agreement provided for Plaintiffs to initially abate and then eventually dismiss their state court proceedings on the basis of which all of the settling parties agreed to support a so-called "Proposed Solution" calling for Meadows to propose and seek to complete with the Forest Service a new land exchange by which Meadows would convey virtually of its properties on the north side of the mountain in Hood River County in return for receiving from the Forest Service two developable parcels near Government Camp on the mountain's south face in

---

[2] For ease of reference and to avoid confusion, I shall hereafter refer to this Plaintiff as "Thrive" throughout my declaration, even during the earlier period when it went by Hood River Valley Residents Committee or HRVRC, except when its previous name is within quotation marks.

Page 4 – DECLARATION OF MATTHEW B. DRAKE

Clackamas County. Paragraphs 15 and 16 of the agreement expressly provide that the proposed exchange may be effectuated via either legislative or administrative means and that, if the parties agreed to pursue the former route, they would either request that legislative counsel draft the proposed legislation or confer with each other in drafting it themselves. The 2005 Settlement Agreement also provides that the parties shall not describe or characterize the position of any other party or seek to cast blame on any other party in their public statements or discussions with the media, and shall only issue public statements or press releases concerning the contents of the Agreement on which all of the parties have agreed. Moreover, the agreement contains elaborate provisions on how appraisal of the properties forming the basis of the Proposed Solution was to be conducted, including the parties' agreement that Mr. Steve Hall should prepare the appraisals. Consistent with these provisions, Mr. Hall completed the initial appraisals for both the federal and non-federal properties forming the basis of the Proposed Solution in September 2005.

7. The following year, on May 16, 2006, Plaintiffs Thrive, McCarthy, Hood River County, and Meadows entered into a series of amendments to the 2005 Settlement Agreement ("2006 Amendments to Settlement Agreement"). Exh. 2. Among other things, these amendments included the agreement of the parties to request the Oregon congressional delegation to prepare and pass federal legislation that would, among other things, adopt the values in the September 2005 appraisals Mr. Hall had completed that the parties expressly approved and agreed satisfied all applicable legal requirements. The amendments also included a detailed series of other provisions and conditions that the legislation the parties agreed to request the delegation to enact should specify, virtually none of which ended up making it into the legislation as ultimately enacted, including congressional adoption of the values reflected in the 2005 Hall appraisals.

Page 5 – DECLARATION OF MATTHEW B. DRAKE

8. Nevertheless, per their mutual understanding as prescribed in the 2005 Settlement Agreement as amended, the parties were able to work together cooperatively with the Oregon congressional delegation to persuade the Congress to enact the Original Exchange Act some three years later as part of the Omnibus Public Land Management Act of 2009. Exh. 3 (Secs. 1202(c)(2), 1205(a), & 1206(a) of Act). Although the Original Exchange Act did not include all of the elements reflected in the 2005 Settlement Agreement, as amended, it did include the two main conservation features designed to benefit the public at large. These features provide for, upon completion of the Exchange: (1) designating approximately 1710 acres to be added to the Mount Hood-Tilly Jane Wilderness Area; and (2) establishing a Crystal Springs Watershed Special Resources Management Unit to both provide for and protect clean drinking water for Hood River County residents and enable the county's visitors to enjoy the watershed's special scenic, natural, cultural, and wildlife values. The Original Exchange Act also expressly provided that any exchange was subject to Meadows's willingness to offer its lands in trade for the federal lands forming the basis of the Proposed Solution. It further directed that a new set of appraisals be prepared by an appraiser jointly selected by the Forest Service and Meadows on which the ultimate exchange would be based in lieu of the ones Mr. Hall had previously executed, in large measure due to concerns the Government Accountability Office had raised with Mr. Hall's appraisals in an independent review conducted at the Oregon congressional delegation's request.

9. The following year Meadows entered into an Agreement to Initiate the Federal Land Exchange ("ATI"). Exh. 4. The ATI sets forth the understanding that the basis for value of the exchange properties shall be appraisals carried out in accordance with the exchange legislation as ultimately reviewed and approved by the Forest Service, and expressly authorizes both the Forest Service and Meadows to withdraw from the exchange process at any time prior to execution of a

binding exchange agreement. Attached to the ATI are exhibits that, among other things, set forth a description of the respective properties that both Meadows and the Forest Service "will consider exchanging." Another exhibit lays out an implementation schedule for the Federal Land Exchange that called for completion of the exchange by November 2012, more than a decade prior to the Forest Service's issuance of the Record of Decision ("ROD") approving the exchange and execution of a binding Exchange Agreement between the agency and Meadows.

10. Because the administrative process the Forest Service carried out for the Federal Land Exchange lagged far behind the time frame prescribed by the Original Exchange Act as well as the schedule laid out in the ATI, in large measure due to hitting various snags along the way, Thrive determined to pursue a two-pronged approach to streamline and facilitate the exchange's completion, composed of commencing litigation to request that the U.S. District Court compel the agency to carry out its tasks in a timely fashion and also pursuing a series of follow-on legislative amendments to the Original Exchange Act. This approach is described in an e-mail that then-Thrive counsel Ralph Bloemers sent to me on June 22, 2015. Exh. 5. Even as initially framed by Mr. Bloemers in that e-mail, Plaintiffs' proposed legislative amendments expressly accepted the fact that Meadows may well need to retain certain of its properties in Hood River County under the final contours of the exchange, depending on how the values ultimately sorted out in the final appraisals, which as of that time had yet to be completed. This theme was carried forward in subsequent e-mails Mr. Bloemers sent to me, including his expressly calling for every discrete property to be separately valued so as to furnish the parties maximum flexibility in arriving at the final parameters of the exchange. See Exhs. 6-7. Ultimately, this string of e-mails from Mr. Bloemers culminated in one in which he forwarded to me an e-mail he had sent to staff for Sen. Wyden and Rep. Blumenauer, members of the Oregon congressional delegation, to

which he attached a draft of legislative language that, as he described it, "captures in more detail what was originally intended to occur substantively by HRVRC and Meadows," and was "prepared jointly by counsel for Meadows and HRVRC." Exh. 8. The draft proposed legislative language Mr. Bloemers attached to this last e-mail authorized "without limitation" a final exchange encompassing less than all of the federal or non-federal properties identified for exchange in the Original Exchange Act and became the precise legislative text of Section 2(2)(B)(H)(i) of the Exchange Clarification Act that Congress enacted in 2018. Exh. 9.

11. Thus, consistent with the explicitly stated common understanding and intent of both Thrive and Meadows as described in the series of e-mails from Thrive's counsel, the Exchange Clarification Act as enacted contains provisions that both require the final appraisals underlying the exchange to assign a separate value to each parcel of property to enhance equalization of values for the federal and non-federal lands ultimately included in the finally approved exchange (Sec. 2(2)(a)(ii)), and also authorize conveyance of a lesser area of the federal or non-federal properties encompassed by the originally proposed exchange "without limitation" insofar as necessary to equalize appraised values of the exchanged properties (Sec. 2(2)(B)(H)). *Id.* at 2-3.

12. The supplemental direction contained in the Exchange Clarification Act regarding appraisal of the subject properties meant that the appraiser on whom the Forest Service and Meadows had mutually agreed, Mr. Richard Maloy, needed to update the appraisals originally completed in October 2017. Two years later, Mr. Maloy submitted the final versions of his appraisal reports, which the Forest Service reviewed and then approved on November 30, 2019.

13. Following completion and the Forest Service's formal approval of these final appraisal reports, which were made available to the public upon request per direction in the Exchange Clarification Act (Sec. 2(2)(A)(iii)), both Plaintiff Thrive and Meadows reviewed the reports,

Page 8 – DECLARATION OF MATTHEW B. DRAKE

eventually sharing their respective concerns to the Forest Service. The upshot is that neither Thrive nor Meadows wholly supports the property values reflected in the finally approved appraisals – Thrive believes the appraisals considerably undervalue the federal lands Meadows will receive under the Exchange while overvaluing the property that Meadows is committed to providing, while Meadows's view reflects the converse. I would quickly note in this context, however, that all three of the appraisals of the subject properties that have been prepared – the first one by Mr. Hall, and both the initial and final iterations by Mr. Maloy – have arrived at values showing that the Meadows properties encompassed by the originally proposed exchange are worth considerably more than the federal lands. It is nevertheless perhaps not altogether surprising that neither Thrive nor Meadows is satisfied with the final appraisal values, but what cannot be seriously disputed is that the final appraisals were performed in conformance with all applicable legal requirements, federal regulations, and professional standards, and that Meadows had no control over the values Mr. Maloy found following a thorough and independent process.

14. Around this same time, and consistent with direction in the Exchange Clarification Act, the values assigned to each separately valued parcel or item of property in the final versions of Mr. Maloy's appraisal reports became the basis of discussions between the parties to the Federal Land Exchange -- the Forest Service and Meadows -- regarding which configuration(s) of federal and non-federal lands would provide for the necessary equalization of values under applicable legal standards and also be feasible for both parties from legal, environmental, and economic perspectives. These discussions allowed the Forest Service and Meadows to discuss and explore the major potential exchange permutations in the context of both applicable legal requirements and for purposes of discerning whether each would be workable for both of them to aid and help inform the agency in arriving at the Proposed Action that would well serve the public interest

while also still being mutually feasible and sustainable over the long-term. This approach not only was expressly contemplated by the Exchange Clarification Act, it also only made sense because, as noted above, the exchange legislation does not compel Meadows to engage in the exchange, nor does the ATI that Meadows and the Forest Service executed bind either party to complete any exchange until and unless both parties execute an exchange agreement. No final decision as to the ultimate configuration of the Federal Land Exchange was made during these discussions. Nor did Meadows direct the Forest Service or otherwise purport to define the set of alternatives the agency ultimately considered in the Final Environmental Impact Statement ("FEIS"), but rather provided requested legal, factual and technical information related to the feasibility of various proposals for the agency's consideration. I would add in this context that I also met with representatives of Thrive to hear its concerns and various proposals for achieving the necessary equalization standards in both FLPMA and the exchange legislation in an effort to seek to accommodate its input and preferences insofar as it was feasible for Meadows to do so.

15. On August 25, 2020, Thrive sent a letter to the Hood River County Board of Commissioners, County Administrator, and Community Development Director ostensibly to provide an update on the Exchange. Exh. 10. Beyond simply providing an update, however, the letter also openly and publicly aired Thrive's concerns with attacked the validity of the finally approved appraisal reports underlying the Exchange. The letter further publicly assailed Meadows and its motives in pursuing the Exchange, and made numerous unfounded allegations both in that regard and also with respect to what the exchange legislation, as amended, requires. To Meadows, this reflected a clear material breach of our 2005 Settlement Agreement.

16. In January 2021, the Forest Service issued the FEIS for the Federal Land Exchange, at which point Thrive representatives and its counsel offered quotes in an *Oregonian* article that

Page 10 – DECLARATION OF MATTHEW B. DRAKE

again attacked the validity of the finally approved appraisals and criticized Meadows for its role in implementing the Federal Land Exchange in accordance with direction in the exchange legislation and terms of the ATI. T. Sickinger, "Mount Hood Land Swap Achieves New Milestone, Generates New Controversy," *The Oregonian* (Feb. 6, 2021) (attached as Exh. 11). To Meadows, this represented another clear material breach of our 2005 Settlement Agreement.

17. Also in February 2021, the Forest Service issued its Draft ROD in which the agency announced its tentative approval of the Federal Land Exchange that reflected several modifications from the original Proposed Action as it found were necessary in order to achieve the equalization standards in FLPMA and the exchange legislation, and also arrive at a final exchange that was feasible and mutually acceptable to both Meadows and the Forest Service.

18. Most of the Plaintiffs objected to the tentative decision to approve the Federal Land Exchange reflected in the Draft ROD. The Forest Service held an objection resolution meeting in May 2021 to discuss Plaintiffs' objections, without resolution, whereupon an Objection Reviewing Officer issued a written finding that none of the objections were well-taken.

19. The Mt. Hood National Forest Supervisor therefore proceeded to issue the Final ROD approving the Federal Land Exchange in May 2022. The next day, on the basis of the approval and authorization in the Final ROD, the Forest Service and Meadows executed a binding Exchange Agreement, committing themselves to exchange the lands comprising the Federal Land Exchange as approved and described in that agreement. Exh. 12. I executed the Exchange Agreement on behalf of Meadows and stand ready to implement it so that the considerable benefits it will provide not only to residents of Hood River and Clackamas Counties, but to all Oregonians and indeed, all of those who care about the mountain, can finally be realized.

Page 11 – DECLARATION OF MATTHEW B. DRAKE

20. In that light, notwithstanding Plaintiffs' allegations in their Amended Complaint, the Federal Land Exchange as approved by the Forest Service and agreed to by both the agency and Meadows contains all of the principal long-term public benefits affirmatively built into the 2005 Settlement Agreement from the outset, including the addition of more than 1700 acres to the existing Mt. Hood-Tilly Jane Wilderness Area, creation of a new Crystal Springs Watershed Special Resources Management Unit, imposition of trail easements to enable the public to continue to engage in non-motorized recreational use of the federal lands to be conveyed to Meadows, the Forest Service's acquisition of title to and management under the Northwest Forest Plan of a large tract of additional high-value forestland near Cooper Spur, and the provision of additional housing units vitally needed for both local workers and the mountain's many recreational users in an already developed area of the mountain at Government Camp. In addition, MHMO has had to give up substantial interests and preferences of its own, including having held off for some two decades on undertaking any meaningful financially beneficial improvements or uses of its land in Hood River County while waiting for the Federal Land Exchange to be evaluated and approved. Moreover, in executing the exchange as approved, Meadows will not receive more than a third of the National Forest System land that it had also reasonably hoped to be able to develop into residential properties in Government Camp.

21. As the Manager of MHMO, I am responsible to its Board of Directors and shareholders to fulfill my fiduciary obligations and, in so doing, to help ensure the long-term financial viability of our company. I also have a responsibility to ensure the financial viability of the Mt. Hood Meadows Ski Area as a necessary condition to the maintenance and renewal of the Special Use Permit Meadows holds under which it operates the ski area. As a result, my priority was and remains to balance the long-term needs of all interested parties by engaging in a fair, financially

viable, and legally compliant exchange that achieves as many of the aspirations of those who care about the future of Mt. Hood to the extent practicable. I sincerely believe the Federal Land Exchange as approved by the Forest Service more than meets this objective and satisfies the lion's share of shared aspirations of all who have been involved in its development even though it does not (and could not reasonably) meet all of the aspirations of any one party or interest.

22. Meadows has worked earnestly and in good faith at each and every step along the way throughout the process leading up to the Forest Service's approval of the Federal Land Exchange and the parties' execution of the binding Exchange Agreement, and has given up and invested a considerable amount in order to achieve necessary compromises to achieve that outcome. Aside from consenting to the appraiser who performed the final appraisals in compliance with the exchange legislation and providing requested supporting information, Meadows had no direct involvement in the way the final appraisals of the subject properties was conducted, or with the Forest Service's review and approval of such appraisals. We nevertheless are willing to move forward in accordance with the deal we made that ultimately was reduced and memorialized in both the Original Exchange Act and Exchange Clarification Act and implement the Federal Land Exchange in the form it ultimately took as approved by the Forest Service in the Final ROD.

23. It is in this spirit that we move for intervention in this case, in order to protect our significant investments of time, money, and energy in implementing the exchange legislation and reaching a final exchange agreement with the Forest Service, and to help defend the final decision the agency reached after more than two decades of persistent effort by Meadows and many other parties, even though it does not reflect everything we had hoped to accomplish in the exchange, either. Nevertheless, we recognize that Meadows and Plaintiffs both agreed to the process and congressional direction under which it was carried out, which was carefully and

Page 13 – DECLARATION OF MATTHEW B. DRAKE

conscientiously followed, and therefore will abide by the final outcome. The process, while arduous and lengthy, was nevertheless fair and thorough. Meadows does not believe that walking away from the Federal Land Exchange as ultimately adopted due to apparent "buyer's remorse" by Thrive over legislative terms the parties agreed to or the final shape it ultimately took is appropriate or legitimate. It is well-past time to move forward and implement this hard-fought and vitally important exchange and realize its myriad benefits for all who love Mt. Hood and enjoy the many values, uses, and experiences it provides.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th day of July 2023.

<div style="margin-left: 40%;">
s/ Matthew B. Drake  
Matthew B. Drake  
President, MBD Development  
Manager, Mt. Hood Meadows Oreg., LLC
</div>

Page 14 – DECLARATION OF MATTHEW B. DRAKE