Jesse A. Buss, OSB No. 122919
Willamette Law Group, PC
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Karl G. Anuta, OSB No. 861423
Law Office of Karl G. Anuta, P.C.
735 S.W. First Ave.
Portland OR 97204
Tel: 503-827-0320
Fax: 503-386-2168
Email: kga@lokga.net

*Attorneys for Plaintiffs Thrive Hood River, Oregon Wild, Sierra Club, Oregon Nordic Club, Friends of Mount Hood, Oregon Kayak and Canoe Club, and Mike McCarthy*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| THRIVE HOOD RIVER, OREGON WILD, SIERRA CLUB, OREGON NORDIC CLUB, FRIENDS OF MOUNT HOOD, OREGON KAYAK AND CANOE CLUB, and MIKE McCARTHY, | Case No. 3:22-cv-01981-AR |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| v. | **(Oral Argument Requested)** |
| META LOFTSGAARDEN, Forest Supervisor for the Mt. Hood National Forest, and the UNITED STATED FOREST SERVICE, | |
| Defendants, | |
| and | |
| MT. HOOD MEADOWS OREG., LLC, | |
| Defendant-Intervenor. | |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT                                           i

**MOTION**

Plaintiffs Thrive Hood River ("Thrive"), Oregon Wild, the Sierra Club, the Oregon Nordic Club, Friends of Mount Hood, Oregon Kayak and Canoe Club, and Mike McCarthy (collectively "the Conservation Plaintiffs") move for an order, pursuant to FRCP 56, granting summary judgment against Defendants Meta Loftsgaarden and the United States Forest Service (collectively "the Forest Service" or "the Service") and Mt. Hood Meadows Oreg., LLC ("Meadows"). Conservation Plaintiffs seek judgment on all claims for relief under the Administrative Procedure Act, 5 U.S.C. § 701–706 ("APA") and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, *see* ECF 4 (Claim 1, Counts 1–4, ¶¶ 38-51), as well as claims for relief under the APA and the Omnibus Public Land Management Act of 2009 (Pub. L. 111-11, 123 Stat. 1018), as amended by the Mt. Hood Cooper Spur Land Exchange Clarification Act of 2018 (Pub. L. 115-110, 131 Stat. 2270) (collectively "the Omnibus Act"), *see* ECF 4 (Claim 2, Counts 1, 3-4, ¶¶ 53-54, 56-60).[1] Those claims all challenge the Forest Service's May 3, 2022, final Record of Decision (ROD) approving a Government Camp/Cooper Spur Land Exchange ("the Proposed Exchange"), AR-50369, as well as the underlying Environmental Impact Statement (EIS). AR-45822. Conservation Plaintiffs request that the Court vacate the Forest Service's ROD and EIS.

In support of this Motion Conservation Plaintiffs offer the following Memorandum, and the concurrently filed supporting Declarations of Lisa Billings, Mike McCarthy, Erik Fernandez, Russ Pascoe, Mike Sargetakis, and Kenneth Wenzel.

---

[1]     Plaintiffs have chosen not to pursue Claim 2, Count 2 on summary judgment.

As Required by Local Rule 7-1(a)(2), on August 5, 2025, Counsel for Conservation Plaintiffs conferred by telephone with counsel for Defendants regarding each claim that is the subject of this Motion. The parties were unable to reach a resolution. Therefore, Conservation Plaintiffs request that the Court enter judgment in their favor on their claims and issue an order setting aside and vacating the ROD and EIS.

**Table of Contents**

**Page Nos.**

Motion.................................................................................................................... ii

Table of Authorities ............................................................................................. vi

Table of Acronyms ...............................................................................................x

Memorandum.........................................................................................................1

    Introduction...........................................................................................................1

    Standing ...............................................................................................................2

    Standard of Review under the Administrative Procedure Act..................................4

    Background ...........................................................................................................5

    Argument ..............................................................................................................9

        I.       Violations of NEPA……………………………………………………….9

                A.     The EIS's purpose and need statement does not accurately reflect the imperatives of the Omnibus Act (Claim 1, Count 1)…………………….11

                B.     The chosen alternative does not fulfill the stated purpose of the project, so other alternatives—that do fulfill that purpose—should have been considered (Claim 1, Count 2) …………………………………………..15

                C.     The EIS fails to consider an adequate range of alternatives, in violation of NEPA (Claim 1, Count 3) ………………………………………………….15

                D.     The appraisals were unlawfully excluded from the EIS, in violation of NEPA (Claim 1, Count 4) …………………………………………………19

        II.      Violations of the Omnibus Act …………………………………………….21

                A.     The ROD improperly reduces the number of federal and non-federal acres subject to the land exchange, in violation of the Omnibus Act (Claim 2, Count 1) …………………………………………………………………….21

                        i.     The Forest Service cannot reduce both the acreage of federal land subject to the exchange and reduce the acreage of non-federal land subject to the exchange. It must pick one or the other…………..22

ii.     The EIS and ROD contain no findings regarding the need to reduce the exchange acreages to equalize the exchange values…………23

iii.    There is no need to reduce the exchange acreages to equalize the exchange values……………………………………………..25

iv.    Even if there is an actual need to reduce the exchange acreages to equalize the exchange values, the proposed reductions are too large……………………………………………………26

B.    The flawed appraisals resulted in an unequal exchange and must be corrected and updated (Claim 2, Counts 3 and 4) ……………………… 27

i.     The Government Camp appraisals (federal property) …………. 30

ii.    The Cooper Spur appraisals (non-federal property) …………….32

Conclusion ...............................................................................................35

**Table of Authorities**

**Cases**                                                                                          **Page Nos.**

*Bair v. California Dep't of Transp.*, 982 F.3d 569 (9th Cir. 2020) ..................................................9

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................................4

*Califano v. Sanders*, 430 U.S. 99 (1977) .....................................................................................5

*Ctr. For Biological Diversity v. U.S. FWS*, 409 F.Supp.3d 738 (D. Ariz. 2019) .........................12

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...............................................5

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ..................11

*Dean v. United States*, 556 U.S. 568 (2009)................................................................................23

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) ............2, 3, 27, 28, 29

*Envtl. Def. Ctr.  v. Bureau of Ocean Energy Mgmt.,* 36 F.4th 850 (9th Cir. 2022).........................4

*Envtl. Def. Fund, Inc. v. Andrus,* 596 F.2d 848 (9th Cir. 1979) ...............................................16, 18

*Friends of the Earth v. Laidlaw,* 528 U.S. 167 (2000) ...................................................................2

*Hood River Valley Residents' Committee, Inc. v. Board of County Commissioners of Hood River County,* 193 Or App 485 (2004) ...................................................................................................6

*Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002)............................................10

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)................................................................................10

*League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012) .................11

*Marsh v. ONRC*, 490 U.S. 360 (1989)........................................................................................28

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000).....................................................................16, 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...............................................................................................................5

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ....................10

*Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010)..................................12

*Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024 (9th Cir. 2007)................................................16

*Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F. Supp. 2d 1199 (D. Or. 2012) ................4

*Olson v. United States*, 292 U.S. 246 (1934)................................................29

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ........................4

*Port of Astoria, Or. v. Hodel,* 595 F.2d 467 (9th Cir. 1979) ........................................16

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.,* 113 F.3d 1505 (9th Cir. 1997) .............19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)..............................10, 19, 20

*Seven County Infrastructure Coalition v. Eagle County*, 145 S.Ct. 1497 (2025)....................10, 11

*Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997)...............................12

*United States v. Korotkiy,* 118 F.4th 1202 (9th Cir. 2024) ........................................22, 23

*W. Land Exch. Project v. U.S. BLM*, 315 F.Supp.2d 1068 (D. Nev. 2004)...............................2

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853 (9th Cir. 2004) ...........................12

*Wild Fish Conservancy v. Jewell*, 730 F.3d 791 (9th Cir. 2013)........................................4

*WildWest Inst. v. Bull*, 547 F.3d 1162 (9th Cir. 2008).................................................19

**United States Code**

5 U.S.C. § 701–706............................................................................ ii, 4

5 U.S.C. § 706.....................................................................................4, 5

5 U.S.C. § 706(2)(A) ...........................................................................4, 5

42 U.S.C. § 4321.................................................................................9, 10

42 U.S.C. §§ 4321 *et seq.*..................................................................... ii, 4

42 U.S.C. § 4332.................................................................................10

42 U.S.C. § 4332(2)(C)..........................................................................10

42 U.S.C. § 4332(2)(C)(iii).......................................................................12, 15

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT                                          vii

42 U.S.C. § 4332(2)(C)(v) ...................................................................................16, 18

43 U.S.C. § 1701 *et seq.*.........................................................................................28

43 U.S.C. § 1716(b) ...............................................................................................25, 28


**Omnibus Act**

Mt. Hood Cooper Spur Land Exchange Clarification Act of 2018
    (Pub. L. 115-110, 131 Stat. 2270)................................................................. *passim*

Omnibus Public Land Management Act of 2009 (Pub. L. 111-11, 123 Stat. 1018)
    (together with 2018 Clarification Act, the "Omnibus Act")..................................... *passim*

Omnibus Act, Section 1205(a)(1)(A) ...........................................................................13

Omnibus Act, Section 1206(a)(1)(B)..............................................................................7

Omnibus Act, Section 1206(a)(1)(C)............................................................................23

Omnibus Act, Section 1206(a)(1)(E)(i) .........................................................................23

Omnibus Act, Section 1206(a)(2)(A) .....................................................................7, 15, 21

Omnibus Act, Section 1206(a)(2)(B)............................................................................28

Omnibus Act, Section 1206(a)(2)(D)(ii)................................................................27, 31, 34

Omnibus Act, Section 1206(a)(2)(D)(iii) ......................................................................35

Omnibus Act, Section 1206(a)(2)(D)(iv).......................................................................20

Omnibus Act, Section 1206(a)(2)(E)(i) ........................................................................14

Omnibus Act, Section 1206(a)(2)(G)(i).........................................................................18

Omnibus Act, Section 1206(a)(2)(H)(i).................................................................. *passim*

Omnibus Act, Section 1206(a)(2)(H)(ii).....................................................................25, 26

## Regulations

40 C.F.R. § 1500.2(d) ........................................................................................19

40 C.F.R. § 1501.4(b) ........................................................................................19

40 C.F.R. § 1502.14 ...........................................................................................15

40 C.F.R. § 1502.19 ...........................................................................................20

40 C.F.R. § 1502.2(f) ....................................................................................16, 18

40 C.F.R. § 1502.2(g) ...................................................................................16, 18

40 C.F.R. § 1506.1(a)(2) ...............................................................................16, 18

40 C.F.R. § 1506.6 .............................................................................................19

40 C.F.R. § 1506.6(a) .........................................................................................19

## Other

Fed. R. Civ. P. 56........................................................................................... ii, 4

Local Rule 7-1(a)(2) ........................................................................................ iii

Uniform Standards of Professional Appraisal Practice (USPAP) ........................27, 30, 31, 33, 34

Yellow Book ...................................................................27, 28, 29, 30, 31, 33, 34

Yellow Book, Section 1.5.2.2 ...............................................................................33

Yellow Book, Section 4.4.2.3 ...............................................................................33

**Table of Acronyms**

APA                          Administrative Procedure Act

EIS                          Environmental Impact Statement

FLPMA                        Federal Land Policy and Management Act

FOIA                         Freedom of Information Act

FRCP                         Federal Rules of Civil Procedure

NEPA                         National Environmental Policy Act

ROD                          Record of Decision

## MEMORANDUM IN SUPPORT OF MOTION

### Introduction

In 2009 Congress passed legislation directing the Forest Service to complete the Government Camp/Cooper Spur Land Exchange on Mt. Hood. The legislation, and the land exchange it described, were intended to resolve a decades-long dispute over the future of the north side of Mt. Hood, namely: whether the relatively undeveloped north side should be conserved to protect wildlife habitat and water quality, or instead developed in a way that includes a destination ski resort (along with all the foreseeable ancillary development it would bring to the area). The legislation resolved that dispute in favor of conservation: the north side would be protected from development via a public-private land exchange. Because it would so fully protect the north side of Mt. Hood from undesirable development, the land exchange mandated by Congress was referred to as the "Clean Sweep."

Unfortunately, the Clean Sweep has not been implemented, and without action from this Court it never will be. In the challenged Record of Decision ("ROD") the Forest Service decided to move forward with a land trade with its private partner, Mt. Hood Meadows, but that trade does not implement the Clean Sweep. Going against Congress's instructions, the proposed trade will not protect the north side of Mt. Hood from commercial development.

Plaintiffs, several of whom helped draft and negotiate the Clean Sweep settlement agreement that led to the legislation, brought this action to enforce the legislation and the congressional intent behind it. As explained in this Memorandum, the proposed land exchange is unlawful and should be enjoined. On remand, the Forest Service should adopt a revised land exchange plan that complies with the law and protects the north side of Mt. Hood.

Page 1: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**Standing**

Conservation Plaintiffs have Article III standing. Plaintiff Mike McCarthy has standing as an individual plaintiff. The organizational plaintiffs also have standing, because (i) their members have standing to sue in their own right, (ii) the interests they seek to protect are germane to the organizations' purposes, and (iii) individual members' participation is not necessary for the Court to provide relief. *Friends of the Earth v. Laidlaw,* 528 U.S. 167, 181 (2000). Conservation Plaintiffs have standing because McCarthy and the organizational plaintiffs' members will suffer injury in fact caused by the proposed land exchange, which injury can be redressed by the requested relief. *Id*. at 180–81. *See also, Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1177 (9th Cir. 2000) (*"Desert Citizens"*)("If, by exchange, public lands are lost to those who use and enjoy the land, they are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchanged is properly valued by the agency."); and *W. Land Exch. Project v. U.S. BLM*, 315 F.Supp.2d 1068, 1077 (D. Nev. 2004) ("The recreational or aesthetic enjoyment of federal lands is a legally protected interest whose impairment constitutes an actual, particularized harm sufficient to create an injury in fact for purposes of standing.") (*citing Desert Citizens*).

As shown by the Declarations concurrently filed with this Memorandum, Conservation Plaintiffs and their members recreate in and around (and some own property next to and/or near) the real property implicated by the challenged proposed land exchange. The Declarations set forth ample facts establishing Conservation Plaintiffs' standing to bring this action. *See generally Friends of the Earth,* 528 U.S. at 180–81.

For example, Lisa Billings, a member and officer of Oregon Wild, shares a property line with the federal Government Camp parcel proposed for exchange. Billings Decl. at ¶ 5. She recreates all throughout that parcel, and considers it her "big backyard." *Id.* at ¶¶ 4-7. Russ Pascoe, member and officer of Oregon Kayak and Canoe Club, Mike Sargetakis, member and officer of Friends of Mt. Hood, and Kenneth Wenzel, member and officer of Oregon Nordic Club, similarly recreate throughout that parcel. Pascoe Decl. at ¶¶ 6, 8-9, 12; Sargetakis Decl. at ¶¶ 5, 9; Wenzel Decl. at ¶¶ 4, 6, 7, 9-10. If that parcel is transferred from federal public ownership to private ownership, as called for by the proposed land exchange, then the recreational and aesthetic interests of Ms. Billings, Mr. Pascoe, Mr. Sargetakis, and Mr. Wenzel will be harmed. This satisfies the standing requirement under *Desert Citizens*. 231 F.3d at 1177.

Mike McCarthy, individual plaintiff and member and officer of Thrive Hood River, and Erik Fernandez, member and Wilderness Program Manager for Oregon Wild, regularly and historically enjoy the private parcels of land on the north slope of Mt. Hood currently owned by Mt. Hood Meadow (and formerly owned by Hood River County) and which are implicated by the land exchange. McCarthy Decl. at ¶¶ 15-16, 31; Fernandez Decl. at ¶¶ 4-6, 9. And as a longtime resident and farmer on the north slope of Mt. Hood with orchards in close proximity to the exchange lands, Mr. McCarthy will be particularly negatively affected by this land exchange. McCarthy Decl. at ¶¶ 2, 15, 17-30.

Both McCarthy and Thrive also have contractual interests in ensuring the land exchange conforms to their 2005 Settlement Agreement with Meadows. McCarthy Decl. at ¶¶ 5, 7, 9-10, 14, 19, 32-33; AR-48635 (2005 Settlement Agreement). In addition, both McCarthy and Thrive have significant interests in ensuring that the follow-on federal legislation—which they helped pass—implements that 2005 Agreement as intended. *See id.*; McCarthy Decl. at ¶ 10; AR-47866.

Page 3: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In sum, Conservation Plaintiffs have Article III standing to bring this case.

**Standard of Review under the Administrative Procedure Act ("APA")**

The National Environmental Policy Act ("NEPA"—42 U.S.C. § 4321 *et seq*) and the Omnibus Act do not contain specific judicial review provisions. Consequently, Conservation Plaintiffs' claims regarding violations of NEPA and the Omnibus Act are governed by the Administrative Procedure Act ("APA"—5 U.S.C. §§ 701-706). *See Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 796 (9th Cir. 2013) (where no private action exists, the APA provides an avenue for review). Section 702 of the APA provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

Under section 704 of the APA, "final agency action" is reviewable. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow. *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867-68 (9th Cir. 2022) (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). An EIS is reviewable under the APA once an agency makes the final decision the NEPA review was intended to inform. *See, e.g., Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010) ("Once an EIS's analysis has been solidified in a ROD, an agency has taken final agency action, reviewable under § 706(2)(A).").

In APA cases, courts use summary judgment procedures under FRCP 56 to "determine whether the evidence in the administrative record permitted the agency to make that decision as a matter of law." *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F. Supp. 2d 1199, 1204 (D. Or. 2012). In making that determination, the court "shall review the whole record[.]" 5 U.S.C. §

Page 4: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

706. The "whole record," means "the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Preserve Overton Park*, *Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(2)(A). For an agency decision to withstand APA scrutiny the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (internal quotation marks omitted). An action is arbitrary and capricious if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *State Farm*, 463 U.S. at 43.

An agency's *post hoc* rationalizations for a decision are irrelevant; courts "assess the lawfulness of agency action based on the reasons offered by the agency," if supported by the whole record. *State Farm*, 463 U.S. at 50.

## Background

The story of this case starts with an earlier and related land exchange between Meadows and Hood River County. In 2002, Meadows and the County went forward with a land exchange (the "Original Land Exchange") that resulted in Meadows obtaining parcels of County land on

the north slope of Mt. Hood.[2] AR-48638; AR-47914-17 (explaining history); AR-47869-70 (same). The Original Land Exchange was challenged by the Hood River Valley Residents' Committee, Inc. (now known as Thrive Hood River) and Mike McCarthy—both plaintiffs in this case. *Id.* That challenge was filed in Hood River County Circuit Court, and it resulted in an Oregon Court of Appeals decision. *Hood River Valley Residents' Committee, Inc. v. Board of County Commissioners of Hood River County,* 193 Or App 485 (2004) ("*HRVRC*").

After the Court of Appeals' decision in *HRVRC* (which remanded to the trial court for resolution on the merits), the parties entered into settlement discussions. To that end, the state court case was abated by stipulation for many years while settlement objectives were mutually pursued by the parties. From Plaintiffs' perspective, the goal of settlement was (and is) to protect the north side of Mt. Hood from undesirable development, including a destination resort development long planned by Meadows. *See, e.g.,* AR-47867 (Thrive DEIS comments explaining that the Omnibus Act "is about protecting as much of the North side of Mt. Hood as possible."); AR-47869 ("The purpose of the Act, the settlement agreement between Hood River County, Mt. Hood Meadows and the Hood River Valley Residents Committee is to protect as much forestland on the North side as possible.").

Ultimately, the parties were successful in reaching an agreement, which was known as the "Clean Sweep." AR-48635 (2005 Settlement Agreement); AR-47914-17 (explaining Clean Sweep as part of 2005 Settlement Agreement). After reaching agreement, the parties worked together to successfully lobby Congress to mandate a federal land trade which, if implemented

---

[2]    Some of these same parcels—those that Meadows obtained from the County in 2002—are now proposed to be traded to the Forest Service under the challenged federal land exchange. *Compare* AR-12487 (2002 deed conveying land from Hood River County to Meadows) *with* AR-50373 (lands proposed to be conveyed in federal land exchange).

Page 6: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

along with the other terms of the parties' 2005 Settlement Agreement, would permanently protect the north side of Mt. Hood from being developed by Meadows in ways opposed by Plaintiffs. *See* AR-48646, ¶ 16 (2005 Settlement Agreement provision regarding joint pursuit of legislation from Congress); AR-47866-67 (description of joint efforts).

To that end, in 2009 Congress passed the Omnibus Public Land Management Act, (Public Law 111-11, 123 Stat. 1018), directing, among other things, the completion of a land exchange (i.e. the Clean Sweep) between Mt. Hood Meadows and the Forest Service.[3] The terms of the Omnibus Act require Meadows to part with nearly all of its land holdings on the north side of Mt. Hood, trading those lands for property held by the Forest Service in Government Camp. *See* ECF 4-1 (text of Omnibus Act); *id.* at § 1206(a)(2)(A) (directing land exchange). The map at AR-16585 is the operative "exchange map" referenced by § 1206(a)(1)(B) of the Omnibus Act, and illustrates the lands to be exchanged under the Clean Sweep.[4]

Unfortunately, in May 2022, following secret negotiations with Meadows, the Forest Service adopted a final decision calling for a federal land trade with Meadows that decidedly *would not* implement the Clean Sweep. AR-50369 (Final ROD). The proposed land trade would do much less. As approved, the federal land trade calls for Meadows to retain control of substantial amounts of land on the north side of Mt. Hood, which is contrary to the Clean Sweep and the implementing special congressional legislation. *Compare* AR-50375 (ROD, Table 2

---

[3]     The Omnibus Act was amended in 2018 by the Mt. Hood Cooper Spur Land Exchange Clarification Act (Public Law 115-110, 131 Stat. 2270). In this brief Conservation Plaintiffs refer to the 2009 legislation, as modified by the 2018 legislation, as the "Omnibus Act."

[4]     For the Court's convenience, a copy of the Omnibus Act exchange map (AR-16585) is appended to the end of this memorandum.

Page 7: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

"Parcel information of lands not included in this exchange") *with* AR-16585 (Clean Sweep exchange map called for by Omnibus Act).[5]

This leaves the door open for Meadows to pursue future development akin to those projects opposed by Plaintiffs in the past, such as Meadows' proposed destination resort. AR-47869, 47871-72, 47878, 47882-83, 47906, 47915, 47951-68, 48013-14, 48635, 49465. That is precisely what the Clean Sweep Agreement was intended to prevent. AR-16036 (Settlement Agreement, providing that "This Agreement seeks to permanently protect the north side of Mt. Hood including the Cooper Spur Ski Area, the Dillard Property, the Meadows Exchange Property, portions of the Crystal Springs Watershed, and certain adjacent lands located in the vicinity of the Crystal Springs Watershed from expansion and development in a manner consistent with the vision for this area that [Thrive] shares with the members of the [Cooper Spur Wild and Free] Coalition, while allowing Meadows to obtain other property in Government Camp, in exchange for its interests on the north east side of Mt. Hood."). Meadows' and the Forest Service's agreement to this much more limited federal land trade is effectively a repudiation of the parties' "Clean Sweep" Settlement Agreement and a gross deviation from the long-acknowledged intent and purpose of the congressional legislation.

The federal land trade as currently proposed by Meadows and the Forest Service does not achieve the goal of protecting the north side of Mt. Hood. With the Clean Sweep having been abandoned by Meadows and the Forest Service, Meadows should not be allowed to keep large reserves of developable land on the north side of Mt. Hood *and* to receive—for a bargain-

---

[5]     To aid understanding of the differences between the land exchange called for by the Omnibus Act and the challenged proposed exchange, two demonstrative exhibits are attached to the end of this memorandum, as follows: (1) a map of the Clean Sweep (which is materially identical to the Omnibus Act exchange map at AR-16585); and (2) a map of the Adopted Federal Land Trade under the challenged decision.

Page 8: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

basement price—additional developable properties adjacent to Government Camp from the Forest Service. In short, Meadows should not be allowed to have its cake and eat it, too, **at the public's expense**.

## Argument

Congress called for a land exchange between the U.S. Forest Service and Mt. Hood Meadows, but not **this** land exchange. As proposed, the land exchange violates NEPA, the APA, and the special legislation calling for a *different* land exchange (i.e. the Omnibus Act). Additionally, the required real property appraisals relied on by the Forest Service are flawed and outdated, and must be redone. The Court should therefore vacate the Forest Service's decision and remand to the agency.

## I.        Violations of NEPA

Congress enacted the NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment. According to 42 U.S.C. § 4321, NEPA seeks to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." The regulations implementing NEPA[6] make it clear that NEPA obligates agencies to make available to the public high-quality information, including accurate expert analyses, expert agency comments, and public comments, before decisions are made and before

---

[6]        The NEPA regulations are promulgated by the Council on Environmental Quality (CEQ) and are binding on the Forest Service. In September 2020 the CEQ amended the NEPA regulations, but the Service conducted its NEPA analysis under the prior version of the NEPA regulations because of when the NEPA process for the challenged decision began. AR-45829 (EIS, so stating). Because the Forest Service applied the earlier regulations, this Court should, too. *Bair v. California Dep't of Transp.*, 982 F.3d 569, 582 n.20 (9th Cir. 2020) ("Because [the agency] applied the previous [NEPA] regulations to the Project, so do we.").

actions are taken. "NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public" so the public can review, comment on, and challenge (if necessary) the agency's action. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011); *see* 42 U.S.C. §§ 4321, 4332; *Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission*, 449 F.2d 1109, 1112 (D.C. Cir. 1971).

Under 42 U.S.C. § 4332(2)(C), NEPA requires all federal agencies to prepare a "detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." This statement is known as an Environmental Impact Statement (EIS). An EIS must adequately: (1) describe the agency's need for the proposed action; (2) include an analysis of the environmental impacts of the proposed action and its alternatives; and (3) consider the direct, indirect, and cumulative impacts resulting from all past, present, and reasonably foreseeable future actions. 42 U.S.C. §4332(2)(C). In other words, before taking a major action, an agency must take a "hard look" at why action is needed, its reasonable alternatives, and the environmental consequences. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (NEPA requires agencies to take "a 'hard look' at environmental consequences."); *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) ("Informed and meaningful consideration of alternatives [] is thus an integral part of the statutory scheme.") (citations omitted).

NEPA itself "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley*, 490 U.S. 332, 350 (1989). The guiding principle for judicial review "inherent in NEPA … is a 'rule of reason.'" *Seven County Infrastructure Coalition v. Eagle County*, 145 S.Ct. 1497, 1513 (2025) (citations omitted). In reviewing for

Page 10: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

NEPA compliance, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.*

As shown below, the Forest Service's EIS fails this "reasonableness" test on numerous grounds. First, the Service's NEPA "purpose and need statement" is flawed because it does not accurately reflect the imperatives of the Omnibus Act. Second, the selected alternative does not even satisfy the Service's flawed purpose and need statement, belying a flawed alternatives analysis. Third, the Service failed to consider reasonable alternatives—as it was required to do under NEPA—that would fully satisfy the Omnibus Act. And fourth, the Service failed to make the required appraisals available to the public by publishing them as an appendix to the EIS, as it was required to do.

**A. The EIS's purpose and need statement does not accurately reflect the imperatives of the Omnibus Act (Claim 1, Count 1)**

As an overarching requirement, EISs must define an underlying and correct "purpose and need" for the project. The EIS's statement of purpose and need is vitally important because it dictates the scope of the agency's review and the range of reasonable alternatives it must consider. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "[A]n agency cannot define its objectives in unreasonably narrow terms." *Id.*

The reasonableness of a purpose and need statement is assessed by considering the "statutory context of the federal action." *League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060, 1069-70 (9th Cir. 2012). In this case, the statutory context is the Omnibus Act, which specifically governs the proposed land exchange. The purpose and need statement must, therefore, be entirely guided by the provisions of the Omnibus Act.

Page 11: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Service's EIS fails to meet that standard because the purpose and need statement defines its objectives in a way that does not accurately reflect the imperatives of the Omnibus Act, rendering the purpose and need statement unreasonable and unlawful for purposes of NEPA. As a result of this unreasonable purpose and need statement the EIS proceeded to consider an unreasonable set of alternatives. That is, because it applied an incorrect view of the Omnibus Act, the agency failed to meet its duty to analyze "a reasonable range of alternatives." 42 U.S.C. §4332(2)(C)(iii). Overall, this legally incorrect view of the "purpose and need" and alternatives fatally undermines the EIS. "No amount of alternatives or depth of discussion could 'foster[ ] informed decision-making and informed public participation' when the Forest Service bases its choice of alternatives on an erroneous view of the law. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)." *Ctr. For Biological Diversity v. U.S. FWS*, 409 F.Supp.3d 738, 766 (D. Ariz. 2019). Therefore, both the unreasonable purpose and need statement and the resulting unreasonable set of alternatives violate NEPA. *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070-72 (9th Cir. 2010) (because a "project's purpose will necessarily affect the range of alternatives considered," agency statements of purpose are evaluated under a "reasonableness standard" to see if they "allow consideration of a reasonable range of alternatives.").

As explained by the court in *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997), under NEPA, "the first thing an agency must define is the project's purpose." Here, the EIS says "[t]he overall purpose of this project is to comply with the congressional direction and conditions in the Omnibus Act and Clarification Act." AR-45847. So far, so good.

Page 12: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

However, the trouble begins when the EIS then identifies an erroneous project "need" that is inconsistent with the Omnibus Act. That expressed project "need" defines the land exchange in a way that does not ensure the full implementation of the Omnibus Act (specifically, section 1205(a)(1)(A)), and therefore that "need" is unreasonable under NEPA. Further, one "need" that is critical to compliance with the Omnibus Act—and therefore should have been included in the EIS's purpose and need statement—is not identified at all.

The Service identifies a "need" to designate "*up to* 2,854 acres" as the Crystal Springs Watershed Special Resources Management Unit. AR-45847 (emphasis added). That expressed "need"—which frames, guides, and constrains the rest of the EIS—does not accurately represent the requirements of the Omnibus Act. Section 1205(a)(1)(A) of that Act contemplates that **all** of the land "as generally depicted on the map entitled 'Crystal Springs Watershed Special Resources Management Unit', dated June 2006" be designated as such. AR-16584 (June 2006 Crystal Springs map, showing all non-federal parcels as designated as part of the management unit). But the EIS's erroneous "need" incorrectly identifies the Crystal Springs unit as only including "a *portion* of the offered non-Federal lands totaling *up to* 2,854 acres." AR-45847 (emphasis added).[7] In other words, the EIS improperly re-defines the geographic scope of the Crystal Springs Watershed Special Resources Management Unit called for by the Omnibus Act,

---

[7] The EIS's "need" language contrasts markedly with the Service's Draft EIS, which described this project need in terms that *maximize* the designation of land for the Crystal Springs Watershed Special Resources Management Unit: "[U]pon completion of the exchange, the Crystal Springs [unit] would be created, which encompasses existing NFS lands *as well as the acquired lands totaling approximately 2,859 acres*." AR-39414 (emphasis added). For unknown reasons, the Forest Service abandoned that correct draft language for incorrect final language in the EIS. As will be seen, that decision led to a failure to consider a reasonable range of alternatives, and the ultimate selection of an alternative that only designates 2,701 acres as the Crystal Springs Watershed Special Resources Management Unit. AR-50375 (ROD).

effectively giving the Forest Service a level of discretion to shrink that management unit that the Omnibus Act does not contemplate.[8]

More glaringly, the EIS's purpose and need statement unreasonably omits a critical "need." Section 1206(a)(2)(E)(i) of the Omnibus Act expressly places emphasis on the "need" to equalize appraised values of the exchanged properties. That language reads: "[I]n addition to or in lieu of monetary compensation, a lesser area of Federal land or non-Federal land may be conveyed if necessary to equalize appraised values of the exchange properties[.]" *Id.* Given the clarity of the Omnibus Act on this point, the Forest Service should have included in the EIS a "need" to consider if it is "necessary" to convey a lesser area of federal land or non-federal land in order to equalize values. For example, the need could have read as follows: "There is a need to determine if it is necessary to equalize appraised values of the exchange properties by conveying a lesser area of land in the exchange." But instead the EIS completely fails to recognize this limitation of the Omnibus Act. That failure is reflected both in the alternatives considered by the Forest Service and the alternative ultimately selected in the ROD. The failure to identify a project "need" associated with Section 1206(a)(2)(E)(i) of the Omnibus Act renders the EIS's purpose and need statement unreasonable under NEPA because it does not properly reflect the statutory context.

---

[8]    As previously noted, the Omnibus Act was precipitated by the 2005 Settlement Agreement (AR-16033) between multiple parties—including Thrive, McCarthy, and Meadows—involved in a long-running dispute over various properties and actions on the north side of Mt. Hood. Like the Omnibus Act itself, that Agreement calls for the transfer of *all* of the lands, not just *a portion* of the lands. *See, e.g., id.* ("This Agreement envisions the permanent protection of the north side of Mt. Hood as part of a compromise and exchange, whereby Meadows acquires land that is zoned for development in Government Camp."); AR-16035-36 (provisions of Agreement defining the properties to be exchanged under the Clean Sweep).

Page 14: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**B. The chosen alternative does not fulfill the stated purpose of the project, so other alternatives—that do fulfill that purpose—should have been considered (Claim 1, Count 2)**

According to the EIS, "[t]he overall purpose of this project is to comply with the congressional direction and conditions in the Omnibus Act[.]" AR-45847. Plaintiffs agree. The selected alternative, however, does not meet that purpose.

The Omnibus Act requires the exchange of as much of the federal and non-federal land as possible while equalizing values. *See id.,* § 1206(a)(2)(A) ("Conveyance of Land"); *id.*, § 1206(a)(2)(H)(i) ("[I]n addition to or in lieu of monetary compensation, a lesser area of Federal land or non-Federal land may be conveyed *if necessary* to equalize appraised values of the exchange properties.") (emphasis added). However, the selected alternative does not maximize the land exchanged. *See* AR- 50375 (Table 2, federal and non-federal lands excluded from exchange).

While NEPA does not require that agencies make any particular decision, it does require them to at least seriously consider reasonable alternatives that fulfill a project's purpose and needs. 42 U.S.C. § 4332(2)(c)(iii). As explained in the following section, the Service failed to consider alternatives that would have equalized values while also maximizing the land exchanged. That failure to consider in detail alternatives that would have fulfilled the project's purpose—that is, implementing the Omnibus Act—violated NEPA.

**C. The EIS fails to consider an adequate range of alternatives, in violation of NEPA (Claim 1, Count 3)**

The NEPA alternatives analysis, in which an agency evaluates all "reasonable" alternatives and explains why alternatives eliminated from detailed study were not considered, is the heart of an EIS. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14; *see also Bob Marshall*

*Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) (alternatives analysis is "an integral part of the statutory scheme."). Additionally, until the NEPA process is complete and a decision is made, agencies may not take any action that would limit the range of available reasonable alternatives. 40 C.F.R. § 1506.1(a)(2); 40 C.F.R. § 1502.2(f); *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (NEPA documentation "must be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made."). EISs, in other words, must be aids to prospective decision-making, not justifications for existing decisions. *See* 42 U.S.C. § 4332(2)(C)(v) (EIS involves consideration of potential future actions); 40 C.F.R. § 1502.2(g) (EISs "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."); *Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d 848, 852 (9th Cir. 1979) ("[T]he [NEPA] assessment should occur at an early stage when alternative courses of action are still possible") (quoting *Port of Astoria, Or. v. Hodel*, 595 F.2d 467 (9th Cir. 1979)); *see also Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1054 (9th Cir. 2007), *aff'd en banc*, 535 F.3d 1058 (9th Cir. 2008) (adopting the opinion of the original three-judge panel regarding consideration of a reasonable range of alternatives).

The EIS violates NEPA because it does not analyze reasonable alternatives and—in part—serves only to justify a decision already made. During public comment, Plaintiffs emphasized the importance of considering a range of alternatives for equalizing value while maximizing the amount of land exchanged. AR-47870; *see also* AR-47766 (objections). To that end Plaintiffs offered some illustrative examples of possible alternatives for consideration if Meadows' land and business holdings on the north side were worth more than the public land in Government Camp:

1. Mt. Hood Meadows continues to operate the Cooper Spur Ski Area in a newly-configured permit size of approximately 50 acres on the same (or new) terms;
2. Mt. Hood Meadows continues to own the Inn at Cooper Spur property (Tract 5) totaling 2.84 acres, with some provision for water from existing sources;
3. A donation by Mt. Hood Meadows; and
4. The retention of a possible piece of land adjacent to the Inn at Cooper Spur which consists of forestland surrounding the 2.84-acre parcel (portion of Tract 7) and/or timber harvest on a portion of forestland of Tracts 1, 2, 3 and/or 8 on areas outside of steep slopes, riparian areas, the drinking watershed zone of contribution.

AR-47870. Other alternatives were also suggested by Platintiffs and other commenters. *See, e.g.,* AR-47869-73. However, the Forest Service dismissed or ignored them all in the EIS.

While the Forest Service was not required to consider every possible alternative, the critical point is that the EIS *completely fails* to disclose and analyze in detail the various ways in which the appraised values of the exchange properties *could be equalized*. That is a major failure in light of section 1206(a)(2)(H)(i) of the Omnibus Act, which allows for a lesser area of land to be exchanged "if necessary" to equalize the appraised values, in addition to or in lieu of monetary compensation. Despite that requirement, the EIS does not confront, let alone explain in any meaningful way, how the selected alternative (or any other) is "necessary" to equalize appraised values of the exchange properties.

An adequate alternatives analysis would consider a reasonable range of different methods to equalize values. Instead—unbelievably—the EIS *does not discuss the results of the appraisals at all*. Nowhere in the EIS are the appraised values of the exchange parcels disclosed, let alone discussed or analyzed in any way. To the contrary, the EIS baldly states, without giving any parcel valuation information, that "The final mix of the Federal parcels and non-Federal parcels to be exchanged (including personal property and improvements to be exchanged, and respective appraised values) will be determined in the final Record of Decision." AR-45857.

It is only in the ROD that the appraised values are disclosed. AR-50373, 50375. But like the EIS, the ROD does not contain, let alone analyze, alternatives involving the exchange of additional or different combinations of parcels that would be consistent with the Omnibus Act. That is, there is still no analysis or consideration of alternatives. Instead, the ROD simply states that the East Parcel of federal land, along with Tracts 4, 5, 6, and 7 of the non-federal land, will not be conveyed. AR-50375.

There are no findings of "necessity" under section 1206(a)(2)(H)(i) of the Act, even though such a finding is required if a lesser area of land is to be exchanged. And even if there had been a finding of "necessity" in the ROD, it would be meaningless without serious consideration in the EIS of alternatives that maximize the exchange of land (for example, by conveying all federal Government Camp parcels and increasing the number of north side lots conveyed by Meadows). For that reason, the alternatives analysis fails to consider a reasonable range of alternatives, is fundamentally flawed, and the EIS violates NEPA.

Further, the EIS shows that the Forest Service made a pre-NEPA decision, which—as discussed above—is not permissible. 42 U.S.C. § 4332(2)(C)(v); *see* 40 C.F.R. § 1502.2(g); 40 C.F.R. § 1506.1(a)(2); 40 C.F.R. § 1502.2(f); *Metcalf v. Daley*, 214 F.3d at 1142; *Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d at 852. The Omnibus Act, at section 1206(a)(2)(G)(i), states that "the Secretary and Mt. Hood Meadows may mutually agree for the Secretary to reserve a conservation easement to protect the identified wetland in accordance with applicable law." However, in the EIS the Forest Service admits that, *prior to completing its NEPA requirements*, the agency decided "not to have the wetland conservation easement reserved." AR-45827; *see also* AR-45870. Instead of making a pre-NEPA decision regarding the

Page 18: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

conservation easement, the Forest Service should have considered the easement, or lack of it, as part of the alternatives analysis. Its failure to do so violated NEPA.

**D.  The appraisals were unlawfully excluded from the EIS, in violation of NEPA (Claim 1, Count 4)**

Meaningful public participation is integral to an agency's lawful implementation of NEPA. Indeed, involving the public in the decision-making process is one of the statute's central purposes. *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.,* 113 F.3d 1505, 1511 (9th Cir. 1997) ("One of the twin aims of NEPA is active public involvement and access to information.") (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 349); 40 C.F.R. §§ 1500.2(d) & 1506.6. This statutory requirement is reflected in the NEPA regulations, which expressly dictate that federal agencies "shall to the fullest extent possible … [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment[,]" which includes making "diligent efforts" and seeking public input "to the extent practicable" when developing projects. 40 C.F.R. §§ 1500.2(d), 1501.4(b), & 1506.6(a); *WildWest Inst. v. Bull*, 547 F.3d 1162, 1170 (9th Cir. 2008).

Here, in failing to provide the critical appraisal reports to the public with the EIS, the Forest Service did not fulfill its responsibility to ensure meaningful public involvement, which is a violation of NEPA. The law requires that, if an agency prepares an appendix to an EIS, the agency "shall publish it with the environmental impact statement, and it shall consist of:"

(a) Material prepared in connection with the EIS;

(b) Material substantiating any analysis fundamental to the impact statement;

(c) Material relevant to the decision to be made; and

(d) For FEISs, the public comment summaries and responses.

Page 19: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

40 C.F.R. § 1502.19; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. at 349 (NEPA statute "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.").

Here, the Forest Service did prepare an appendix. AR-46234-94. However, it does not include the appraisals prepared for the exchange parcels. Instead, the Forest Service expressly required the public to submit a Freedom of Information Act (FOIA) request in order to obtain those appraisals. AR-45857.

The appraisals are clearly "material prepared in connection with the EIS," "material substantiating any analysis fundamental to the [EIS]," and "material relevant to the decision." The appraisals control the values of the exchange parcels for purposes of this project. The Omnibus Act expressly requires the land exchange to be for equal value. Accordingly, the appraisals should have been included in the Appendix. *See also,* Omnibus Act at § 1206(a)(2)(D)(iv) (requiring the Forest Service "to make available for public review the complete appraisals of the land to be exchanged."). The Forest Service's failure to include those appraisals in the Appendix was, plainly, a violation of the NEPA statute and implementing regulations that impaired the substantial rights of the public to comment on the appraisals as key components of the EIS.[9]

---

[9]     Indeed, because the Forest Service did not provide the appraisals to the public, to obtain them Plaintiffs submitted FOIA requests to the agency. *See* AR-44637, 49526. However, complete, unredacted appraisals were not provided in time for public comment under NEPA and the formal objection period because, according to the Forest Service, it had a "backlog of pending FOIA requests." AR-49529. As a result, the NEPA public involvement process was undermined by the unavailability of the complete, unredacted appraisals, and the public went without key pieces of information regarding the land exchange.

## II.    Violations of the Omnibus Act

The Omnibus Act specifically directs the completion of the Cooper Spur/Government Camp land exchange. Thus, its requirements are necessarily unique.[10] As explained in this section, the chosen alternative under the ROD does not comply with those unique requirements. The ROD is, therefore, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA.

### A.  The ROD improperly reduces the number of federal and non-federal acres subject to the land exchange, in violation of the Omnibus Act (Claim 2, Count 1)

The Forest Service's ultimate decision—to trade substantially fewer acres of land than contemplated by the Omnibus Act—is a dramatic shift from the way the trade was framed during project development. The Draft EIS, for example, affirmed the Omnibus Act's intent to maximize the land trade acreages when it described the project's purpose to convey "approximately 109 acres" of public land for "approximately 769 acres" of private land. AR-39398. Yet, for some reason, the Forest Service changed its mind and in the Final EIS describes the land trade as involving "*up to* 107 acres" of public land for "*up to* 764 acres" of private land, suggesting that the Forest Service has discretion in deciding how much land to trade. AR-45826 (emphasis added); *see also* AR-50373 (ROD; same). But the Forest Service does not have such broad discretion under the applicable statute.

---

[10]    The requirements of the Omnibus Act were triggered when Meadows "offer[ed]" to convey to the United States all right, title, and interest in and to the non-federal land. *Id.* at § 1206(a)(2)(A). According to the EIS, that "offer" trigger occurred. *See, e.g.,* AR-45874-77. ("Lands and Infrastructure and Personal Property Offered to be Acquired"); AR-45874 ("[T]he actual acreage of the offered non-Federal lands is approximately 764"; AR-45875 ("The items listed are owned by Meadows North LLC and offered in this exchange"); *id.* ("Equipment and personal property located at this resort is also offered in this exchange along with the buildings and improvements").

Section 1206(a)(2)(H)(i) of the Omnibus Act allows a "lessor area of Federal land *or* non-Federal land" to be conveyed in the exchange—but only "*if necessary to equalize appraised values of the exchange properties*, without limitation." (Emphasis added). The Service's decision is inconsistent with that language, because it purports to reduce the amount of both federal *and* non-federal land exchanged, instead of just one or the other. AR-50375 (ROD, Table 2, lands not included in proposed exchange).

Further, the EIS and ROD contain no findings regarding the supposed "necessity" of those land area reductions to equalize values. In reality, there is no actual need to reduce the exchange acreages at all. The Omnibus Act requires that either all 107 acres of federal land or all 764 acres of non-federal land, or both, to be traded in this exchange. And if either acreage amount is reduced to a "lesser area" under subsection (a)(2)(H)(i), then findings and an explanation regarding the "necessity" of that reduction are required by the Act. The lack of such analysis requires vacatur by the Court and remand for further agency action.

i. **The Forest Service cannot reduce both the acreage of federal land subject to the exchange and reduce the acreage of non-federal land subject to the exchange. It must pick one or the other.**

As the plain language of section 1206(a)(2)(H)(i) makes clear, an acreage reduction in this land exchange must be applied, if at all, to *either* the federal property acreage "or" the non-federal property acreage, but not both. Congress used the singular when it said "*a* lessor area" of land may be conveyed if necessary to equalize values, not the plural "lesser *areas*" of land may be conveyed if necessary to equalize values. *Id.* Congress also used the word "or" instead of "and." If Congress had intended to allow simultaneous reductions in *both* the federal and non-federal acreages, it could and would have done so. Congress did not, however, do so. *See United States v. Korotkiy,* 118 F.4th 1202, 1216 (9th Cir. 2024) ("We ordinarily resist reading words or

elements into a statute that do not appear on its face.") (*citing Dean v. United States*, 556 U.S. 568 (2009)). Therefore, the Forest Service's decision to reduce **both** the federal and non-federal acreage subject to the exchange is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

The "without limitation" language in section 1206(a)(2)(H)(i) does not alter this conclusion. Those words modify the phrase "if necessary to equalize appraised values of the exchange properties" such that the Forest Service is not limited in the *amount* of acreage that it can exclude from the land exchange in order to achieve an equalization of values (either federal *or* non-federal—but as noted, not both). Reading the words "without limitation" such that they would allow the Forest Service discretion to reduce *both* federal and non-federal acreages ignores the Act's use of the word "or" and the use of the singular-tense, as well as the fact that the entire point of the land exchange is to maximize the amount of land exchanged while equalizing values. Allowing reductions in both federal and non-federal acreages would undermine that purpose.

> **ii. The EIS and ROD contain no findings regarding the supposed "need" to reduce the exchange acreages to equalize the exchange values.**

Section 1206(a)(2)(H)(i) allows a reduction in exchange acreage only "if *necessary* to equalize appraised values of the exchange properties." (Emphasis added). The necessity requirement serves the purpose of the Omnibus Act, which is to ensure the exchange of "approximately 770 acres of private land" for "approximately 107 acres of National Forest System land." *Id.*, § 1206(a)(1)(C) & (E)(i). If there was no "need" requirement, then the Forest Service would have wide latitude to trade substantially fewer acres and the purpose of the Omnibus Act would be frustrated.

Page 23: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The necessity requirement thus maximizes the acreage that is exchanged, while allowing enough flexibility in the acreage to equalize the values. However, the Forest Service has failed to demonstrate or make any findings showing that there is any "need" to reduce the federal or non-federal acreages subject to the exchange in order to equalize values.

Simply put, there is nothing in the EIS or the ROD that explains how the reductions in acreages are "necessary to equalize values" in the exchange. Instead, the Forest Service simply states that the government and Meadows agree that those reductions are necessary: "My decision also honors our cooperative engagement with Mt. Hood Meadows and reflects the agreement between the Forest Service and Mt. Hood Meadows regarding an appropriate area of lands to be exchanged as necessary to equalize values." AR-50376.

It is unsurprising that Meadows agrees with the Forest Service on this point. However, the existence of such an agreement does not constitute an analysis of necessity, nor is the existence of such an agreement an adequate explanation by the Forest Service of supposed "necessity" to equalize value. Nothing in the Omnibus Act allows the reduction of exchange acreage simply due to a proverbial "back room" agreement between the Forest Service and Mt. Hood Meadows.[11] Instead, the Act requires a showing of actual *necessity*, which the Forest Service has not even attempted to undertake in either the EIS or the ROD.

---

[11]    Moreover, if such an "agreement" with Meadows was made, it would violate NEPA's prohibition against making a decision before the NEPA process is completed. And if such an agreement contained the missing—but statutorily requisite—"necessity" findings and analysis under Section 1206(a)(2)(H)(i) of the Omnibus Act, that analysis belongs in the EIS, not in a pre-NEPA private agreement.

Page 24: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### iii. There is no need to reduce the exchange acreages to equalize the exchange values.

The ROD reflects the Forest Service's decision *not* to exchange the East Parcel of federal land and Tracts 4, 5, 6, and 7 of the non-federal land. AR-50375 (Table 2, lands not included in proposed exchange). According to the ROD, the East Parcel is appraised at $1,899,200, Tracts 4 & 6 are together appraised at $2,003,923, Tract 5 is appraised at $1,996,961 (plus personal property valued at $395,439—AR-48980 (Maloy Appraisal)), and Tract 7 is appraised at $610,877. *Id.* The parcels that are proposed to be exchanged are appraised as follows: West Parcel and South Loop Road Parcel (federal - $3,759,300); Tract 1 (non-federal - $429,000); Tracts 2 & 3 (non-federal - $2,673,000); and Tract 8 (non-federal - $198,000), plus personal property ($410,240) and fixtures ($388,000) at the Cooper Spur Ski Area. AR-50373 (ROD, Table 1); AR-48980 (Maloy appraisal executive summary). This adds up to a total of $5,658,500 in appraised value for the federal land, and $9,105,440 in appraised value for the non-federal land and personal property. If those values are accepted, the value of the non-federal property exceeds the value of the federal property by $3,446,940. *See* AR-49523-25 (summary and comparison of appraisal valuations).

According to the Omnibus Act, "[i]f, after payment of compensation or adjustment of land area subject to the exchange under this Act, the amount by which the appraised value of the land and other property conveyed by Mt. Hood Meadows" exceeds the appraised value of the federal land to be conveyed, then that additional value "shall be considered a donation by Mt. Hood Meadows to the United States." § 1206(a)(2)(H)(ii). The Forest Service is permitted to pay a cash equalization payment to Meadows of up to 25% of the value of the federal lands exchanged. AR-45857; 43 U.S.C. § 1716(b). That amounts to $1,414,625 in a cash equalization payment (0.25 x $5,658,500) which, if applied in full, leaves a remaining surplus value of non-

Page 25: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

federal lands/property of $2,032,315 ($3,446,940 - $1,414,625). Under § 1206(a)(2)(H)(ii) of the Omnibus Act, that surplus "shall" be considered a donation by Mt. Hood Meadows to the United States. There is, therefore, no actual "need" under § 1206(a)(2)(H)(i) to convey a lesser area of land under the exchange, and doing so is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

### iv. Even if there is an actual "need" to reduce the exchange acreages to equalize the exchange values, the proposed reductions are too large.

The Forest Service's decision proposes to eliminate the East Parcel (federal) and Tracts 4, 5, 6, and 7 (non-federal) from the land exchange. However, even assuming for the sake of argument that it is statutorily "necessary" to exchange a lesser area in order to equalize appraised values under § 1206(a)(2)(H)(i), the Forest Service's proposed reductions go much further than necessary. That is a violation of the Omnibus Act.

As already outlined, the total appraised value of the federal land is $5,658,500, and the total appraised value of the non-federal land/property is $9,105,440. That is a difference of $3,446,940. It is a simple matter to equalize those values without eliminating all of the East Parcel and Tracts 4, 5, 6, and 7 from the land exchange. For example, because Tract 5 is appraised at $2,392,400 ($1,996,961 land value plus $395,439 in personal property), eliminating *solely* Tract 5 from the land exchange would bring the difference in appraised values between the federal and non-federal lands to only $1,054,540 in favor of Meadows. *See* AR-48658 (Plaintiffs' proposed Alternative A). That amount could be donated by Meadows, equalized via cash payment from the Forest Service, or a combination of both.

Similar possibilities exist for eliminating solely Tracts 2 & 3 or Tracts 4 & 6. *See id.* (Plaintiffs' proposed Alternatives B and C, respectively).[12] Compared with the Forest Service's decision, all of these possibilities would reduce the amount of land "necessary" to equalize the exchange under section 1206(a)(2)(H)(i) of the Omnibus Act. The Forest Service's choice, as reflected in the ROD—which entirely ignored these options—was arbitrary and capricious.

### B.  The flawed appraisals resulted in an unequal exchange and must be corrected and updated (Claim 2, Counts 3 and 4)

The Omnibus Act requires that the appraisals relied upon by the Forest Service in determining the values of the federal and non-federal property involved in the land exchange shall be conducted in accordance with "nationally recognized appraisal standards," including the Uniform Appraisal Standards for Federal Land Acquisitions ("the Yellow Book"—AR-48018) and the Uniform Standards of Professional Appraisal Practice ("USPAP"—AR-48280). Omnibus Act, § 1206(a)(2)(D)(ii). However, the appraisals relied on by the Forest Service in the ROD do not comply with generally accepted appraisal standards, the Yellow Book, or the USPAP. Thus, the proposed land exchange is noncompliant with the Omnibus Act. As a result, the Forest Service's decision as reflected in the ROD is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

*Desert Citizens* is particularly instructive on this point. 231 F.3d 1172. There the plaintiff challenged a federal land exchange, alleging that the BLM relied on an outdated appraisal that

---

[12]     The purpose of these examples is to show that parcel and value combinations exist that better comport with the purpose of the Omnibus Act, but which were not considered by the Forest Service. There are more possible combinations that satisfy the Omnibus Act, but Plaintiffs do not endeavor to list all possible combinations.

Page 27: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

undervalued the federal lands. *Id.* at 1174.[13] After finding that the plaintiff had standing, *id.* at 1176-80, the court turned to the adequacy of the appraisal, applying rationale basis review. *Id.* at 1180 ("This standard necessitates a judicial examination of the disputed decision's rationale and surrounding circumstances in order to carry out the 'demand that courts ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.')(*citing Marsh v. ONRC*, 490 U.S. 360, 378 (1989)).

Applying "nationally recognized appraisal standards," including the Yellow Book/Uniform Appraisal Standards (UAS), the Court explained the requirements for appraisals as follows:

> "The appraisal must determine the 'market value' of the affected lands, based on the 'highest and best use' of the appraised property, and estimate the market value 'as if in private ownership and available for sale on the open market.' The report documenting the appraisal must set forth supporting information, including a description of 'all relevant physical, legal and economic factors' bearing on the comparable sales used. […]

> "Before it can be concluded that any use for the property is its highest and best use, the UAS requires that the use must be 'physically possible, legally permissible, financially feasible' and 'result in the highest value.' 'Each of these four criteria must be addressed in the appraisal report.

> "While uses that are merely speculative or conjectural need not be considered, uses that are 'reasonably probable' must be analyzed as a necessary part of the highest and best use determination. This analysis must 'have due regard for the existing business or wants of the community, or such needs as may be reasonably expected to develop in the near future.' […]

> "The appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process."

---

[13]     The challenge in *Desert Citizens* was based on Section 206(b) of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, which requires that the lands involved in a federal exchange be of equal market value or that the exchange be made equal through cash payment. *Desert Citizens*, 231 F.3d at 1174; 43 U.S.C. § 1716(b). The Omnibus Act expressly requires compliance with FLPMA § 206. Omnibus Act, § 1206(a)(2)(B).

*Desert Citizens*, 231 F.3d at 1181-82 (internal citations omitted); *see also Olson v. United States*, 292 U.S. 246, 257 (1934)("The determination [of highest and best use] is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof.").

Applying those standards, the Ninth Circuit found that the BLM had unreasonably relied on the challenged appraisal because it failed to consider the "reasonably probable" future use of the exchanged land as a landfill, and other potential uses impacting the land's value. *Desert Citizens*, 231 F.3d. at 1181 ("The appraisal report failed to consider the market demand for this potential future [landfill] use, or for any other reasonably probable uses for which the land may have been adapted."). The Court also faulted the BLM's appraisal for failing to "consider the probability of a zoning change" to allow future landfill use, "as required by the [Yellow Book]." *Id.* at 1184; *see also id.* at 1186 ("As noted earlier, the [Yellow Book] requires reasonably probable zoning changes to be taken into account."). Because the BLM "fail[ed] to value properly the land being acquired," and because the appraisal's shelf-life had expired, the Court set aside the land exchange. *Id.* at 1185-88; *see also id.* at 1188 ("The government must not wear blinders when it participates in a real estate transaction, particularly if the result, as here, is the transfer of a flagrantly undervalued parcel of federal land to a private party.").

Here, too, the agency misapplied nationally recognized appraisal standards to "flagrantly undervalue" federal land. *Id.* at 1188. But the Forest Service's error here is worse than the BLM's in *Desert Citizens*, because the Service also *overvalued* the non-federal land involved in the exchange. These valuation errors matter. As noted, the Omnibus Act has the same equal-value requirement as FLPMA, and flawed appraisals are an insurmountable barrier to satisfying that requirement.

Page 29: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Here, the Forest Service utilized Maloy & Company, Inc. from Birmingham, Alabama, to prepare appraisals of the federal and non-federal property. Appraisals were obtained from that company in both 2017 and 2019. AR-41565-42448 (2017 reports); AR-43755-44636 (2019 reports); AR-45857 (EIS). Plaintiffs obtained reviews of those appraisals from a highly respected local appraiser, Donald R. Palmer, MAI, of Appraisal & Consulting Group, LLC. Mr. Palmer's reviews and conclusions are set forth at AR-47789-47865. As explained there and in this section, "Mr. Maloy has not followed the acceptable guidelines [under the Yellow Book and USPAP]," and therefore "his [appraisal] is not credible" and is "not supported." AR-47844.

**i.    The Government Camp appraisals (federal property).**

Mr. Palmer reviewed both the 2017 and 2019 Maloy appraisals of the Government Camp property. AR-47789 (review of 2017 appraisal); AR-47804 (review of 2019 appraisal). In his review of the 2017 appraisal, among other things Mr. Palmer concludes that the sales comparables used by Mr. Maloy were "not credible and therefore the valuation conclusion is not credible." AR-47799.

The errors of the 2017 appraisal were not corrected in the 2019 Government Camp appraisal. While Mr. Maloy chose new comparable sales for the 2019 appraisal, he did not follow generally accepted appraisal methodologies (including the Yellow Book methodology and USPAP) in analyzing those comps. *See* AR-47806-09. The result was that Mr. Maloy under-valued the Government Camp properties by at least $2.6 million. *Compare* AR-47809 (Palmer review) *with* AR-44251 (Maloy appraisal) *and* AR-50373, 50375 (ROD, appraisal values).

In his review of the 2019 Government Camp appraisal, AR-49471, Mr. Palmer finds that Mr. Maloy did not include confirmation sources for the comparable sales he used. AR-49473-76. Rather, it appears Mr. Maloy relied on the deeds to confirm the sales prices. *Id.* This procedure is

Page 30: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

not an acceptable appraisal practice and violates the Yellow Book, which requires sales to be confirmed with parties of the transaction. *Id.* In failing to confirm the comparable sales with the buyer, seller, broker or other person having knowledge of the price, terms, and conditions of sale Mr. Maloy made multiple errors such as not adjusting for sales that were negotiated 1.5 to 2 years prior to closing. AR-49476.

Further, in analyzing the four comparables it selected the Maloy appraisal seriously errs by using gross acreage instead of net acreage. AR-49473. This is important, as potential buyers analyze a site based on the net acres that can be developed. *Id.* But the Maloy appraisal erroneously states that the sales comparables were fully developable and, unlike the Government Camp parcels, had no wetlands, trails easements or other encumbrances that would reduce developable land. AR-49474, 49491, 49499-500. But in fact, Sale 1 and Sale 3 (out of the four comparable sales proposed by Maloy) *have* encumbrances that render about *50% of their sites undevelopable*, rendering Maloy's sales comparables analysis plainly erroneous.[14] AR-49474, 49491, 49499-500. This, and the other errors identified by Mr. Palmer (AR-47789-47823), resulted in artificially low appraised values for the federal properties.

In sum, the Maloy appraisals for the federal Government Camp properties failed to follow nationally recognized appraisal standards, including the Yellow Book and USPAP. That is a violation of the Omnibus Act (§ 1206(a)(2)(D)(ii)), resulting in undervalued federal parcels. The Forest Service's reliance on the Maloy appraisals was, therefore, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA.

---

[14]    Mr. Palmer is a local, has visited the Government Camp parcels several times, and is personally familiar with them. AR-49471. Further, Mr. Palmer's office had professional experience appraising Maloy's Sales Comparables 1, 3, and 4 for past transactions, so he knew those properties quite well. AR-49473.

### ii.  The Cooper Spur appraisals (non-federal property).

Like he did with the Government Camp appraisals, Mr. Palmer reviewed both the 2017 and 2019 iterations of the Cooper Spur (non-federal property) appraisals completed by Mr. Maloy. AR-47824 (review of 2017 appraisal); AR-47831 & 47841 (reviews of 2019 appraisal).[15] In his review of the 2017 appraisal Mr. Palmer confined his analysis to the 156 acres designated as Forest Zone F-1. AR-47824. Mr. Palmer concludes that "The [Maloy] appraisal inadequately evaluates the Highest & Best Use of the area zoned F-1" such that Mr. Maloy's conclusion "is not credible and therefore the valuation conclusion is not credible." AR-47825-26.

In his review of Maloy's 2019 Cooper Spur appraisal, Mr. Palmer's review was not confined to an analysis of the highest and best use of the 156 acres of F-1 property. AR-47831-32. With regard to the house, 156 acres of land, and Nordic buildings, Mr. Palmer concluded that Mr. Maloy used the incorrect valuation approach. AR-47833. While Mr. Maloy used the cost approach to value, that approach was flawed because it is very difficult to estimate an accurate replacement cost for the older improvements located on the Cooper Spur properties, and because of the uncertainties of depreciation. *Id.* Where, as here, land sales sharing a similar highest and best use are available for comparison, the sales comparison approach should have been used. *Id.* Mr. Maloy's error resulted in an overvaluation of the property. AR-47833-34. Similar methodological errors related to valuation of the Cooper Spur Inn and the personal property, machinery, and equipment, resulted in erroneously high values. AR-47834-36.

In his final review regarding the Cooper Spur appraisals, AR-47841, completed on March 19, 2021, Mr. Palmer analyzed the 2019 Maloy appraisal for its treatment of tracts 4, 6, and 7,

---

[15]    As with the Government Camp parcels, Mr. Palmer had visited and was personally and professionally familiar with the area of the north side/Cooper Spur properties. AR-49481.

along with compliance with the Yellow Book and USPAP. *Id.* Mr. Palmer, citing sections 4.4.2.3 and 1.5.2.2 of the Yellow Book, finds that Mr. Maloy did not include confirmation sources for the comparable sales he used in his appraisal. AR-47843-44. Rather, based on a review of datasheets included the Maloy appraisal's addenda, it appears Mr. Maloy relied on the deeds to confirm the sales prices. *Id.* This procedure is not an acceptable appraisal practice under USPAP, and it violates the Yellow Book, which requires sales to be confirmed with parties of the transaction. *Id.* Accordingly, Mr. Maloy's conclusions are "not credible." AR-47844.

Further, the land valuation methodology used by Mr. Maloy conflicts with generally accepted appraisal standards. *Id.* Mr. Maloy used a flawed process that "has the potential for significant error." *Id.* One of the specific errors made by Mr. Maloy is that the "improvement characteristics of [his chosen comparables] and the amenities provided make it difficult to analyze these sales to determine a $/Acre conclusion for the subject. The additional improvements inflate the $/Acre." AR-47846. In other words, and as detailed in Mr. Palmer's review (AR-47844-46), the comparable sales used by Mr. Maloy were inappropriate and insufficient. Ultimately Mr. Maloy concluded that $14,500/Acre was appropriate for these tracts. However, as Mr. Palmer outlined, that conclusion is "not supported or credible." AR-47844. Using appropriate comparable sales, and adjusting for the improvements to the comparable sales, the much lower range of $5,300/Acre to $10,000/Acre is supported. *Id.* Simply put, Mr. Maloy clearly and substantially over-valued the Cooper Spur properties.

And finally, the 2017 appraisals did not adequately account for what is *legally allowable* on the federal land in Government Camp. *See* AR-47867-69 (Plaintiffs' comments on Draft EIS). With the updated appraisals, the Forest Service failed to correct those inadequacies. The result is that the appraisals do not accurately reflect fair market value for the parcels. For example, Mr.

Page 33: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Maloy made erroneous assumptions about several of the Cooper Spur properties that are demonstrably incorrect. *See* AR-49467-69 (Plaintiffs' letter to Forest Service). Chief among those are misapprehensions about the lawful and unlawful uses of land on those properties. *See id.* That is, several of the uses of the Cooper Spur properties that Mr. Maloy assumed were lawful are, in fact, not. *See generally* AR-49530 (letter from Hood River County Counsel to Forest Service regarding unlawful uses of Cooper Spur properties).

Examples are the unpermitted wedding venue, spa, and associated amenities. AR-49533-34; *see also* AR-49507-12 (Hood River County Code violation complaints); AR-49538-39 ("Staff agrees that the subject properties contain at least three land use violations[.]"); AR-49546-48 (description of land use violations). Mr. Maloy was therefore wrong to build those assumptions about *legally allowable* uses into his 2019 appraisal, and the Forest Service was acting arbitrarily and capriciously to rely on that appraisal, when the Forest Service already knew those uses were not lawful. The result of Mr. Maloy's improper assumptions is a skewed perception in the appraisal of what lawfully conforming businesses could actually generate as revenue/income on those properties. This, and the other errors identified by Mr. Palmer (AR-47824-47865), resulted in artificially high appraised values for the non-federal properties.

As explained, the Maloy appraisals for the non-federal north side properties failed to follow nationally recognized appraisal standards, including the Yellow Book and USPAP, in violation of the Omnibus Act (§ 1206(a)(2)(D)(ii)), resulting in overvalued non-federal parcels. The Forest Service's reliance on the Maloy appraisals is, therefore, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA.

As outlined, the proposed exchange is not for equal value because the flaws in the Forest Service's appraisals resulted in improper valuations of the exchange parcels. Remand is,

Page 34: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

therefore, the correct remedy. If there was any doubt on this point, Section 1206(a)(2)(D)(iii) of the Omnibus Act removes it. Entitled "Final Appraised Value," that section requires that "after the final appraised value of the Federal land and the non-Federal land are determined and approved by the Secretary, the Secretary shall not be required to reappraise or update the final appraised value for a period of up to 3 years, beginning on the date of the approval by the Secretary of the final appraised value."

Since the appraisals are plainly flawed, and they are now much more than three years old—the Secretary approved the final appraised values for the exchange properties on or about November 30, 2019 (AR-44560-636)—if this Court vacates the ROD, then the appraisals must be corrected and updated on remand.

## Conclusion

For the above reasons, Conservation Plaintiffs respectfully requests that the Court grant summary judgment in its favor on Claim 1 (Violations of NEPA and the APA), Counts 1–4, and Claim 2 (Violations of the Omnibus Act/Clarification Act and the APA), Counts 1, 3, and 4, from its First Amended Complaint, ECF-4, and vacate the Forest Service's ROD and EIS.

Respectfully submitted this 11th day of August 2025.


    /s/ Jesse A. Buss                              /s/ Karl G. Anuta
Jesse A. Buss, OSB No. 122919          Karl G. Anuta, OSB No. 861423
Willamette Law Group, PC                Law Office of Karl G. Anuta, P.C.
411 Fifth Street                        735 S.W. First Ave.
Oregon City OR 97045-2224               Portland OR 97204
Tel: 503-656-4884                       Tel: 503-827-0320
Fax: 503-608-4100                       Fax: 503-386-2168
Email: jesse@WLGpnw.com                 Email: kga@lokga.net

*Attorneys for Plaintiffs*



Cooper Spur / Government Camp Land Exchange, June 2006

AR 16585

# The Clean Sweep

Mt. Hood Meadows trades all its land at Cooper Spur for developable land
at Government Camp owned by US Forest Service.

The US Forest Service acquires Mt Hood Meadows land at Cooper Spur which
then becomes part of the Mt. Hood National Forest.



McCarthy Decl., Ex. 1

# The Adopted Federal Land Trade

Mt. Hood Meadows retains significant holdings on the north side of Mt. Hood

They keep 159 acres and the Inn at Cooper Spur
plus the option for a new special use permit to expand the Cooper Ski area by hundreds of acres



Date: 8/19/2021
Coordinate System: NAD27 UTM, Zone 10 North, Meter
Projection: Transverse Mercator
Datum: NAD27
false easting: 500,000.0000
false northing: 0.0000
central meridian: -123.0000
scale factor: 0.9996
latitude of origin: 0.0000
Units: Meter

**Government Camp - Cooper Spur Land Exchange**

Land to be acquired or retained by US Forest Service

Land to be acquired or retained by Mt. Hood Meadows

McCarthy Decl., Ex. 2