**STEPHEN J. ODELL, OSB #903530**
MARTEN LAW LLP
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone:  (503) 241-2648
E-mail: sodell@martenlaw.com
  *Attorney for Defendant-Intervenor Mt. Hood Meadows OREG., LLC*

<br>

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

<br>

| | |
|---|---|
| **THRIVE HOOD RIVER; OREGON WILD; SIERRA CLUB; OREGON NORDIC CLUB; FRIENDS OF MOUNT HOOD; OREGON KAYAK AND CANOE CLUB;** and **MIKE MCCARTHY**,<br><br>     Plaintiffs,<br><br>v.<br><br>**META LOFTSGAARDEN;** and **UNITED STATES FOREST SERVICE**,<br><br>     Defendants,<br><br>and<br><br>**MT. HOOD MEADOWS OREG., LLC,**<br><br>     Defendant-Intervenor. | Case No. 3:22-cv-01981-AR<br><br>**DEFENDANT-INTERVENOR MT. HOOD MEADOWS'S CROSS-MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE ADMINISTRATIVE PROCEDURE ACT & COMBINED MEMORANDUM IN SUPPORT OF CROSS-MOTION & RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 74)**<br><br>**Oral Argument Requested** |

**MOTION**

Pursuant to Secs. 701-06 of the Administrative Procedure Act ("APA"), Defendant-Intervenor Mt. Hood Meadows Oreg., LLC ("MHMO" or "Meadows"), hereby respectfully cross-moves for summary judgment on each of the claims that Plaintiffs bring forth in the above-captioned action.  Pursuant to Fed. R. Civ. P. 56, Meadows also moves for summary judgment dismissing Plaintiffs Thrive, Mike McCarthy, and Sierra Club from this case due to their failure to create a genuine issue of material facts necessary that could establish their standing under article III of the U.S. Constitution.  Meadows respectfully submits that the Court should grant its cross-motion for summary judgment in full on the basis of the memorandum below submitted both in support of its cross-motion and in response to Plaintiffs' Motion for Summary Judgment (Dkt. #74) and its further briefing on the merits of Plaintiffs' claims as well as the administrative record underlying the Forest Service's approval of the Federal Exchange challenged in this action, and should further grant summary judgment dismissing Plaintiffs Thrive, Mike McCarthy, and Sierra Club on those bases as well as the Second Declaration of Matthew B. Drake that Meadows files with the Court this same date.  Finally, in accordance with LR 7-1(a)(1), undersigned counsel for MHMO concurs with the statement of Plaintiffs' counsel that he and the other counsel for both Plaintiffs and Federal Defendants conferred in a good-faith effort to resolve the issues on which Plaintiffs' claims turn but that they were unable to do so.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

   Legislative History:  108th Congress (2003-04)......................................................... 3

   Stakeholder Activities:  2005-06................................................................................ 4

   Legislative History:  109th through 111th Congresses (2005-10) ............................. 6

   Parties' Implementation of the Federal Exchange:  2010-15..................................... 8

   Legislative History:  114th & 115th Congresses (2015-18) .................................... 10

   Parties' Exchange Implementation through Issuance of Final ROD (2016-22) ...................... 11

ARGUMENT ...................................................................................................................... 17

   I.     PLAINTIFFS THRIVE, MCCARTHY, & SIERRA CLUB HAVE ALL FAILED TO GENERATE A GENUINE ISSUE ON ANY MATERIAL FACTS NECESSARY TO ESTABLISH THEIR STANDING TO PURSUE THEIR CLAIMS. .................................. 17

   II.    THE FEDERAL EXCHANGE COMPLIES WITH THE EXCHANGE LEGISLATION................................................................................................................. 21

      A.   Plaintiffs' Claim That the Federal Exchange Violates Subparagraph (H) of the Exchange Legislation Is Based on a Flawed, Overly Rigid Misreading in a Vacuum. .... 21

      B.   The Forest Service Followed All Requisite Procedures in Approving the Appraisals on which the Federal Exchange Was Based & Mere Disagreements that Plaintiffs' Appraiser Has as to How He May Have Performed the Appraisals Do Not Render Them Arbitrary & Capricious or Inconsistent with Applicable Professional Standards............. 25

   III.   PLAINTIFFS' NEPA CLAIM IS MERITLESS & WHOLLY DISCONNCTED FROM CONSIDERATION OF ENVIRONMENTAL EFFECTS, THE ACT'S ENTIRE PREMISE, AS WELL AS THE SUPREME COURT'S LANDMARK COURSE CORRECTION IN JUDICIAL REVIEW OF NEPA CLAIMS. .......................................... 30

      A.   The Forest Service's "Purpose and Need" Statement Is Reasonable & Plaintiffs' Challenge to it is Based on A Misinterpretation of the Exchange Legislation. ............ 31

      B.   The Forest Service Was Not Arbitrary & Capricious in Fulfilling its Statutory Obligation in its Consideration of Reasonable Alternatives in the FEIS..................... 33

      C.   The Regulation Plaintiffs Allege the Forest Service Violated in their Fourth NEPA Count Has Been Rescinded & the Agency Provided Plaintiffs the Appraisals underlying the Exchange, on which they Extensively Commented, in Any Event. ..... 34

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Chemehuevi Tribe of Indians v. Fed. Power Comm'n*, 420 U.S. 395 (1975) .............................. 23

*Clapper v. Amnesty Int'l*, 568 US 398 (2013) ........................................................ 18, 20

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................................ 17

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000) ........................ 21,28

*DeSylva v. Ballentine*, 351 U.S. 570 (1956) ........................................................ 23

*Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018) ........................................ 23

*FCC v. Prometheus Radio Proj.*, 592 U.S. 414 (2021) .............................................. 27

*Florida Power & Light v. Lorion*, 470 U.S. 729 (1984)............................................. 27

*HRVRC v. Pena*, Case no. 15-1397-BR (D. Or.) ..................................................... 25

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2004).............................................. 29

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................ 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................... 18

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)........................................ 17

*Pulsifer v. United States*, 601 U.S. 124 (2024)..................................................... 23

*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014) ...................... 27

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S.Ct. 1497 (2025) ...................... 3,30,31,33

*Swearingen v. United States*, 161 U.S. 446 (1896)................................................... 23

*Western Land Exch. Proj. v. BLM*, 315 F. Supp.2d 1068 (D. Nev. 2004)............................... 21

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ....................................................... 19

**Statutes & Acts of Congress**

5 U.S.C. § 706(2) .................................................................................. 34

5 U.S.C. §§ 701-06 ................................................................................ 21

16 U.S.C. §§ 1131 et seq............................................................................ 4

16 U.S.C. §§ 1271 et seq............................................................................ 4

42 U.S.C. § 4332(2)(C)............................................................................. 30

43 U.S.C. § 1716(a) .............................................................................. 17, 24

43 U.S.C. § 1716(b)............................................................................... 12, 23

Lewis & Clark Mt. Hood Wilderness Act, Subtitle I.C., Secs. 1201-07 of the Omnibus Public
    Land Management Act of 2009, Pub. L. 111-11 (Mar. 30, 2009)................................... *passim*

Mt. Hood Cooper Spur Land Exchange Clarification Act, Pub. L. 115-110 (Jan. 10,
2018). ........................................................................................... *passim*

**Congressional Materials**

150 Cong. Rec. S3169 (Mar. 25, 2004)............................................................. 4

150 Cong. Rec. S8705 (July 22, 2004) ................................................................... 4
152 Cong. Rec. H5578 (July 24, 2006) .............................................................. 3, 4
152 Cong. Rec. H5578-79 (July 24, 2006) ............................................................ 6
152 Cong. Rec. H5581 (July 24, 2006) ................................................................. 6
155 Cong. Rec. H3985 (Mar. 25, 2009) ............................................................... 8
155 Cong. Rec. S3394 (Mar. 19, 2009) ................................................................ 8
162 Cong. Rec. H3488 (June 7, 2016) ............................................................... 10
162 Cong. Rec. H3517 (June 8, 2016) ............................................................... 11
163 Cong. Rec. H1331 (Feb. 27, 2017) ............................................................. 11
163 Cong. Rec. S8268-69 (Dec. 21, 2017) ........................................................ 11
H. Rpt. 114-514 (Apr. 21, 2016) ....................................................................... 10
H.R. 3826, 114th Cong. (Oct. 23, 2015) ........................................................... 10
H.R. 5025, Secs. 801-04, 109th Cong. (Mar. 28, 2006) ....................................... 6
H.R. 6290 (June 18, 2008) ................................................................................. 7
H.R. 699, 115th Cong. (Jan. 24, 2017) ............................................................. 11
S. 2069, 114th Cong. (Sept. 22, 2015) ............................................................. 10
S. 22, 111th Cong., Subtitle IC, Secs. 1201-07 (Jan. 7, 2009) ............................. 8
S. 225, 115th Cong. (Jan. 24, 2017) ................................................................ 11
S. 2723, 108th Cong., Titles I & II (July 22, 2004) .............................................. 4
S. 3854, Sec. 502(d), 109th Cong. (Sept. 6, 2006) .............................................. 6
S. 647, 110th Cong., Secs. 501-04 (Feb. 15, 2007) ............................................. 7
S. HRG. 108-737 (Sept. 14, 2004) ...................................................................... 4
S. Rpt 114-191 (Dec. 16, 2015) ....................................................................... 10
S. Rpt. 110-172 at 14-15 (Sept. 17, 2007) .......................................................... 7

**Regulations**

36 C.F.R. § 254.3(b) ......................................................................................... 17
36 C.F.R. § 254.9 ............................................................................................. 26
36 C.F.R. § 254.9(d) ......................................................................................... 27

**Federal Register Notices**

90 Fed. Reg. 10,610 (Feb. 25, 2025) ................................................................ 34

**Other References**

H.W. Fowler, A Dictionary of Modern English Usage 147 (2d ed.1965) ................. 25
2A Sutherland, Statutory Construction, § 46.5 (7th ed., updated Apr. 2025) ............ 23

**Administrative Record Citation Conventions**

MHMO uses the following citation conventions in its summary judgment papers:  for the original administrative record ("AR") in *HRVRC v. Pena*, Case no. 15-1397-BR (D. Or.)("HRVRC"), inserting an "H" (for *HRVRC*) prior to "AR" such that the citations read "HAR [pg. no.]"; for the first supplement to that AR, inserting an "H1S" before "AR" such that the citations read "H1SAR [pg. no.]"; for the second supplement, inserting an "H2S" before "AR" such that the citations read "H2SAR [pg. no.]"; for the third supplement, inserting an "H3S" before "AR" such that the citations read "H3SAR [pg. no.]"; for the fourth supplement, adding an "H4S" before "AR" such that the citations read "H4SAR [pg. no.]"; and for the fifth supplement, adding an "H5S" before "AR" such that the citations read "H5SAR [pg. no.]."

**COMBINED MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT & IN RESPONSE TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

**INTRODUCTION**

This case involves a land exchange that has had the bipartisan and unwavering support of the full breadth of the Oregon congressional delegation, exemplified by enactment of a pair of acts prescribing its implementation to protect and enhance the state's iconic Mt. Hood, aptly described by John Muir as a "glorious manifestation of divine power." Yet, due almost entirely to Plaintiffs, including their present challenge to the Forest Service's approval of the exchange in 2022 more than 15 years after the Congress intended for it to be completed, it remains undone.

The acts the Congress overwhelmingly approved at the urging of the Oregon delegation prescribing the land exchange at issue are the Lewis & Clark Mt. Hood Wilderness Act ("Mt. Hood Wilderness Act" or "Act"), Secs. 1201-07 of the Omnibus Public Land Management Act of 2009, Pub. L. 111-11 (Mar. 30, 2009)(AR19088-19106), and the Mt. Hood Cooper Spur Land Exchange Clarification Act ("Clarification Act"), Pub. L. 115-110 (Jan. 10, 2018)(AR42879-82). Critical to resolution of this case is the understanding that the Congress prescribed the exchange at issue ("Federal Exchange") to serve the broader public interest, not just the narrow, blinkered preferences of any one particular set of interests such as that reflected in Plaintiffs' claims that seek to undo all the progress that has been painstakingly accomplished to bring it to fruition.

Seen in light of the full spectrum of the public interest the Congress had front and center in legislatively prescribing the Federal Exchange, its two most critical elements that are only actuated upon its final implementation are designation of an additional 1710 acres of Wilderness on Mt. Hood and establishment of a 2700-acre Crystal Springs Watershed Special Resources Management Unit ("WSRMU") to ensure clean drinking water for the residents of Hood River County. As finally configured, the Federal Exchange at issue also will add nearly 540 acres of

forestland to the Mt. Hood National Forest while also providing desperately needed additional workforce and other housing in Government Camp.[1]  Setting aside the exchange as Plaintiffs request by their claims will not allow for realization of any of these significant public benefits.

Even from Plaintiffs' myopic perspective, which appears to be mostly about trying to preclude Defendant-Intervenor Mt. Hood Meadows Oreg., LLC ("Meadows" or "MHMO") or its principals from owning a single acre or building in Hood River County, the Federal Exchange as approved by the Forest Service nevertheless provides them with the vast majority of that goal, as Meadows is set to convey 80 percent of its holdings in the Cooper Spur area to the United States to be managed as part of a special watershed unit to protect the county's drinking water supply. Even as to the remaining twenty percent, extant zoning prohibits outright the highly speculative type of extensive development Plaintiffs contend they wish to prevent.  In a paradoxical twist, were the Court to set aside the exchange as Plaintiffs request, Meadows would retain the entirety of its present land ownership in the County, resulting in the exact opposite of the outcome for which Plaintiffs are so vigorously contending, the epitome of an effective lack of redressability.

Plaintiffs' claims are similarly overly narrow and contorted, embodying their preferred, parochial predilections on various elements of the approach the Forest Service took in analyzing and approving the exchange.  They futilely strain to convert their quibbles into violations of Section 1206 of the Mt. Hood Wilderness Act, as amended by the Clarification Act ("Exchange Legislation"), and the National Environmental Policy Act ("NEPA").  Such claims necessarily falter based on Plaintiffs' failure to account for the capacious discretion Congress confirmed the Forest Service had to fashion the final configuration of the exchange in the Clarification Act, or

---

[1] AR16107 (2005 Government Camp Revitalization Plan, which acknowledges that "[t]he availability of affordable housing for the employees of Mount Hood ski areas and businesses is a recognized problem in this area and may prevent some employers from locating in the area").

Page 2 – MHMO'S CROSS-MOTION FOR SUMMARY JUDGMENT & MEMORANDUM

to factor into their proffered construction of the Exchange Legislation applicable direction in the Federal Land Policy and Management Act ("FLPMA").  Plaintiffs also fail to carry their burden on their NEPA claims by focusing on issues that have nothing to do with consideration of environmental effects, the animating purpose underlying NEPA, and largely ignoring the seismic shift the Supreme Court effected last term in its *Seven County* decision in which it declared that reviewing courts need to extend maximal deference to agencies on the inherently discretionary judgment calls they face at virtually every turn in conducting analyses under that statute.

## FACTUAL BACKGROUND

The Federal Exchange and the events leading up to it have been in the works and subject to extensive negotiation, intensive analysis, formulation and re-formulation, public involvement, two acts of legislation, and implementation for two full decades.  It has dual origins, one in Congress, given that the exchange was congressionally prescribed, the other a local settlement agreement over where and how to expand protections and focus future development activity on Mt. Hood.  This section describes both tracks and alternates between summarizing efforts in the Congress and actions taken by interests in the state to implement the exchange that interwove with each other until its final configuration and approval.  Before delving into this description of how the Federal Exchange came to be, it is important to emphasize that it is the Exchange Legislation the Congress enacted, not the private settlement agreement, that forms the basis for the Court's evaluation of Plaintiffs' claims, a point often lost on Plaintiffs in their arguments.

### *Legislative History:  108th Congress (2003-04)*

In the summer of 2003, Reps. Walden & Blumenauer commenced bipartisan discussions that eventually came to involve virtually the entire Oregon congressional delegation on crafting a "Mt. Hood Legacy bill."  *See* 152 Cong. Rec. H5578 (July 24, 2006) (in debate over passage of H.R. 5025, precursor to the Mt. Hood Wilderness Act, Rep. Walden stating his desire "to thank

EARL BLUMENAUER for his leadership in starting this process nearly 3 years ago when he suggested that he and I could work together to consider the issues and pressures facing Oregon's icon, Mount Hood"). That August, Reps. Walden and Blumenauer hosted the first of two "public summits" to allow Oregon citizens the opportunity to weigh in on how best to preserve Mt. Hood's legacy and the diverse array of invaluable public benefits it provides. *Id.*

The following March of 2004, Sen. Wyden kicked off legislative activity in the U.S. Senate by floating a draft wilderness proposal in honor of the fortieth anniversary of the National Wilderness Act of 1964, the twentieth anniversary of the Oregon Wilderness Act of 1984, and the 200th anniversary of the Lewis and Clark Expedition. 150 Cong. Rec. S3169 (Mar. 25, 2004). Four months later, Sen. Wyden introduced the proposed Lewis and Clark Mount Hood Wilderness Act. 150 Cong. Rec. S8705 (July 22, 2004). This bill served as the initial legislative proposal that established the framework for the Exchange Legislation as ultimately enacted. As originally introduced, the primary elements of the legislation included designating approximately 177,000 more acres as Wilderness on Mt. Hood pursuant to the Wilderness Act, 16 U.S.C. §§ 1131 et seq, and nearly 50 miles of additional streams as Wild or Scenic pursuant to the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 et seq. S. 2723, 108th Cong., Titles I & II (July 22, 2004). It did not include any direction for the Federal Exchange at issue in this case. The bill was the subject of a legislative hearing in the Senate, S. HRG. 108-737 (Sept. 14, 2004), but the House did not undertake any activity on similar Mt. Hood legislation in the 108th Congress.

### *Stakeholder Activities: 2005-06*

The initial germ for the idea to pursue a federal land exchange grew out of a 2005 Settlement Agreement among Meadows, Plaintiffs HRVRC (hereafter, "Thrive") and McCarthy, and Hood River County. AR16033-47. The agreement settled (at least temporarily) two state court proceedings that Thrive and Mr. McCarthy had initiated in Hood River County Circuit

Court to challenge an earlier, wholly independent land exchange between the County and Meadows pursuant to which Meadows conveyed approximately 775 acres to the County for approximately 603 acres of County land ("County Exchange").  AR16035-36.

At a broad scale, this agreement provided for Plaintiffs to abate their state court actions during the pendency of which the settling parties agreed to support a proposal for Meadows to pursue a land exchange with the Forest Service under which Meadows would convey virtually all its properties on the northside of the mountain in Hood River County for two developable parcels in the Mt. Hood National Forest on the mountain's south face adjacent to Government Camp. AR16036-38.  The non-federal properties referenced in that agreement include:  (1) a parcel of approximately 159 acres known as the "Dillard Property" or "Panhandle" that consists of 156 acres of F-1 zoned forestland as well as a small commercially zoned tract of less than three acres on which the Inn at Cooper Spur is situated, along with associated buildings, improvements, and personal property; (2) the forested parcels comprising around 603 acres that Meadows obtained via the County Exchange; and (3) buildings, improvements, and personal property of Meadows associated with its operation of the Cooper Spur Ski Area on the Mt. Hood National Forest pursuant to a Special Use Permit.  AR16035-36; AR45874-77.  Paragraphs 15 and 16 of the agreement provided that the proposed exchange could be effectuated via either legislative or administrative means and that, if the parties agreed to pursue the former, they would request legislative counsel to draft the proposed legislation or jointly draft it themselves.  AR16044.

The parties to the 2005 Settlement Agreement adopted a series of amendments the following year.  AR16577-83.  These 2006 amendments included an agreement to pursue legislation to prescribe and provide direction for the exchange, which entailed a series of provisions that the parties agreed to request the delegation to incorporate into such legislation,

although most of these did not make it into the Exchange Legislation as ultimately enacted, further emphasizing the dichotomy between the Settlement Agreement and the legislation.

***Legislative History:  109th through 111th Congresses (2005-10)***

The Oregon delegation continued to pursue Mt. Hood-themed legislation in the next three Congresses until finally succeeding when the 111th Congress enacted the Mt. Hood Wilderness Act as part of the much larger Omnibus Public Lands Act of 2009, Pub. L. 111-11.

In the 109th Congress, Rep. Walden introduced the proposed Mt Hood Stewardship Legacy Act, the first bill that included congressional direction prescribing a Cooper Spur-Government Camp property exchange.  H.R. 5025, Secs. 801-04, 109th Cong. (Mar. 28, 2006). Unlike the Exchange Legislation that ultimately passed the Congress, this bill directed a mandatory exchange of all the federal properties for all the non-federal properties referenced in the Settlement Agreement.  *Id.* at Sec. 802(a) & (b).  The bill also contained the initial direction for the Forest Service to establish the Crystal Springs WSRMU upon final implementation of the Federal Exchange.  *Id.* at Title VI & Sec. 803(d).  The House of Representatives eventually passed the bill by a two-thirds voice vote.  152 Cong. Rec. H5578-79 & 5581 (July 24, 2006).

In the Senate, Sens. Wyden and Smith introduced S. 3854, the land exchange provisions of which were similar to H.R. 5025 as it had passed the House, but expressly added the requirement that equalization of the values of the non-federal and federal lands ultimately included in the exchange satisfy Section 206 of the Federal Land Policy and Management Act ("FLPMA").  S. 3854, Sec. 502(d), 109th Cong. (Sept. 6, 2006).  The Senate Public Lands & Forests Subcommittee held a legislative hearing on S.3854 (S. Hrg. 109–778), but no further action was taken on the bill in the Senate before the 109th Congress came to a close.

The Exchange Legislation continued to take shape in the 110th Congress.  Sens. Wyden and Smith introduced a new version of their proposed Lewis & Clark Mt. Hood Wilderness Act

containing a revised subtitle laying out direction for the Federal Exchange. S. 647, 110th Cong., Secs. 501-04 (Feb. 15, 2007). Among other things, the revisions included, consistent with the Exchange Legislation as ultimately passed, re-framing the direction to make the exchange discretionary on the part of Meadows. *Id.* at Sec.503(a). In addition, S. 647 made the exchange subject to all requirements for federal land exchanges in FLPMA, 43 U.S.C. § 1716, except as otherwise provided. *Id.* at Sec. 503(c). The Senate Energy and Natural Resources Committee reported S. 647 as amended. S. Rpt. 110-172 at 14-15 (Sept. 17, 2007). The committee's primary amendments included: (1) conditioning designation of the 1710-acre Mt. Hood-Tilly Jane Wilderness upon completion of the Federal Exchange; (2) exempting the Panhandle from the disposal and other restrictions placed on land within the Crystal Springs WSMRU so as to "retain flexibility in developing the terms and conditions of the land exchange with [Meadows]"; and (3) requiring that Meadows share in selecting an appraiser. Id. at 16, 18, & 20. As reported by the Committee, this substantive direction became part of the Exchange Legislation as enacted. *Compare* S. 647, 110th Cong., 201-02 (as reported by S. Nat. Res. Cmte., Sept. 17, 2007) *with* Pub. L. 111-11, Sec. 1206 (Mar. 30, 2009)(AR19099-19100). The Committee stated that the bill's overall purpose is "to designate certain land on Mount Hood, Oregon, as wilderness, to designate certain rivers as components of the National Wild and Scenic Rivers System, to designate the Mount Hood National Recreation Area, and to otherwise improve Federal land management in and around the Mount Hood National Forest." S. Rpt. 110-172 at 14.

In June 2008, Rep. Blumenauer, on behalf of himself and fellow Oregon Reps. DeFazio, Hooley, and Wu, introduced a companion bill in the House that was the same in all material respects to S. 647 as reported by the Senate Natural Resources Committee. H.R. 6290 (June 18, 2008). Neither bill was passed by its respective chamber, however.

That changed in the first days of the 111th Congress, as that version of the legislation was inserted into an Omnibus Public Lands Management Act bill, S. 22, introduced in January 2009. S. 22, 111th Cong., Subtitle IC, Secs. 1201-07 (Jan. 7, 2009).  After adoption of a few modest changes to address independent concerns with the larger omnibus bill, both the Senate and House passed it with considerable majorities.  155 Cong. Rec. S3394 (Mar. 19, 2009) (passed Senate by vote of 77-20); 155 Cong. Rec. H3985 (Mar. 25, 2009) (passed House by vote of 285-140).

### *Parties' Implementation of the Federal Exchange:  2010-15*

As it turned to implementing the original Act, the Forest Service began wrestling with interpretation of some of the key provisions related to the Federal Exchange, particularly in light of the requirement that the agency comply with Section 206 of FLPMA pertaining to federal land exchanges more generally except as otherwise provided.  In this light, for example, on Apr. 29, 2009, the Forest Service's Pacific Northwest Regional Office prepared a memo laying out key elements of its preliminary interpretation of that direction that included the following elements:

• "By requiring compliance with existing law, it appears that Congress provided the authorizing officer with discretion concerning the proposed exchange";

• noting that one of the requirements of existing law in Section 206 of FLPMA is for "[t]he properties [to] be equal value, or equalized by payment of money so long as the payment does not exceed 25 percent of the value of the lands exchanged out of Federal ownership, and provided the amount of payment is reduced to as small an amount as possible"; and

• in implementing the exchange, stating its intent to "[e]qualize values of the Federal and non-Federal lands by deleting lands from the exchange proposal, and to use cash equalization, contingent on the availability of appropriated funds, only after exhausting all reasonable efforts to equalize values by modifying the estate to be exchanged."  AR19538-40; *see also* AR20304. To like effect, in a Valuation Consultation the following February the agency's Regional

Page 8 – MHMO'S CROSS-MOTION FOR SUMMARY JUDGMENT & MEMORANDUM

Appraiser posited that the values in the appraisals "would be the baseline for negotiating equalization configurations if needed" and that a supplemental appraisal may therefore prove necessary "for any change deemed necessary to the estate of either or both sides."  AR20142.

In August 2010, Meadows and the Forest Service took their first formal procedural step to implement the Federal Exchange by entering into an Agreement to Initiate ("ATI") the exchange.  AR20482-20502.  The ATI provides that the basis for values of the exchange properties shall be appraisals carried out in accordance with the Exchange Legislation as approved by the Forest Service, and authorizes both the agency and Meadows to withdraw from the exchange process any time prior to execution of a binding exchange agreement.  AR 20482. Exhibits to the ATI describe in detail the respective properties that Meadows and the Forest Service "will consider exchanging."  AR20485; AR20494.

Shortly after the ATI was executed, the Forest Service published its first Notice of Intent to prepare an Environmental Impact Statement ("EIS") for the land exchange pursuant to NEPA in which it invited Scoping comments.  AR20598-99.  Two of the next major milestones in the ATI schedule, AR20498, however, did not meet their deadlines.  The Forest Service sought to explain the hold-up as arising from an inability to reach agreement with Meadows on the wetland conservation easement prescribed by the Original Act.  AR24747.  This delay well beyond the intended congressional time frame of 16 months for completion of the exchange in the Original Act elicited a letter from three members of the Oregon delegation in June 2015 to strongly urge the Forest Service to work to immediately resolve the wetland easement issue and complete the Federal Exchange within a year.  AR25720-21.  These members concluded their letter by foreshadowing that any failure to swiftly resolve the issues that had given rise to the delays in implementing the exchange "will also necessitate other Congressional action."  AR25721.

*Legislative History:  114th & 115th Congresses (2015-18)*

The Oregon delegation shortly made good on its threat to spring back into action

in the Congress, as Sen. Wyden thereafter introduced the initial iteration of the proposed

Mt. Hood Cooper Spur Land Exchange Clarification Act.  S. 2069, 114th Cong. (Sept.

22, 2015).  The following month, Reps. Walden and Blumenauer introduced an identical

companion bill in the House.  H.R. 3826, 114th Cong. (Oct. 23, 2015).  The main purpose

of the follow-on legislation was effectively to grease the skids so as to enable expeditious

completion of the exchange given that, even at that time, it had been five years past its

intended completion deadline in the Original Act.  162 Cong. Rec. H3488 (June 7, 2016).

In addition to making some minor technical corrections, the clarification bill modified or

clarified three primary elements of the Original Act.  First, it added a requirement that the

appraisals assign a separate value to each tax lot to facilitate equalization of values and

clarified that, upon approval by the Forest Service, such values would serve for up to

three years as a valid basis for entering into a binding exchange agreement.  S. 2069, Sec.

2, subpar. (2)(B).  Second, it clarified direction concerning the easements prescribed in

the Original Act.  *Id.* at Sec. 2, subpar. (2)(D)(G).  Third, it confirmed that Meadows and

the Forest Service had discretion "without limitation" to convey less than the full array of

parcels referenced in the Original Act in configuring the Federal Exchange as necessary

to equalize values of the exchanged parcels, consistent with the other requirements of the

Act as clarified and subject to both parties' approval.  *Id.* at Sec. 2, subpar. (2)(D)(H).

The full committees of jurisdiction in both chambers favorably reported their

respective Clarification Act bills after making a few minor amendments.  S. Rpt 114-191

(Dec. 16, 2015); H. Rpt. 114-514 (Apr. 21, 2016).  The House then passed H.R. 3826 as

reported by a vote of 401-2, 162 Cong. Rec. H3517 (June 8, 2016), although the Senate

did not take up its companion measure on the floor during the 114th Congress.

In the ensuing Congress, identical bills were introduced in both the Senate and

House that were the same in all material respects to their predecessors as reported by the

respective committees of jurisdiction in the 114th Congress, except for deleting two

minor provisions and modifying direction on the wetland conservation easement to make

its reservation entirely discretionary. S. 225, 115th Cong. (Jan. 24, 2017); H.R. 699,

115th Cong. (Jan. 24, 2017). The House passed its version of the bill by a vote of 415-1.

In floor discussion on the bill leading to final passage, Rep. McClintock, then-Chair of

the House Subcommittee on Federal Lands, explained that H.R. 699 was in part designed

to modify conveyance conditions regarding, among other things, "equalization of values

of the exchange properties." 163 Cong. Rec. H1331 (Feb. 27, 2017). The Senate then

passed H.R. 699 by voice vote, 163 Cong. Rec. S8268-69 (Dec. 21, 2017), and it became

Pub. L. No. 115-110 on Jan. 10, 2018. AR19072-19537.

### *Parties' Exchange Implementation through Issuance of Final ROD (2016-22)*

While the Clarification Act was wending its way through the Congress, the Forest

Service continued implementing the Original Act, primarily by issuing a Draft EIS in October

2016, AR39394-39784, and instructions for an initial round of appraisals completed a year later.

AR31105-32132; AR41565-41907; AR41983-42448. As summarized above, the Clarification

Act included revised direction for the appraisals, and thus upon its enactment, one of the first

orders of business for the Forest Service was to request a new round of appraisals consonant with

that direction. AR42993-43560; AR43580-81. The Forest Service's Review Appraiser thereby

transmitted instructions to prepare new appraisals to the appraiser, Mr. Richard Maloy, on whom

the agency and Meadows had jointly agreed. AR43569-78; AR43592-43611. Fifty-six of the 86

Page 11 – MHMO'S CROSS-MOTION FOR SUMMARY JUDGMENT & MEMORANDUM

exhibits supplied to Mr. Maloy delineate various issues that Plaintiffs or others raised with his 2017 appraisals during mediation for an earlier case, supplied as the instructions stated to allow him to take such concerns into account in preparing his superseding versions.  AR 43572.  Part of this mediation included the opportunity for Plaintiffs Thrive and McCarthy, the Forest Service, and Meadows to obtain answers to questions to the counties concerning the zoning and land-use prescriptions for exchange properties.  See, e.g., AR42888-95; AR42896-4294; AR43106-67; AR43168-69; AR43183; AR43184-88; AR43189-96; AR43197-43203; AR43204-46.  In accordance with the supplemental instructions, Mr. Maloy issued new discrete appraisals for the non-federal and federal properties in October 2019.  AR43755-44248; AR44249-44559. The non-federal appraisal assigned a value of $9,105,440 to the full array of MHMO properties within the ambit of the exchange legislation, some $450,000 less than the valuation in the 2017 appraisal, while the federal appraisal assigned a value of $5,658,500 to the corresponding Forest Service properties, nearly $600,000 more than the 2017 appraisal.  *Compare* AR 41988 *with* AR 43764 (non-federal reports); *compare* AR 41568 *with* AR 44251 (federal reports).

The following month the agency's Review Appraiser reviewed and approved the final 2019 versions of Mr. Maloy's appraisal reports for both the federal and non-federal properties. AR44560-89; AR44590-44636.  Although the amount by which the total appraised valuation of non-federal properties exceed the appraised valuation of the federal properties was more than $1 million lower in the 2019 appraisals than that reflected in the 2017 appraisals, that delta still amounted to nearly $3.5 million, well outside the 25 percent of the federal property value equalization cap in FLPMA (equaling $1,414,625).  43 U.S.C. § 1716(b).

As a result, consistent with the direction in the Clarification Act, in the aftermath of the approval of the updated appraisals the Forest Service and Meadows turned their efforts to

conferring on alternative configuration(s) of federal and non-federal lands that could satisfy the necessary equalization parameters while also being acceptable to both parties, as further informed by the Forest Service's FLPMA responsibility to consider how to configure the exchange in a manner that would well-serve the public interest.  In this light, both the Forest Service and Meadows prepared equalization proposal alternatives on which to begin conferring in February 2020.  AR44664-70; AR44677-83.  This kicked off a series of discussions in which the Forest Service and Meadows were able to carefully and thoughtfully explore myriad exchange permutations potentially consistent with the necessary equalization parameters.

One of the equalization alternatives the Forest Service outlined for discussion included for the first time the kernel of conveying just the western federal parcel near Government Camp while retaining the east parcel, and proposing that Meadows retain the mostly developed Panhandle (and the buildings, improvements, and personal property associated with the Cooper Spur Ski Area).  AR 45290.  Of the five alternative proposals outlined for initial consideration, the one Meadows proffered would have allowed for equalization of values while still allowing for conveyance of the full suite of federal parcels, all the forestland Meadows had obtained from Hood River County, and some one-half of the Panhandle.  AR 44677-78.  To be feasible, this equalization option would require three minor Property Line Adjustments to two parcels within the larger Panhandle.  AR 44679 & 44683.  To follow up on the potential feasibility of this option, Meadows submitted an application to the Hood River County Community Development Department for such adjustments.  AR 45148-88.  Thrive urged denial of the application.  AR 45088-91.  After considering Thrive's objections, the Department's Director gave tentative approval to the requested adjustments.  AR 45191-45220; AR 45221-50; AR 45251-80.  Thrive responded by appealing all three tentative Property Line Adjustment approvals to the County's

Planning Commission.  AR45324-29.  Shortly thereafter, Meadows withdrew its application for

the adjustments in question, AR45333, effectively taking that proposed equalization option off

the table.  Nevertheless, through the course of their ongoing discussions, Meadows and the

Forest Service landed on another proposed equalization option that met with their mutual

tentative approval and reflected a slight variation of the one the agency had earlier presented for

conferment whereby it would convey only the western federal parcel while Meadows would

convey all its parcels and property in Hood River County save for the Panhandle.  AR45289-

45323; *see also* AR49571-81.  The parties' understanding at this stage was necessarily

preliminary in nature, as the ultimate authority to determine whether the Federal Exchange

complied with all applicable legal requirements and approve it resided with the Responsible

Official, the Mt. Hood National Forest Supervisor, which she would exercise only following her

review of the FEIS and consideration of other relevant portions of the record as well as any

objections to a draft decision.  AR45828; AR50373; AR50387.  Beyond that, this tentative

equalization was also inherently provisional given that the ATI does not bind either party to

complete an exchange until execution of a formal exchange agreement.

 In the meantime, the Forest Service continued preparing its FEIS, eventually issuing it in

January 2021.  AR45822-46294.  The FEIS defined the Proposed Action as encompassing all the

potential federal and non-federal lands referenced in the legislation (even while acknowledging

that lesser areas of such lands would be required for equalization of values) in order to ensure

full disclosure of projected environmental effects and to provide ongoing flexibility to the Forest

Service's Responsible Official (and Meadows) to modify the ultimate configuration of the

exchange prior to final consideration and approval.  AR 45827.  As the agency explained:

> It is the Forest Service's interpretation that the Clarification Act therefore
> provides flexibility "without limitation" that [the Forest Service] and Mt. Hood

> Meadows need not undertake an "all-for-all" exchange of the Government Camp and Cooper Spur parcels, if the Secretary and Mt. Hood Meadows approve of a lesser area of lands to be conveyed in order to equalize the appraised values. Pursuant to that allowance, these parties ultimately may approve an exchange of some of the parcels. This FEIS analyzes the effects of an "all-for-all" exchange, in order to capture the full range of potential effects.

*Id.*

Shortly thereafter, in early February 2021, the Forest Service issued its Draft Record of Decision ("Draft ROD") in which the agency's Responsible Official announced his intent to approve the Federal Exchange. AR46989-47027. All but one Plaintiff objected to the Responsible Official's tentative decision reflected in the Draft ROD. AR47757-49567. One segment of those objections assert that Mr. Maloy's 2019 appraisals of both the federal and non-federal exchange lands suffer from a series of alleged flaws based on cursory reviews of an independent appraiser with which Plaintiffs had contracted for that purpose. AR47777-82; AR47804-23; AR47831-40; AR47841-65. In response, the Forest Supervisor requested that Mr. Maloy prepare a consultation report addressing these alleged flaws in his 2019 appraisals to assist the agency in responding to that portion of Plaintiffs' objections. AR47629-87. Mr. Maloy prepared a report systematically addressing each of Plaintiffs' issues. AR49582-96.

Having solicited input to aid it in responding to Plaintiffs' objections, the agency held an objection resolution meeting with Plaintiffs in May 2021. AR49621; AR49622-26. The meeting did not yield resolution of Plaintiffs' objections, giving rise to a 21-page written review by the Deputy Regional Forester finding that none of them were well-taken. AR49834-54.

Plaintiffs doggedly continued to seek new avenues to derail the Federal Exchange. Thus, in June 2021, as well as in February and March 2022, Thrive submitted substantial additional tranches of allegedly significant new information it contended undermined the Draft ROD. AR49441-46; AR49977-50007; AR500322-57. Insofar as this information related to appraisal

issues, the Forest Service's Regional Appraiser reviewed it and concluded that none of it

undermined the agency's reliance on Mr. Maloy's 2019 appraisals.  AR50069-71; AR50361.

Forest Supervisor Meta Loftsgaarden issued her Final Record of Decision ("ROD")

documenting her approval of the Federal Exchange on May 3, 2022.  AR 50369-50408.  As

approved, the Federal Exchange reflects a modified version of the comprehensive Proposed

Action analyzed in the FEIS and includes the following key elements:

• the Forest Service's conveyance to MHMO of the 67-acre western parcel near Government

Camp in exchange for MHMO's conveyance to the U.S. of the entire 603 acres of F-2 zoned

forestland that Meadows acquired via its exchange from Hood River County in addition to the

buildings, improvements, and personal property associated with the Cooper Spur Ski Area;

• upon final completion of the Federal Exchange, designation of more than 1700 additional acres

of Wilderness within the Ski Area's current Permit Area on the Mt. Hood National Forest, the

vast majority of which is currently allocated for Winter Recreation uses under the Forest's Plan;

• also upon final completion of the Federal Exchange, establishment of a new 2700-acre Crystal

Springs WSRMU, including all of the 603-acre F-2 forestland parcel Meadows is conveying to

the U.S., which the Exchange Legislation provides is to be administered to protect the quality

and quantity of the water in the watershed for the benefit of Hood River County residents;

• a net increase of nearly 540 acres to the federal land base that the Forest Service will manage as

part of the Mt. Hood National Forest to benefit the public consistent with specially formulated

congressional direction that Plaintiffs helped to develop;

• retention by the Forest Service of the majority of high-value wetlands on the federal lands

referenced in the Exchange Legislation that exist on the eastern parcel and a nearly one-for-one

exchange of wetlands on the lands to be conveyed under the Federal Exchange; and

• retention and ongoing operation by Meadows of the Inn at Cooper Spur, which Forest Service

analysis determined would not be in the public interest for the agency to own and operate, either

by its staff or a private entity under a Special Use Permit on National Forest land.  AR 50373-77.

     In the ROD, the Forest Supervisor also determined that the Federal Exchange well-serves

the public interest, consistent with direction in FLPMA, 43 U.S.C. § 1716(a), and the Forest

Service's land-exchange regulations at 36 C.F.R. § 254.3(b).  AR 50377.  She went on to

sequentially set forth detailed findings that the Federal Exchange as approved satisfies all other

applicable laws, regulations, and executive guidance to which it is subject.  AR50379-85.

     Pursuant to the authorization in the ROD, the Forest Service and Meadows in turn

executed a binding Exchange Agreement, committing themselves to exchange to each other the

lands comprising the Federal Exchange as approved by the Forest Service.  AR 50410-25.

## **ARGUMENT**

I.    PLAINTIFFS THRIVE, MCCARTHY, & SIERRA CLUB HAVE ALL FAILED TO
GENERATE A GENUINE ISSUE ON ANY MATERIAL FACTS NECESSARY TO
ESTABLISH THEIR STANDING TO PURSUE THEIR CLAIMS.

     As the Supreme Court has stated, "[n]o principle is more fundamental to the judiciary's

proper role in our system of government than the constitutional limitation of federal-court

jurisdiction to actual cases or controversies," the existence of which requires a plaintiff to

establish their standing to bring the claims of which they seek review.  *DaimlerChrysler Corp. v.

Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted).  For a plaintiff to meet its

burden in this regard, it must satisfy a tripartite test, namely that it has sustained an injury in fact

cognizable under article III that is sufficiently "concrete, particularized, and actual or imminent;

fairly traceable to the challenged action; and redressable by a favorable ruling" of the reviewing

court.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).  Plaintiff must meet its

burden for each of these elements in the same way as any other matter on which it bears the

burden of proof, i.e., with the manner and degree of evidence required at the applicable stage of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Thus, at the present summary judgment stage, Plaintiffs must "set forth by affidavit or other evidence specific facts" that support the requisite showing for each of the three elements necessary to establish standing. *Clapper v. Amnesty Int'l*, 568 US 398, 412-13 (2013).

In an effort to establish standing, Plaintiffs have submitted a half-dozen declarations (ECF nos. 75-80). These declarations fall into two general buckets: (1) those which rely on claimed injuries arising from alleged new development by Meadows of a destination resort following execution of the Federal Exchange near Cooper Spur (McCarthy and Fernandez); and (2) those which rely on alleged injuries arising from the loss of access to the federal land on the south side of the mountain currently within the Mt. Hood National Forest that the Forest Service will convey to Meadows pursuant to the Federal Exchange (Wenzel, Billings, Pascoe, and Sargetakis). To correct and clarify the record so as to inform issues underlying Plaintiffs' effort to establish standing, Meadows submits its own Second Declaration of Matthew B. Drake.

Plaintiffs' declarations that revolve around alleged injuries they aver they will sustain from MHMO's development activities on the northside of the mountain do not satisfy any of the three elements necessary to establish standing under article III, and thus, Plaintiffs who rely exclusively upon such declarations, Thrive and Mr. McCarthy, fail to meet their burden and should be dismissed from this case. Moreover, no member of Plaintiff Sierra Club has submitted a standing declaration, and thus, it necessarily must be dismissed from this action as well.

Right off the bat the McCarthy Declaration fails to satisfy the first prong of the article III standing test, which requires a showing that plaintiff is subject to a cognizable "injury in fact" that is "certainly impending" as opposed to merely speculative. *Whitmore v. Arkansas*, 495 U.S.

149, 158 (1990). The vast majority of the alleged injuries Mr. McCarthy contends he (and by

extension, Thrive) will sustain, however, stem from a purely speculative "destination resort" that

he repeatedly contends Meadows will seek to develop on the Panhandle that is not included in

the Federal Exchange and Meadows will therefore retain.[2] See McCarthy Declaration at ¶¶ 17-

30. These alleged injuries are quintessentially of the type that qualify as conjectural and

speculative and thus, insufficient to constitute a cognizable "injury in fact" under article III.

First, development of anything even approaching a destination resort is categorically impossible

under the zoning applicable to the Panhandle. All but around three acres of the property is zoned

as F-1 Forestland on which a destination resort is an outright prohibited use. AR43113. Indeed,

Plaintiffs' own counsel unequivocally stated in the record that "1) destination resorts are

prohibited outright" in the F-1 Zone in Hood River County "and 2) that the ability to rezone is

highly unlikely and too speculative," to which the County's Counsel responded with "True" and

"Agree that a rezone is unlikely," respectively. AR 43106; AR 43198-99. The remaining 2.89-

acre parcel is zoned for C-1 Commercial Uses, but its zoning includes special terms to limit any

uses to ones consistent with the already existing low-intensity lodging and restaurant. AR42953;

---

[2] In this context it is highly relevant that the map attached as Exhibit 2 to the McCarthy
Declaration that allegedly depicts and describes the lands Meadows will retain in Hood River
County reflects two significant errors. First, in looking at the key, it asserts that the lands
depicted in yellow represent "land to be acquired or retained by Mt. Hood Meadows." Exh. 2 to
McCarthy Declaration (ECF no. 78 at p. 14). But the map erroneously shows a large amoeba-
like parcel (below the mostly rectangular one) that is on the Mt. Hood National Forest and will
not be conveyed to Meadows under the Federal Exchange, but will be retained by the Forest
Service to be managed as Wilderness or part of the Crystal Springs WSRMU. AR45852 (Fig. 7).
Second, the map also asserts Meadows will retain "the option for a new special use permit to
expand the Cooper Spur Ski area by hundreds of acres." This is also erroneous or at best grossly
misleading given that part of the Forest Service's Federal Exchange decision is doing the exact
opposite, namely *dramatically reducing* the size of the Ski Area Permit Area from 1400 to
approximately 61 acres, with more than 1000 acres of the former permit area being converted to
Wilderness, which obviously will not be able to be used as a Ski Area. AR 45875-86 & Fig. 10.

2nd Drake Declaration at ¶ 4.  Nor is the limited size of the C-1 zoned tract large enough for anything approaching a destination resort in any event.  These alleged injuries are considerably too speculative to support standing under article III.  *See Clapper*, 568 U.S. at 410-13.

The other injury Mr. McCarthy references in his declaration arises from his alleged inability to use the F-2 zoned forestland that Meadows currently owns and will convey to the Forest Service under the Federal Exchange that he asserts he formerly enjoyed using when it was still owned by the County more than 20 years ago.  McCarthy Declaration at ¶¶ 15-16 & 31.  This also cannot constitute a requisite injury in fact given that Mr. McCarthy cannot currently legally use such forestland for the activities cited in his declaration because it is owned by Meadows and has been since 2002.[3]  AR12487-91.

Nor does the McCarthy Declaration satisfy the second prerequisite for establishing article III standing, requiring that the alleged injuries of which he complains can be said to be "fairly traceable" to the challenged agency action.  This follows from the obvious fact that, because the alleged injuries are either insufficiently certain to occur at all or lack a sound factual basis to give rise to an injury in the first place, such injuries necessarily cannot be said to be fairly traceable to the Federal Exchange.  This is essentially the same train of logic on which the Supreme Court relied in finding that the overly speculative injuries on which Plaintiffs sought to rely in *Clapper* also could not satisfy the second "causation" prong, either.  *Clapper*, 568 U.S. at 413-14.

---

[3] Mr. McCarthy also alleges that the Federal Exchange will injure him and Thrive due to its alleged "detrimental[] interfere[nce] with contractual relationships, rights and obligations flowing from the 2005 Settlement Agreement."  McCarthy Declaration at ¶¶ 7 & 14.  But in a theme that runs throughout Plaintiffs' papers, they continuously confuse and conflate the 2005 Settlement Agreement with the Exchange Legislation that provides the legal direction on which the Federal Exchange is based and upon which the Court needs to premise its judicial review.

Nor could the Court redress the alleged injuries Mr. McCarthy avers he will suffer from the Federal Exchange in any event such that he and Thrive also fail to satisfy the third standing prerequisite.  With respect to Mr. McCarthy's first set of alleged injuries arising from the destination resort he speculates Meadows will seek to build in Hood River County, the most the Court could do even under Plaintiffs' "wish list" prayer for relief would be to set aside the Federal Exchange, Amended Complaint at p. 20 (Dkt. #4), not enjoin Meadows as to what it is allowed to do on its private property following any such vacatur.  With respect to the alleged injuries Mr. McCarthy avers he has sustained from being unable to use the former county land near his property, the Court indisputably lacks authority to reach out and reverse a 2002 County Land Exchange that is not before it, but indeed is the subject of ongoing state court litigation.

Finally, the two cases involving federal land exchanges that Plaintiffs cite to support their standing, *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000)("*DCAP*") and *Western Land Exch. Proj. v. BLM*, 315 F. Supp.2d 1068 (D. Nev. 2004), cannot rescue Mr. McCarthy's Declaration from its inherent flaws.  Even as Plaintiffs summarize the holdings of those cases related to standing, the courts upheld the plaintiffs' standing in those cases based upon alleged injuries arising from loss of the ability to use the public lands to be transferred out of federal ownership as they had done prior to the proposed exchange.  Pls.' Op'g SJ Brf. at 2.

II.    THE FEDERAL EXCHANGE COMPLIES WITH THE EXCHANGE LEGISLATION.

A.    Plaintiffs' Claim That the Federal Exchange Violates Subparagraph (H) of the
      Exchange Legislation Is Based on a Flawed, Overly Rigid Misreading in a Vacuum.

Plaintiffs' first count asserting that the Forest Service's approval of the Federal Exchange violates the Exchange Legislation turns on a wooden, context-shorn interpretation of a single word in Sec. 1206(a)(2)(H)(i):  "or."  Pls.' Op'g SJ Brf. at 21-27.  That clause provides in full, under subparagraph (H) entitled "Equalization of Values:  "Notwithstanding [Sec. 1206(a)(2)(A),

which directs the Forest Service to convey to Meadows the federal lands encompassed by the

legislation if Meadows offers to convey the non-federal lands], in addition to or in lieu of

monetary compensation, a lesser area of Federal land or non-Federal land may be conveyed if

necessary to equalize appraised values of the exchange properties, without limitation, consistent

with the requirements of [the Mt. Hood Wilderness Act] and subject to the approval of the

[Forest Service] and [Meadows.]"  AR42881.  Plaintiffs contend the Federal Exchange violates

this provision because the word "or" necessarily has a disjunctive meaning such that the

exchange could only have provided for a lesser amount of land on either side of the equation, but

not both.  Pls.' Op's SJ Brf. at 22-23.  This facile argument cannot withstand analysis under the

law, logic, grammar, or an appropriate understanding of statutory context or legislative history.

      As an initial matter, one considerable stroke against Plaintiffs' argument is that Plaintiffs

themselves have proffered no less than three different (and internally inconsistent) interpretations

of what lands needed to be included in the Federal Exchange under the Exchange Legislation.

Throughout most of their papers, Plaintiffs' main argument is the Act mandates implementation

of their self-proclaimed "Clean Sweep" that would not allow for exclusion of any of the lands

referenced in the legislation from the Federal Exchange.  *See, e.g.,* Pls.' Op'g SJ Brf. at 1, 7, & 8,

& 47.  At other times, Plaintiffs contend that the direction requires absolute maximization of the

lands referenced in the Act to be included in the exchange.  *Id.* at 24.  These alternate

interpretations not only reek of confusion and desperation, they make it hard to give much

credence to any of the Plaintiffs' shifting positions on how the Act should be construed.

      First, with respect to the law, courts have long determined that legislatures often use "or"

conjunctively instead of as a disjunctive, exclusive "or."  *See, e.g., Chemehuevi Tribe of Indians

v. Fed. Power Comm'n*, 420 U.S. 395, 417–18 (1975); *DeSylva v. Ballentine*, 351 U.S. 570, 573

(1956); *Swearingen v. United States*, 161 U.S. 446, 450 (1896); *see also* 2A Sutherland, Statutory Construction, § 46.5 (7th ed., updated Apr. 2025)("Courts do not rely too heavily upon characterizations such as 'disjunctive' or 'conjunctive' forms to resolve difficult issues, but look to all parts of a statute").  Much more recently, the Court reaffirmed that "context can overcome the ordinary, disjunctive meaning of 'or.'" *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018); *see also Pulsifer v. United States*, 601 U.S. 124, 151 (2024).  When viewed in appropriate context and not in the vacuum on which Plaintiffs' interpretation erroneously relies, it becomes clear the interpretation the Forest Service gave Sec. 1206(a)(2)(H)(i) is correct and deserving of considerable deference.  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402-03 n.13 (2024) (in exercising their prerogative to construe statutes in the course of performing APA review, courts should offer "due respect for the views of the Executive Branch").

Here, contrary to Plaintiffs' contention, taking into account the full context of the Exchange Legislation, the Forest Service construed even the original Act as providing it with authority to include lesser amounts of the lands on either or both sides of prescribed exchange as referenced in the legislation.  See AR 19538-40; AR19551; AR20142.  This interpretation stemmed largely from its recognition of its separate duty as confirmed in Sec. 1206(a)(2)(B) to provide for equalization of values in accordance with Sec. 206 of FLPMA, 43 U.S.C. § 1716(b).  Another key element of the federal land exchange direction in Section 206 of FLPMA that informed the Forest Service's interpretation is its responsibility to account for well-serving the public interest when engaging in exchanges.  43 U.S.C. § 1716(a).  As the Forest Service explained in the ROD approving the Federal Exchange in reconciling all these duties, although it accepted that the Congress had effectively determined that an exchange was in the public interest by prescribing its implementation subject to certain express conditions, it retained its duty to

consider the public interest "in determining *how to implement* the land exchange." AR34856
(emphasis in original); *see also* AR45855-56. It is also worth noting that the Forest Service and
Meadows utilized "prioritization" of the parcels under their respective ownership in their original
discussions about how to configure the exchange prior to enactment of the Clarification Act.
See, e,g, AR30057-60; AR32007-32026. This was done with an eye toward which parcels each
side would prefer to retain depending on the outcome of appraisal valuations, clearly connoting
that even then, the Forest Service was acknowledging that less than all the parcels might
ultimately be included in the exchange. Seen in this light of how the Forest Service approached
complying with its duties even before the Clarification Act, it cannot be seriously contended the
Congress intended to bind the agency's hands or engage in a meaningless exercise of providing
authority under which the agency was already operating.

Rather, virtually every provision in the Clarification Act reflects the opposite, which is
that the Congress sought to expand the flexibility under which the Forest Service was operating
so that the Federal Exchange could be completed once and for all. Indeed, even within Sec.
1206(a)(2)(H)(i) itself, it expressly provides that it overrides the primary direction in Sec.
1206(a) about the lands to be contained within the exchange and then goes on to include the
phrases suffused with discretion, "without limitation" and "in addition to or in lieu of monetary
compensation," and making the final equalization expressly subject to approval of both the
Forest Service and Meadows. To make its intent even clearer in this regard, the Congress also
directed that the appraisals "shall assign a separate value to each tax lot to allow for the
equalization of values," without limiting such direction to the federal or non-federal estate.

With respect to grammar, even phrases that seem obviously disjunctive like "or, in the
alternative" are sometimes used conjunctively. *See* H.W. Fowler, A Dictionary of Modern

English Usage 147 (2d ed.1965). This is especially the case here where the Congress was not

setting forth requirements or criteria to be satisfied, but was making an express grant of authority

to the Forest Service in the light of its previous practice. Even examples from our everyday life

show why this makes sense. When one is at a dinner party and the host asks us if we would like

"cream or sugar" in our coffee, it is not understood to mean that we can only have one or the

other, but not both. That form of straitened interpretation is usually limited to situations where

the options offered are mutually exclusive, such as "Yes/No" questions. Indeed, were Congress

to have used "and" between federal and non-federal, it would have created an equal and opposite

mischief under a rigid interpretation, for then it would have been left to Plaintiffs to argue that

the exchange could have only satisfied the direction if both sides had reduced acreages.[4]

> B. The Forest Service Followed All Requisite Procedures in Approving the Appraisals on which the Federal Exchange Was Based & Mere Disagreements that Plaintiffs' Appraiser Has as to How He May Have Performed the Appraisals Do Not Render Them Arbitrary & Capricious or Inconsistent with Applicable Professional Standards.

Plaintiffs also claim that both the federal and non-federal appraisals on which the Federal

Exchange are based do not comply with certain requirements in the Exchange Legislation. Pls.'

---

[4] Plaintiffs raise several issues concerning the Forest Service's determination that the Federal Exchange as finally configured and approved was necessary for equalization of values. Pls.' Op'g SJ Brf. at 23-27. But in another manifestation of the same theme, Plaintiffs' arguments on this front are hyper-focused on a single clause in the Exchange Legislation to the exclusion of the appropriate complete context of the statutory direction and are otherwise unsound. First, that parsed snippet of the Exchange Legislation is in Sec. 1206(a)(2)(H)(i), which is expressly subject to two conditions that Plaintiffs ignore: (1) its authority is granted notwithstanding the direction in Sec. 1206(a)(2)(A), the operative provision in the legislation directing the Forest Service to convey its lands as defined in the Act if Meadows offers to convey its lands; and (2) what is necessary for equalization is not only to the Forest Service's approval, but also MHMO's. AR42881. Second, consistent with this direction, the Forest Service expressly stated that its decision "reflects the agreement between the Forest Service and Mt Hood Meadows regarding an appropriate area of lands to be exchanged as necessary to equalize appraised values." AR50376. This position is in accord with the thrust of the Court's dismissal of a claim in an earlier case involving the Federal Exchange that sought an injunction to compel the Forest Service to complete the exchange unilaterally. *HRVRC v. Pena*, Case no. 15-1397, ECF no. 21 (D. Or.).

Op'g SJ Brf. at 27-35.  The specific requirements that Plaintiffs assert the appraisals violate are found in Sec. 1206(a)(2)(D)(ii) of the Act, which as Plaintiffs note, direct that the appraisals comply with UASFLA and USPAP.  The land-exchange regulations the Forest Service adopted pursuant to Sec. 206(f) of FLPMA likewise require appraisals prepared for exchanges to which it is a party to comply with UASFLA "to the extent appropriate."  36 C.F.R. § 254.9.  Importantly, these regulations lay out a detailed set of procedures and standards that appraisers who prepare such appraisals must satisfy in order to ensure that they comply with nationally recognized appraisal standards, including UASFLA and USPAP.  Id. at § 254.9(a)-(d).

The Forest Service's regulations not only include upfront requirements that an appraiser must satisfy to qualify for preparing a federal exchange appraisal, id. at § 254.9(a), and detailed instructions on how they are to be conducted, id. at § 254.9(b)-(c), but also provide measures for the back-end of the process as well that mandate a thorough review and preparation of a written report of specific findings by a qualified Review Appraiser.  Id. at § 254.9(d).  In accordance with the Exchange Legislation, the specific Appraisal Reviews the Forest Service performed here also had the explicit purpose of judging the appraisal's compliance with both UASFLA and USPAP and "to develop a credible opinion of the adequacy of the data and appropriateness of the analysis of the data relative to the final conclusions."  AR44567 & AR44604.

This final step in the Forest Service's appraisal process is key to the Court's standard of review, for the Court is decidedly not operating on a blank slate to determine itself in the first instance or de novo whether it believes the appraisals are consistent with UASFLA and USPAP, but effectively sitting as an appellate tribunal to review whether Plaintiffs have met their burden to establish that the Forest Service's findings in this regard are arbitrary and capricious within the meaning of the APA.  See *Florida Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1984).

Plaintiffs do not even cite the Forest Service's Appraisal Reviews, but rather rely virtually entirely on their own separate appraisal reviews they had conducted that seek to poke holes in the appraisals.  Pls.' Op'g SJ Brf. at 30-34.  Before delving into any of the particulars of the concerns raised by Mr. Palmer, which the record shows contain errors and problems of their own, reviewing the following fundamental points central to the Court's review is in order.

First and foremost, as alluded to above, the Court should not allow itself to get drawn into a vortex of trying to find what it believes the appropriate values are of the exchange properties, or indeed, even which approach as between Messrs. Maloy and Palmer it might find more persuasive (even though it is worth pointing out in this regard that Mr. Palmer's short-hand critiques do not appear to have been performed in full accord with all the appraisal review requirements of USPAP, AR 42557-64, or at the level of rigor required by the Forest Service's federal appraisal regulations, 36 C.F.R. § 254.9(d)).  On the contrary, in reviewing claims under the highly deferential standards of the APA, an agency has "substantial discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (cleaned up).  As the Supreme Court has noted in the context of arbitrary and capricious review under the APA, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained its decision").  *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).  Thus, Mr. Palmer's disagreements with how Mr. Maloy carried out his appraisals or on with the ultimate valuations he reached, no matter how vigorously Plaintiffs may present them, are essentially of no moment unless they go to show that the Forest Service's approvals of the appraisals are patently unreasonable or failed to consider factors relevant to finding that the

appraisals complied with applicable legal standards, which they demonstrably do not do.  As the UASFLA candidly acknowledge, appraising is not a matter of precise mathematics and often therefore give rise to a range of reasonable estimates of fair market value.  AR28201.

Second, the primary case on which Plaintiffs rely in support of this count is far afield from the matter under review and therefore does not aid them to carry their burden either.  That case, *DCAP v. Bisson*, 231 F.3d 1172 (9th Cir. 2000), revolves almost entirely around the court's finding that the appraisal of the federal land involved in an exchange failed to account at all for a likely potentially highly valuable future use of the property as a landfill, for which the record showed a market existed, in arriving at its "Highest and Best Use" ("HBU").  *Id.* at 1180-85 & 1187.  Here, on the contrary, the only issue that Plaintiffs (and Mr. Palmer) raise concerning HBU concerns the one determined for the F-1 Forestland within the Panhandle in the obsolete 2017 iteration of the appraisals.  Pls.' Op'g SJ Brf. at 32 (citing AR47825-26, Palmer's critique of 2017 non-federal appraisal).  But the 2017 appraisals are irrelevant to the Court's review of course, as they were wholly superseded by the 2019 appraisals on which the Forest Service relied in approving the Federal Exchange.  AR50373 & AR50385.  In addition, Mr. Maloy made several modifications to his discussion and treatment of HBU for the F-1 Forestland in the Panhandle, including the determination to assign absolutely no contributory value to the storage building given its non-conforming status under County zoning law and practice.  *Compare* AR43808-11 (2019 appraisal) *with* AR42037-39.  Particularly in light of these modifications between Mr. Maloy's 2017 and 2019 appraisals, it is noteworthy that Mr. Palmer did not raise the HBU concern in his critique of the latter.  AR47833-34.  Finally, the *DCAP* opinion cannot be seen as even roughly analogous to Plaintiffs' argument given that in that case, the court was concerned that the appraisal did not consider a potential market use at all, whereas here, Mr.

Palmer's beef with the 2017 appraisal was merely his differing opinion on how to account for the fact that the Panhandle has two different zoning designations and complementary characteristics and uses that needed to be evaluated as part of a single "larger parcel."

Third, the remainder of the issues that Plaintiffs raise with the relevant 2019 version of the appraisals can effectively be categorized as simply different points-of-view on technical questions or discretionary calls such as the most appropriate methodologies to utilize. As the Ninth Circuit has admonished, these are the precise kinds of questions requiring a high degree of expertise on which an agency is to be given almost complete deference upon judicial review. *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2004)(en banc). Moreover, the Forest Service took the added step beyond that which was required of it in its land exchange regulations to request Mr. Maloy to respond to each of the issues that Mr. Palmer (and Plaintiffs raised with his 2019 appraisals, which he did point-by-point in a detailed consulting report. AR49582-96.

Lastly, it is worth quickly noting that Mr. Palmer's critiques bring to mind the adage that he who throws stones should avoid doing so in a glass house, for the record reveals that certain of his critiques are based on faulty or at least dubious calculations or premises. See AR47752-56. One particularly salient example is Mr. Palmer's fundamental error in assailing Mr. Maloy's Comparable Sale 3 upon which Mr. Palmer grounded much of his critique. AR47640-44; AR47645-54. Mr. Palmer calculated for purposes of his review that this sale had 10.8 acres of usable land that resulted in a net value of $128,333 per acre. AR47649. The glaring problem evident in his approach, however, is that he was comparing apples and oranges given that he arrived at the number of acres of usable land for the sale solely on the basis of adding up the sum of the individual platted lots as reflected on the subdivision plat, but failed to account for roads, parks, and other infrastructure located outside these lots. AR47643. Mr. Maloy did take these

additional impediments to development use into account in his analysis of the Government Camp

West parcel, which resulted in an accurate net acreage of 29.99 acres upon subtracting the

designation of 3.68 acres of wetlands, 2.41 acres of unbuildable slope areas, 7.5 areas of roads,

and 1.52 acres of public trail easements from the 45.13-acre gross sum.  Thus, it is Mr. Palmer

who confused apples with oranges in his challenge on this point, leading him to commit the very

type of error of which he accused Mr. Maloy.  AR47755.  The record contains ample evidence to

rebut or put into proper context the other alleged flaws Mr. Palmer noted in his review.  The

bottom line for purposes of this Court's review is that none of them come close to establishing

that the Forest Service's findings that Mr. Maloy's 2019 appraisals are in compliance in all

applicable material respects with UASFLA and USPAP are arbitrary and capricious.

III.    PLAINTIFFS' NEPA CLAIM IS MERITLESS & WHOLLY DISCONNCTED FROM
        CONSIDERATION OF ENVIRONMENTAL EFFECTS, THE ACT'S ENTIRE
        PREMISE, AS WELL AS THE SUPREME COURT'S LANDMARK COURSE
        CORRECTION IN JUDICIAL REVIEW OF NEPA CLAIMS.

As the Supreme Court recently proclaimed in its landmark NEPA decision of *Seven Cnty.*

*Infrastructure Coal. v. Eagle Cnty.*, 145 S.Ct. 1497 (2025), the fundamental purpose of an EIS an

agency prepares under its auspices is to "address the significant *environmental effects* of a

proposed project and identify feasible alternatives that could mitigate *those effects*."  *Id.* at 1507

(emphases supplied); see also 42 U.S.C. § 4332(2)(C) (NEPA provision requiring preparation of

EIS exclusively focuses on environmental impacts and resources).  In this same opinion, even

before addressing the merits of the matter before it, the Court engaged in a rather lengthy and

detailed historical overview of how lower courts have exercised judicial review of NEPA claims

since the statute's enactment in 1970, concluding that, because some courts have inappropriately

taken "an aggressive role in policing agency compliance with NEPA," it needed to provide a

"course correction" to bring such review back in line with statutory text and common sense."  *Id.*

at 1510-15.  It announced that this course correction could be summed up in one bedrock

principle to govern courts in their review of NEPA claims:  "Deference."  *Id.* at 1515.

   In light of this game-changing decision in which the Supreme Court went to great lengths

to run NEPA to ground and put judicial review of environmental analyses done under its purview

back on a correct trajectory, it is notable that, of the counts comprising Plaintiffs' NEPA claim:

(1) none involve analysis of environmental effects; and (2) all of them seek to entice the Court

not to defer one iota to the myriad judgment calls the Forest Service was called upon to make in

analyzing environmental effects of the Federal Exchange.  Pls.' Op'g SJ Brf. at 15-20.  As such,

Meadows believes these counts can be disposed of in short order, as discussed seriatim below.

   A.   The Forest Service's "Purpose and Need" Statement Is Reasonable & Plaintiffs'
        Challenge to it is Based on A Misinterpretation of the Exchange Legislation.

   In discussing their first NEPA Count challenging the Forest Service's Purpose and Need

Statement, Plaintiffs correctly note that a reviewing court is to determine the reasonableness of

such a statement in large measure based on the statutory context authorizing the agency action at

issue.  Pls.' Op'g SJ Brf. at 11 (citing *LOWD v. Forest Serv.*, 689 F.3d 1060, 1069-70 (9th Cir.

2012)).  Here, as described above, that context comprises the Exchange Legislation and FLPMA.

Plaintiffs' argument quickly veers off course, however, because it is based on the same flawed

interpretation of that statutory context as is their substantive claims alleging violations of the

Exchange Legislation.  More specifically, Plaintiffs first contend the Forest Service's insertion of

the two words, "up to," in describing the number of acres that ultimately will comprise the

Crystal Springs WSRMU render its Purpose and Need Statement invalid.  Plaintiffs base their

contention on their reading of a single provision in the Act that they allege imposed an

unconditional mandate for the Forest Service to include within the WSRMU the entirety of the

2854 acres "generally depicted" on a map referenced in the Act that encompasses both existing

Page 31 – MHMO'S CROSS-MOTION FOR SUMMARY JUDGMENT & MEMORANDUM

federal and non-federal lands. Pls.' Op'g SJ Brf. at 13-14. But the provision in question, Sec. 1205(a)(1)(A), does not refer to any specific number of acres in defining the WSRMU, even in approximate terms, even more notable because two other provisions in the Act that designate other special areas do so. See Sec. 1202(c)(2) (including reference to "approximately 1,710 acres" to be designated as additional Wilderness in addition to map reference) & Sec. 1204(b) (including reference to "approximately 34,550 acres" as comprising the Mt. Hood National Recreation Area in addition to map reference). Moreover, Plaintiffs' interpretation improperly seeks to construe one provision in isolation rather than in the complete "statutory context" as required. In this vein, the Forest Service knew it could include within the Crystal Springs WSRMU only the Federal land it would end up managing, and Sec. 1206(a)(2)(H)(i) expressly allows for a lesser area of the non-Federal lands to be conveyed in the ultimate exchange "without limitation," so the agency appropriately adjusted its Purpose and Need statement in the FEIS to reflect the clarified and complete statutory context under which it was operating.[5]

Plaintiffs also seek to undermine the Purpose and Need Statement by asserting it should have contained a reference to the Forest Service's need to equalize values as referenced in Sec. 1206(a)(2)(E)(i) of the Act. Pls.' Op'g SJ Brf. at 14. This argument founders right out of the gate given that the Forest Service expressly stated its overall purpose is to comply with the

---

[5] For helpful context regarding this Count, it is also worth noting the following salient points. First, upon final completion of the Federal Exchange as approved by the Forest Service, approximately 95 percent of the area "generally depicted on the map" referenced in Sec. 1206(a)(1)(A), or some 2701 acres, will be within the Crystal Springs WSRMU upon its establishment under the Act. *Compare* AR50375 *with* AR45847. Second, as to the remaining five percent that will not, comprising the Panhandle, the provision prescribing the establishment of the WSRMU in the Exchange Legislation expressly excepted the Panhandle from its prohibition against entry, appropriation, or disposition under various public land and natural resources development laws, meaning that the Congress explicitly authorized for it to end up in private hands or to be developed even if it had been included in the exchange as ultimately configured. Sec. 1205(a)(1)(C)(ii) (Panhandle referenced as "HES 151") (AR19096).

Page 32 – MHMO'S CROSS-MOTION FOR SUMMARY JUDGMENT & MEMORANDUM

direction and conditions in the exchange legislation, AR45847, which obviously includes the very provision Plaintiffs argue was not accounted for in the Purpose and Need Statement.

    B.  <u>The Forest Service Was Not Arbitrary & Capricious in Fulfilling its Statutory Obligation in its Consideration of Reasonable Alternatives in the FEIS.</u>

The second and third counts of Plaintiffs' NEPA claim assert in slightly different ways that the Forest Service was arbitrary and capricious in its consideration of alternatives in the FEIS. Pls.' Op'g SJ Brf. at 15-19. There are three fundamental problems that infuse the arguments Plaintiffs present in support of these counts that render them meritless.

First, Plaintiffs entirely overlook that identification of alternatives in the preparation of an EIS is a NEPA issue the Supreme Court highlighted as one in which an agency possesses substantial deference and in which reviewing courts are therefore to be at their "most deferential." *Seven Cnty.*, 145 S.Ct. at 1512. Plaintiffs cite nothing but NEPA cases that are all more than 15 years old. Pls.' Op'g SJ Brf. at 15-16.

Second, the premise of Plaintiffs' arguments misses the mark because it is not based on an alleged failure of the Forest Service to have considered alternatives that would have better informed the decisionmaker's analysis of or potential mitigation of environmental effects, but rather on equalization options it contends the agency should have considered. That is wholly outside the purpose of NEPA and its direction to consider reasonable alternatives. Moreover, the Forest Service considered the full panoply of environmental effects arising from an exchange that would have included all of the referenced in the Exchange Legislation, which necessarily encompassed all possible environmental effects from any potential equalization option, including the ones Plaintiffs urged the agency to consider. AR45827; AR50377.

Third, Plaintiffs' contention that the Forest Service was arbitrary and capricious by not teasing out for independent detailed treatment their preferred equalization alternatives in the

FEIS fails because it fails to recognize that equalization by the explicit terms of the Exchange

Legislation is a matter turning on the mutual agreement of the Forest Service and Meadows.

Sec. 1206(a)(2)(H)(i) grants discretion to convey lesser areas of exchange lands without

limitation, expressly subject to the approval of those two parties.  By that provision, the Congress

placed determination of the ultimate equalization decision for the Federal Exchange squarely

within the exclusive mutual purview of the parties to the exchange and no others.

    C.  <u>The Regulation Plaintiffs Allege the Forest Service Violated in their Fourth NEPA
Count Has Been Rescinded & the Agency Provided Plaintiffs the Appraisals
underlying the Exchange, on which they Extensively Commented, in Any Event</u>.

Plaintiffs' Fourth NEPA Count is facially deficient for the simple reason that it alleges a

violation of one of the NEPA implementing regulations, 40 C.F.R. § 1502.19, of the Council on

Environmental Quality ("CEQ"), all of which have been rescinded.  90 Fed. Reg. 10,610 (Feb.

25, 2025) (rescission of rules effective Apr. 11, 2025).  What is more, the Forest Service

provided Plaintiffs with the appraisals underlying the Federal Exchange and also reviewed each

of the myriad complaints that Plaintiffs raised with respect to the appraisals, rendering any error

harmless in any event.[6]  5 U.S.C. § 706(2) (in performing judicial review under the APA, courts

instructed to take "due account" of the "rule of prejudicial error").[7]

---

[6] For this reason, even though Plaintiffs opted not to pursue on summary judgment the second
count of their Exchange Legislation claim, Pls.' Op'g SJ Brf. at ii n.1, which asserts that the
Forest Service improperly failed to make the appraisals available to the public, Amended
Complaint at ¶55, Defendants are entitled to summary judgment on that count as well.

[7] Meadows specifically concurs in, and incorporates by reference herein, Federal Defendants'
statements concerning the applicable Statutory Framework and Standard of Review applicable to
Plaintiffs' claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06.

## <u>CONCLUSION</u>

For the foregoing reasons and those in Federal Defendants' summary judgment briefing that Meadows incorporates by reference insofar as it is consistent with their own, and on the basis of the administrative record, the Court should dismiss Plaintiffs Thrive, McCarthy, and Sierra Club for lack of standing and grant summary judgment in full to Federal Defendants and Defendant-Intervenor Meadows on each of Plaintiffs' Claims on the merits pursuant to the APA.

Respectfully submitted this 6th day of October 2025.

<u>s/ Stephen J. Odell</u>
Stephen J. Odell
MARTEN LAW LLP

Attorney for Defendant-Intervenor Mt. Hood Meadows OREG., LLC