**STEPHEN J. ODELL, OSB #903530**
MARTEN LAW LLP
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone:  (503) 241-2648
E-mail: sodell@martenlaw.com
 *Attorney for Defendant-Intervenor Mt. Hood Meadows OREG., LLC*

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **THRIVE HOOD RIVER; OREGON WILD; SIERRA CLUB; OREGON NORDIC CLUB; FRIENDS OF MOUNT HOOD; OREGON KAYAK AND CANOE CLUB;** and **MIKE MCCARTHY**, | Case No. 3:22-cv-01981-AR |
| Plaintiffs, | **SECOND DECLARATION OF MATTHEW B. DRAKE** |
| v. | |
| **META LOFTSGAARDEN;** and **UNITED STATES FOREST SERVICE**, | |
| Defendants, | |
| and | |
| **MT. HOOD MEADOWS OREG., LLC,** | |
| Defendant-Intervenor. | |

_____

 I, MATTHEW B. DRAKE, in accordance with the provisions of 28 U.S.C. Section 1746,

hereby declare as follows:

Page 1 – SECOND DECLARATION OF MATTHEW B. DRAKE

1.      I am the President of MBD Development, LLC, the Manager of Mt. Hood Meadows Oreg., LLC ("Meadows" or "MHMO"), a manager-managed LLC in Oregon, the non-governmental party to the congressionally prescribed and conditioned Government Camp-Cooper Spur property exchange whose approval by the Forest Service Plaintiffs challenge in this action.  I previously submitted a declaration in this action in support of MHMO's application for intervention, Declaration of Matthew B. Drake ("1st Drake Declaration") (ECF no. 12), and the statements I made in that declaration remain true and are the same in all material respects as I described them therein, including those addressing my qualifications, knowledge, and experience in regard to the issues at stake in this case.  I make this declaration based on my own personal knowledge as well as information provided by other representatives of the company with knowledge of the subjects it addresses.  I believe the information in this declaration to be true and correct to the best of my knowledge.

2.      In making this declaration, I have reviewed the papers Plaintiffs filed in support of their Motion for Summary Judgment (ECF nos. 74-80), including the declarations that they submitted to support their standing to bring the claims presented in this case (ECF nos. 75-80).  I submit this declaration in large measure to provide a more accurate and comprehensive statement of the relevant factual background leading up to and underlying the Federal Exchange than that presented in Plaintiffs' standing declarations and to correct, clarify, and provide appropriate context for many of the assertions they contain so as to better inform the factual premises relevant to a resolution of Plaintiffs' standing arguments.

3.      The events relevant to Plaintiffs' standing to bring their claims challenging the Federal Exchange began in 2001, when Meadows acquired some 159.2 acres from Dan and Sharon Dillard (the "Dillard Property" or "Panhandle") in Hood River County.  The Dillard

Page 2 – SECOND DECLARATION OF MATTHEW B. DRAKE

Property has been in private ownership since 1919 when the United States issued a patent conveying it to a homesteader under the federal Homestead Act.  HAR 1117.  Currently, the Dillard Property comprises a small 2.83-acre parcel the County has zoned C-1 Commercial with a series of special restrictions that is designated Tract 5 in the Forest Service's Federal Exchange Record of Decision ("ROD"), and 156.37 acres of land zoned F-1 ("Forest Zone") that are cumulatively designated Tracts 4, 6, and 7 in the ROD.  Although encompassed within the Proposed Federal Exchange the Forest Service analyzed in its Cooper Spur-Government Camp Land Exchange Final Environmental Impact Statement ("Federal Exchange FEIS"), the Dillard Property ultimately was excluded from the final configuration of the Federal Exchange as approved by the Forest Service in order to satisfy equalization requirements and in light of other legislative conditions of the Exchange.

4.       The Cooper Spur Inn Resort that Meadows owns and operates occupies the 2.83-acre tract of the Dillard Property.  Hood River County's C-1 zoning applicable to this tract limits its commercial uses to those consistent with those already in effect.  AR 42953.  The County also purposefully set the boundaries of the C-1 zone to the smallest possible area necessary to accommodate only the approved uses of the tract at the time of its zoning.  The County's F-1 Zoning Ordinance applicable to the remainder of the Panhandle states its purpose "is to assure the continuous growing and harvesting of trees consistent with management of soil, air, water and fish and wildlife, and while providing for agriculture and recreation."  The ordinance expressly prohibits destination resorts on lands zoned F-1.  AR 43113 (Table 4.02).  At present, a single-family residence along with a few other buildings and improvements and associated infrastructure are located on the F-1 zoned portion of the Dillard Property.  Consistent with the County's zoning direction, Meadows currently has no

intention of utilizing the Dillard Property for any uses other than those which presently exist or are allowed by the F-1 zoning ordinance. In his declaration, Mr. McCarthy repeatedly references certain preliminary "Destination Resort Plans" Meadows prepared more than two decades ago when it was evaluating a variety of options for potential uses of its properties in Hood River County upon obtaining ownership of the much larger parcels from the County as described in paragraph 5, below. The referenced plans are wholly obsolete, however, as Meadows determined as early as 2005 not to pursue development along the lines laid out in those plans, which among other things would have required securing significant changes to the restrictive F-1 zoning limitations applicable to the large majority of the Panhandle.

5.      With respect to the much larger array of properties comprising more than 600 acres that Meadows will convey to the Forest Service pursuant to the Federal Exchange designated as Tracts 1, 2, 3, and 8 in the ROD, Meadows acquired them in 2002 via a separate land exchange with Hood River County in return for which it conveyed 715 acres of other forestland it then owned to the County ("County Exchange"). AR 12485-86; AR 12487-91. In at least two places in his declaration, Mr. McCarthy erroneously asserts that, under the Federal Exchange, Meadows will retain at least some of the forestland it obtained from the County via the County Exchange. McCarthy Declaration at ¶¶ 22 & 31 (ECF no. 78). In fact, however, the Federal Exchange as approved by the Forest Service indisputably provides for Meadows to convey all the forestland it obtained from Hood River County to the Forest Service. AR 50373. This correction is not a matter of picking nits, as all 603 acres of this forestland to be conveyed to the Forest Service per the Federal Exchange will be within the Crystal Springs Watershed Special Resources Management Unit to be established with special management protections that will spring into existence upon final completion of the

exchange. Finally in this regard, the property Meadows conveyed to Hood River County in 2002 pursuant to the County Exchange shares a common border with property Mr. McCarthy owns and has therefore been in public ownership for more than two decades now as well.

6.      The Federal Exchange also provides for Meadows to convey to the Forest Service the property (not the land, which is already part of the Mt. Hood National Forest) it owns within the Cooper Spur Ski Area, consisting of buildings, furniture, fixtures, equipment, and other improvements used in operation of the Ski Area. In December 2001, the Forest Service first granted Meadows a Special Use Permit for the Ski Area. AR 14194-14209. The Permit Area presently encompasses approximately 1400 acres of which only approximately 61 are developed. Pursuant to the congressional direction prescribing the Federal Exchange, upon completion of the exchange more than 1000 acres of the remainder of the undeveloped portion of the Ski Area Permit Area would be designated additional Wilderness. AR 45875.

7.      In exchange for the property Meadows will convey to the U.S. pursuant to the Federal Exchange, the U.S. has agreed to convey to Meadows a parcel of approximately 67 acres currently within the Mt. Hood National Forest. AR 50410 & 50421. The Forest Service will retain the other smaller 40-acre federal parcel encompassed within the exchange legislation in light of other legal duties and conditions, including the equalization and public interest requirements of the Federal Land Policy and Management Act and the agency's consideration of environmental effects in its National Environmental Policy Act analysis.

8.      As Mr. McCarthy notes in his Declaration at ¶ 8, in 2002, shortly after Meadows and Hood River County executed the County Exchange, he and Thrive (that then went by its

former name of Hood River Valley Residents Committee or the acronym, HRVRC[1]) initiated

two separate lawsuits in state court (wholly independent from this one) to challenge the

County's approval and execution of that exchange. That state court litigation eventually gave

rise to mediation discussions that resulted in a 2005 Settlement Agreement among the

County, Meadows, Thrive, and Mr. McCarthy. AR16033-47.

9.      Broadly, the 2005 Settlement Agreement provided for Plaintiffs to initially abate

and then potentially dismiss their state court proceedings on the basis of which all the settling

parties agreed to support a so-called "Proposed Solution" calling for Meadows to seek to

complete a new federal land exchange that for the most part became the Proposed Action the

Forest Service evaluated in the Federal Exchange FEIS, AR 45869-88, under which

Meadows would convey virtually all its properties in Hood River County in return for the

prospect of receiving from the Forest Service the two parcels near Government Camp in

Clackamas County. Paragraphs 15 and 16 of the agreement expressly provide that the

proposed exchange could be effectuated via either legislative or administrative means and

that, if the parties pursued the former, they would either request that legislative counsel draft

proposed legislation or confer with each other in drafting it themselves. The Settlement

Agreement also provides that the parties shall not describe or characterize the position of any

other party or cast blame on any other party in their public statements or discussions with the

media, and shall only issue public statements or press releases concerning the contents of the

Agreement on which all the parties agreed. Moreover, the agreement contains detailed

---

[1]  For ease of reference and to avoid confusion, I shall hereafter refer to this Plaintiff as "Thrive"
throughout my declaration, even during the earlier period when it went by Hood River Valley
Residents Committee or HRVRC, except when its previous name is within quotation marks.

provisions on how appraisals of the properties forming the basis of the Proposed Solution were to be conducted, including that Steve Hall should prepare such appraisals. Consistent with these provisions, Mr. Hall completed the initial appraisals for both the federal and non-federal properties forming the basis of the Proposed Solution in September 2005.

10.    A critical element of the 2005 Settlement Agreement is Paragraph 5 in which the parties agreed that all of their obligations under the agreement are expressly conditioned upon ongoing abatement of the state court proceedings (or extensions of time within which the parties are required to make filings) and that, until completion of the Exchange, "if any party determines that the manner in which the Lawsuits are abated or delayed is inadequate to meet their needs, the obligations set forth herein will not bind any party." AR 16035. In 2021, abatement of the state court proceedings came to an end. Thrive and Mr. McCarthy thereby filed an amended petition for writ of review in Hood River County Circuit Court. Given that the state court proceedings are no longer abated and currently still on appeal, the parties to the 2005 Settlement Agreement are no longer bound by its terms pursuant to those very terms. Moreover, as I described in my first declaration, it is Meadows's position that Thrive engaged in at least two material breaches of the 2005 Settlement Agreement even before cessation of the abatement of its state court proceedings challenging the County Exchange. 1st Drake Declaration at ¶¶ 15-16. As I explained in more detail there, the first breach occurred in August 2020, when Thrive sent a letter to Hood River County officials that publicly attacked the validity of the finally approved appraisal reports underlying the Federal Exchange and publicly cast erroneous aspersions at Meadows for pursuing the exchange. The second occurred in January 2021, upon issuance of the Federal Exchange FEIS, at which point Thrive representatives and its counsel provided quotes for a public

newspaper article that also attacked the validity of the finally approved appraisals and criticized Meadows for its role in implementing the Federal Exchange.

11.     With respect to the state court action Thrive and Mr. McCarthy resumed litigating in 2021, as described above, the Circuit Court recently entered final judgment in favor of Hood River County on all of Petitioners' claims and upheld in all respects the County Exchange, including the County's transfer of ownership to Meadows of the 607 acres it has in turn agreed to convey to the U.S. as part of the Federal Exchange. Exhs. 1-2 (*HRVRC v. Bd. of Cnty. Comm'rs of Hood Rvr. Cnty.*, Case No. 020029CC, Supp. Jdgmt. (HR Cnty. Circ. Ct. Sept. 9, 2025) & Gen. Jdgmt. (HR Cnty. Circ. Ct. June 28, 2024). It is also worth noting in this regard that, even in the context of the one minor point on which the Circuit Court remanded to the County for remediation, which it ultimately determined the County had accomplished, it made clear that it would in no way "reverse and annul the [County] land trade" as Petitioners requested that even then had been in place for more than 21 years. Exh. 3 (*HRVRC v. Bd. of Cnty. Comm'rs of Hood Rvr. Cnty.*, Case No. 020029CC, Mem. Op. at 12 n. 5 (HR Cnty. Circ. Ct. Nov. 14, 2023). The Court noted in that regard that the "County has logged the land and entered into a long-term lease that affects the land which would return to [Meadows]" and that adopting Petitioners' preferred remedy "would set off a volcanic eruption of litigation." *Id.* Thus, for its part at least, the Circuit Court made clear it had no intent on unwinding the County Exchange. Thrive and Mr. McCarthy have filed appeals from these judgments to the Oregon Court of Appeals.

12.     Per the terms of the 2005 Settlement Agreement, Meadows and Thrive worked together cooperatively with the Oregon congressional delegation to persuade the Congress to include the original legislative direction for the Federal Exchange ("Original Congressional

Exchange Direction") as part of the Mt. Hood Lewis & Clark Wilderness Act, itself one of the dozens of federal land enactments bundled together and passed as the Omnibus Public Land Management Act of 2009. Subtitle I.C. of Act (AR 19088-19106). As ultimately enacted, the Original Congressional Exchange Direction was modified from and did not include all of the elements in the 2005 Settlement Agreement (as amended), but importantly, it did include the two main conservation features that are designed to benefit the public at large. These features provide for, upon execution of the Federal Exchange: (1) designating approximately 1710 additional acres as Wilderness on Mount Hood (Tilly Jane Wilderness Area); and (2) establishing the above-referenced Crystal Springs Watershed Special Resources Management Unit to both provide for and protect clean drinking water for Hood River County residents and enable its visitors to enjoy the watershed's special scenic, natural, cultural, and wildlife values. The Original Congressional Exchange Direction expressly provided that any exchange was subject to Meadows's willingness to offer its lands in trade for the federal lands forming the basis of the Proposed Solution. It also directed that a new set of appraisals be prepared by an appraiser that the Forest Service and Meadows would jointly select on which the ultimate configuration of the Federal Exchange would be based.

13.     The following year Meadows entered into an Agreement to Initiate the Federal Exchange ("ATI"). AR20482-20502. The ATI sets forth the understanding that the basis for value of the exchange properties shall be appraisals as ultimately reviewed and approved by the Forest Service and carried out in accordance with the exchange legislation, and expressly authorizes both the Forest Service and Meadows to withdraw from the exchange process at any time prior to execution of a binding exchange agreement. Attached to the ATI are

exhibits that, among other things, set forth a description of the respective properties that both

Meadows and the Forest Service "will consider exchanging."  AR 20485 & AR 20494.

14.    In large measure because the administrative process the Forest Service carried out

for the Federal Exchange ended up lagging far behind the time frame prescribed by the

Original Congressional Exchange Direction as well as the schedule laid out in the ATI,

Thrive opted to initiate a two-pronged approach to streamline and facilitate the exchange's

completion, composed of commencing litigation to request that this Court compel the agency

to carry out its tasks in a timely fashion and also working with Meadows to jointly pursue a

series of follow-on amendments to the original legislation.  This approach is described in an

e-mail that then-Thrive counsel Ralph Bloemers sent to me on June 22, 2015.  Exh. 5 to 1st

Drake Declaration (ECF no. 12-5).  Even as initially framed by Mr. Bloemers in that e-mail,

Plaintiffs' proposed legislative amendments expressly accepted the fact that Meadows might

well need to retain certain of its properties in Hood River County under the final contours of

the exchange, depending on how the values ultimately sorted out in the final appraisals,

which as of that time had yet to be completed.  In that vein, Mr. Bloemers's e-mail included

the following:  "This has to resemble the clean sweep of 2006 as much as is possible, and we

need to start exploring the options and making decisions before we get to a final appraisal -

If-Then Scenarios if you will starting with retaining minimal land ownership (e.g. the CSSA

(at circa 50 acres) and the Inn at Cooper Spur (at 2.84 acres) in its current configuration, and

then perhaps a portion of the Dillard forest land equal to minimum lot sizes for forest land,

second."  *Id.*  These statements expressly acknowledge that at least under the terms of the

prospective follow-on legislation it was Plaintiffs' explicit understanding that Meadows

might need to and was even likely to end up retaining certain of its lands included in the

Page 10 – SECOND DECLARATION OF MATTHEW B. DRAKE

originally proposed exchange, and they are therefore inconsistent with the assertions in Mr.

McCarthy's Declaration that the legislative direction for the Federal Exchange mandates a

"Clean Sweep" that would preclude a final exchange configuration under which Meadows

would retain any such properties.  See, e.g., McCarthy Declaration at ¶¶ 5, 12, & 32.

15.    This theme was carried forward in subsequent e-mails Mr. Bloemers sent to me,

including his expressly calling for every discrete property to be separately valued to furnish

the parties maximum flexibility in arriving at the final parameters of the exchange.  Exhs. 6-7

to 1st Drake Declaration (ECF nos. 12-6 & 12-7).  Ultimately, this string of e-mails from Mr.

Bloemers culminated in one in which he forwarded an e-mail he had sent to staff for Sen.

Wyden and Rep. Blumenauer, members of the Oregon congressional delegation, to which he

attached a draft of bill language that, as he described it, "captures in more detail what was

originally intended to occur substantively by HRVRC and Meadows," and was "prepared

jointly by counsel for Meadows and HRVRC."  Exh. 8 to 1st Drake Declaration (ECF no. 12-

8).  To afford this maximal flexibility, the draft proposed legislative language Mr. Bloemers

attached to this last e-mail authorized "without limitation" a final exchange encompassing

less than all of the federal or non-federal properties identified for exchange in the Original

Exchange Direction and became the text of Section 2(2)(B)(H)(i) of the Mt. Hood Cooper

Spur Land Exchange Clarification Act enacted in 2018 ("Clarification Act").  AR 42881.

16.    Thus, consistent with the explicitly stated common understanding and intent of

both Thrive and Meadows as described in the series of e-mails from Thrive's counsel, the

Clarification Act as enacted contains provisions that both require the final appraisals

underlying the exchange to assign a separate value to discrete parcels to enhance equalization

of values for the federal and non-federal lands ultimately included in the finally approved

exchange (Sec. 2(2)(a)(ii)), and also authorize the Forest Service and Meadows to exchange less than the full array of properties encompassed by the originally proposed exchange "without limitation" insofar as necessary to equalize appraised values of the exchanged properties (Sec. 2(2)(B)(H)).  AR 42879-82.

17.      Following completion and the Forest Service's formal approval of the final appraisals prescribed by the Clarification Act (Sec. 2(2)(A)(iii)), both Thrive and Meadows reviewed the reports, eventually sharing their respective concerns to the Forest Service.  The upshot is that neither Thrive nor Meadows wholly supports the property values reflected in the finally approved appraisals – Thrive believes the appraisals considerably undervalue the federal lands Meadows will receive under the Exchange while overvaluing the property that Meadows is committed to providing, while Meadows's view reflects the converse.  It is nevertheless perhaps not altogether surprising that neither Thrive nor Meadows is satisfied with the final appraisal values, but what cannot be seriously disputed is that the final appraisals were performed in conformance with all applicable legal requirements, federal regulations, and professional standards, and that Meadows had no control over the values Mr. Maloy found following a thorough and independent process.

18.      Around this same time, and consistent with direction in the Clarification Act, the values assigned to discrete parcels and various buildings, improvements, and items of personal property in Mr. Maloy's 2019 appraisal reports became the basis of discussions between the parties to the Federal Exchange -- the Forest Service and Meadows -- regarding which configuration(s) of federal and non-federal lands would provide for the necessary equalization of values under applicable legal standards and also be feasible for both parties from legal, environmental, and economic perspectives.  These discussions allowed the Forest

Service and Meadows to discuss and explore the major potential exchange permutations in the context of both applicable legal requirements and for purposes of discerning whether each would be workable for both of them to aid and help inform the agency in arriving at an equalization of values and ultimate configuration that would well serve the public interest while also still being mutually feasible and sustainable over the long-term. This approach not only was expressly contemplated by the Clarification Act, it also made sense because, as noted above, the exchange legislation does not compel Meadows to engage in the exchange, nor does the ATI that Meadows and the Forest Service executed bind either party to complete any exchange until and unless both parties execute an exchange agreement.

19.    Eventually, in May 2022 the Mt. Hood National Forest Supervisor issued the Final Record of Decision approving the Federal Land Exchange subject to review in this case. AR50369-50408. The next day, on the basis of the approval and authorization in the Final ROD, the Forest Service and Meadows executed a binding Exchange Agreement, committing themselves to exchange the lands comprising the Federal Land Exchange as approved and described in that agreement. AR50410-25. I executed the Exchange Agreement on behalf of Meadows and stand ready to implement it so that the considerable benefits it will provide not only to residents of Hood River and Clackamas Counties, but to all Oregonians and indeed, all of those who care about the mountain, can finally be realized.

20.    In that light, the Federal Exchange as approved by the Forest Service and agreed to by both the agency and Meadows contains all of the principal long-term public benefits Congress sought to provide in the Original Congressional Exchange Direction and the Clarification Act, including the addition of more than 1700 acres to the existing Mt. Hood-Tilly Jane Wilderness Area, creation of a new Crystal Springs Watershed Special Resources

Management Unit, the Forest Service's acquisition of title to and management under the Northwest Forest Plan of more than 500 net acres of additional high-value forestland to be added to the Mt. Hood National Forest, and the provision of additional housing units vitally needed for both local workers and the mountain's many recreational users in an already developed area of the mountain at Government Camp. I would emphasize that not one of these public benefits will be realized unless the Federal Exchange that has been in the works for more than two decades with the consistent bipartisan support of the Oregon congressional delegation is finally executed and put into effect.

21.     As I noted in my first declaration, I am a fourth-generation Oregonian. I therefore respect that Mr. McCarthy's family has an established history on Mt. Hood and understand he has strong feelings about what he believes to be in the long-term best interest of the mountain. My family also has a long history heavily involved with deeply appreciating, enjoying, and responsibly caring for the mountain's many extraordinary resources, features, and amenities. Indeed, my father successfully competed for and was awarded the original Special Use Permit for Mt. Hood Meadows in 1966-1967, which I remember well. My late sister was also wholeheartedly committed to the proper management and conservation of Mt. Hood. I grew up in many respects on the mountain and have devoted the majority of my adult professional life to its appropriate utilization and conservation so that many more generations of Oregonians, including the states' many Tribal members whose history with the mountain reaches back even further, and the many others who appreciate its extraordinary natural resources, rugged grandeur, and matchless recreational opportunities will be able to share in the same blessings that my family and I have.

Page 14 – SECOND DECLARATION OF MATTHEW B. DRAKE

22.     I have remained committed to seeing this Federal Exchange through for more than twenty years (and counting).  Working closely with my team at MHMO, LLC, and pursuant to the administrative guidance of the Forest Service, we have diligently and consistently performed all of the many duties and responsibilities required of us to complete this Exchange in good faith and a professional manner.  We have invested heavily in these efforts and have made many sacrifices during a journey that Congress intended to be completed in 16 months.  Along with the entire MHMO, LLC team, I believe, as Congress determined in overwhelmingly passing the legislation prescribing the Exchange, that the totality of the benefits it will provide upon its completion will serve not just one narrow set of interests, but will well serve the public interest overall, and offers the best opportunity in this century to fulfill a legacy to enhance and protect a true treasure of Oregon, Mt. Hood, in perpetuity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of October 2025.

s/ Matthew B. Drake
Matthew B. Drake
President, MBD Development
Manager, Mt. Hood Meadows Oreg., LLC

Page 15 – SECOND DECLARATION OF MATTHEW B. DRAKE