FILED
NOV 14 2023
TRIAL COURT CLERK
HOOD RIVER COUNTY CIRCUIT COURT

Verified Correct Copy of Original 11/14/2023._

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF HOOD RIVER

| | |
|---|---|
| HOOD RIVER VALLEY RESIDENTS' COMMITTEE, INC., an Oregon non-profit corporation, and MIKE MCCARTHY, an individual resident of the state of Oregon and Hood River County,<br><br>Petitioners,<br><br>v.<br><br>BOARD OF COUNTY COMMISSIONERS OF HOOD RIVER COUNTY, an Oregon Municipal Corporation, and MT. HOOD MEADOWS OREGON, LTD, an Oregon limited partnership,<br><br>Respondents. | Case No. 020029CC<br><br>MEMORANDUM OPINION FOLLOWING WRIT OF REVIEW HEARING |

## INTRODUCTION

Following two public hearings held in August of 2001, the Board of County Commissioners of Hood River County (hereafter BOC) entered into a land exchange agreement with Mt. Hood Meadows Oregon, Ltd. (hereafter MHM). In March of 2002 Respondents (collectively referred to as Thrive) filed a Petition for Writ of Review. The trial court dismissed the Petition, but that decision was reversed by the Court of Appeals. **Hood River Valley Residents' Committee, Inc. v. Board of County Commissioners of Hood River County**, 193 Or App. 485, 91 P.3d 748 (2004) ("**HRVRC**"). The case was not remanded back to the trial court for nearly 17 years due to extensive (and perhaps unprecedented) efforts by the parties to effectuate a settlement of the litigation.[1] Following remand, Thrive filed an Amended Petition for Writ of Review on June 17, 2021. The record (totaling 1,218 pages) was returned September 23, 2021. Preliminary motions and objections were filed, briefed, argued,

---

[1] In the interim MHM has entered into an exchange agreement with the US Forest Service pursuant to which it is required to convey all the land it received from Hood River County to the US Forest Service and receive in return property located in Government Camp. For its part, the County has entered into a long-term lease for construction of a reservoir on the land it received from MHM and logged significant stands of timber from that land.

1

_Verified Correct Copy of Original 11/14/2023._

and adjudicated. The Writ of Review was finally heard August 3, 2023, nearly 22 years to the day from the first public meeting on the proposed land exchange.

The land exchange at issue was governed by ORS 275.335. That statute provided in relevant part:

> (1) Notwithstanding the provisions of ORS 275.330 or 275.340, any county court[2] may provide for the exchange of land within a designated county forest for other land when in the judgment of the county court, supported as provided in subsection (3) of this section, such exchange is for equal value and is in the best interest of the county. Such exchanges shall be authorized under this section only when the land obtained by the county in exchange is immediately incorporated into the designated county forest.
> (2) Before making an order for exchange of property, the county court shall hold a hearing in the county courtroom at which objections to the proposed exchange of real property may be heard. Notice of the hearing shall be given by publication weekly for two consecutive weeks, or two publications in all, in a newspaper circulated generally within the county, such notice to describe particularly the property affected. The date of hearing shall be not less than five days following the last date of publication of notice.
> (3) The exchange authorized in subsection (1) of this section shall be made by order of the county court duly entered in its journal and supported by reports of the value of the properties being exchanged submitted by:
>    a. The county assessor; and
>    b. The county forester or other qualified agent selected by the governing body.
> (4) The exchanges authorized in this section may include any timber on the land involved if the value of such timber is established as provided in subsection (3) of this section.

In Writ of Review proceedings, such as this, the Court must determine whether the local governing body:

(a) Exceeded its jurisdiction;

(b) Failed to follow the procedure applicable to the matter before it;

(c) Made a finding or order not supported by substantial evidence in the whole record;

(d) Improperly construed the applicable law; or

---

[2] "The 'county court' is 'the governing body and shall exercise general legislative authority over all matters of county concern and shall consist of the county judge and two county commissioners[.]' ORS 203.111. ORS 203.230, in turn, permits counties to abolish the office of county judge, add a third commissioner, and 'transfer all powers and duties of the county court and the county judge to the board of county commissioners[.]' ORS 203.230(1). Thus, as pertinent here, the 'county court' described in ORS 275.335 consists of the county commissioners." **Hood River Valley Residents Committee, Inc. v. Board of County Commissioners of Hood River County**, *supra*, at ftnt. 8.

(e) Rendered a decision that is unconstitutional.

**ORS 34.040(1).** Following the review, "the court shall have power to affirm, modify, reverse or annul the decision or determination reviewed, and if necessary, to award restitution to the plaintiff, or to direct the inferior court, officer, or tribunal to proceed in the matter reviewed according to its decision." **ORS 34.100**.

Thrive asserts four claims for relief. First, Thrive contends that the BOC failed to make the necessary findings that the land exchange was in the best interest of the county and for equal value. Second, Thrive argues that the failure to hold a public hearing following the completion of the valuation reports violated the requirements of ORS 275.335(2). Third and Fourth, Thrive contends that the BOC improperly construed ORS 275.335 by not using the proper measurement for "equal value" and by allowing for an equalizing cash payment, thereby resulting in the decision of the BOC not being supported by substantial evidence.

## FAILURE TO MAKE FINDINGS

The BOC and MHM argue that the requisite best interest and equal value findings were made at the public hearings held in August of 2001. *See* pg. 15, ll. 17-21 of BOC trial brief; pg. 12, ll. 11-16 of MHM trial memorandum. I agree that best interest findings were made[3], but conclude that the BOC only made (and could only make) a preliminary finding of equal value following the public hearings.[4] However, I cannot find from the record that the BOC ever made a final finding of equal value that was

---

[3] Respondents did not argue that the best interest determination was not subject to writ of review. But I note that "[w]hen a governmental action is characterized as 'legislative' or 'adjudicative,' there is the risk that the characterization will be carried beyond the specific issue being decided." **Strawberry Hill 4 Wheelers v. Board of Commissioners for Benton County**, 287 Or. 591, 602, 601 P.2d 769 (1979). Although the Court of Appeals held in **HRVRC** that the county's decision to enter into the land exchange agreement was "quasi-judicial" and thus subject to challenge by writ of review, it is not clear that the holding extended to review of the best interest determination: "Respondents are correct that, under Land (v. City of Prineville), 49 Or App. 385, 619 P.2d 940 (1980)), the requirement of ORS 275.335(1) that 'such an exchange...is in the best interests of the county' cannot, and does not render the county's decision here 'quasi-judicial.'" **HRVRC**, *supra*, at 498.

[4] The BOC was aware at the public hearings that the exchange had to be for equal value and had a pretty good idea what the respective values of the properties were. The BOC knew the property the county would receive was worth more but didn't have a precise idea of how much more. By baking into the agreement an equalizing payment (not to exceed $1.5 million), the BOC essentially made a finding that the exchange would be for equal value. But, for the reasons stated below, this finding could only be preliminary and not final given the dictates of the statute.

supported by the requisite evidence.

As previously described, two public hearings were held in August of 2001 to consider the proposed land trade between Hood River County and Mount Hood Meadows. The BOC reviewed and considered verbal and written public comments (pro and con) regarding whether the proposed land exchange was in the county's best interest. The BOC wrestled with a number of considerations that can only be described as "best interest" considerations. Examples include the affect the exchange would have on Crystal Springs, marketability, drainage, protection of natural resources, the potential affect on TL 1000 and 1400, age of the timber, whether the scenic highways had been considered, whether better lands (to exchange) were available, the inherent difficulty of finding lands to exchange, and the primary benefits to the county in making the exchange. Chair Arens opined that it was in the best interest of the county to move forward with the exchange due to the age of the timber in question. Commissioner York concurred and noted she preferred to own land within the county when possible because it was easier to manage. Commissioner Thomsen made a motion to go with the recommendation of the Forestry department and approve the land exchange. The motion carried 4-1. **RECORD** 001208-001212. In my view this constituted a best interest determination by the BOC.

The BOC and MHM also argue that the equal value finding I characterize as "preliminary" in footnote 4 is all that was required under the statute. This argument underpins their repeated assertions that the filing of the Writ of Review was untimely. But this argument ignores the holding in **HRVRC**. As the Court of Appeals instructed in **HRVRC**, the decision following the August public meetings is what *triggered* the requirement that the BOC make a quasi-judicial decision regarding the proposed land trade; it was not the endpoint of that quasi-judicial process. Indeed, this instruction was central to the holding by the Court of Appeals that the land trade was subject to a writ of review:

> We turn to the first of the factors set forth in Strawberry Hill 4 Wheelers— whether the governmental process, once begun, "calls for reaching a decision." … Here, the county *began a process* when it entered into its *preliminary* agreement with Mr. Hood Meadows in August 2002. *(sic.)* Pursuant to that agreement, the proposed exchange was subject to various conditions, including the results of a timber cruise and an appraisal by the county assessor.

4

**Exhibit 3 to Second Drake Declaration**
Thrive Hood River v. Loftsgaarden, Case no. 3:22-cv-1981-AR (D. Or.)

_Verified Correct Copy of Original 11/14/2023_

_Verified Correct Copy of Original 11/14/2023._

Moreover, and necessarily, the ultimate decision as to whether the exchange would, in fact, be consummated was also conditioned upon compliance with ORS 275.335. Thus, while the county was not required to enter into the initial agreement with Mt. Hood Meadows, once it did so, it was ultimately bound *to reach a decision* as to whether the contractual and *statutory conditions* for the exchange *had been satisfied* and, thus, whether the exchange should actually be consummated.

**Hood River Valley Residents' Committee, Inc. v. Board of County Commissioners of Hood River County**, *supra,* at 497 (emphasis added).

Nor could the BOC have made the requisite equal value finding in August of 2001, because the evidence necessary for such a finding had not yet been developed. As the Court of Appeals instructed in **HRVRC:** "…ORS 275.335(1) requires that the county must not only make a 'best interest' determination but must also make a finding that the 'exchange is for equal value.' Further, the latter finding must be 'supported by reports of the value of the properties being exchanged' prepared by certain county officials. ORS 275.335(3). That is, *the statute prescribes the nature and form of the evidence that must substantiate the 'equal value' finding.*" **HRVRC** at 498 (emphasis added).

It is clear that ORS 275.335 required that the equal value finding be "supported" by reports of the value of the properties being exchanged, submitted by the county assessor and the county forester or other qualified agent selected by the governing body. The statute does not define the word "support." "In the absence of any evidence to the contrary, we assume that the legislature intended to give those words their plain, natural, and ordinary meaning, relying on dictionaries that were in use at the time the statute was enacted." **State v. Delaurent**, 320 Or App 191, 195, 514 P.3d 113, *rev. den.*, 370 Or. 303, 518 P.3d 126 (2022) (citations and internal quotation marks omitted). "Support" means "to show or tend to show to be true; help prove, vindicate, or corroborate." **Webster's New World Dictionary of the American Language**, 2nd College Edition (1976). Thus, the necessary factual support for an equal value finding was not available to the BOC in August of 2021. It simply did not exist at that time and therefore the BOC could not make a final equal value finding at that time.

The reports were eventually generated in October of 2021. **RECORD** 000329-000420; **RECORD** 000421-000497; **RECORD** 000498-000550. Respondents argue

that the appraisals reflect equal value, that the BOC did not exercise its contractual right to object to the appraisals, and no further affirmative action needed to be taken by the County. See pg. 13 of MHM Trial Memorandum. Ultimately, I don't feel it's necessary to determine whether the BOC could passively discharge its quasi-judicial responsibilities in this manner (although I have my doubts), because I cannot find from the record that the underlying valuation reports were actually presented to the BOC. At most, I can only find that a *summary* of the reports was provided. **RECORD** 000553-000556. A summary is not the prescribed "nature and form of the evidence that must substantiate the 'equal value' finding." Therefore, I conclude that the BOC failed to make the requisite equal value finding.

## **FAILURE TO HOLD A PUBLIC HEARING FOLLOWING COMPLETION OF THE VALUATION REPORTS[5]**

As previously noted, the requisite valuation reports were produced in October of 2021. Thrive argues that the failure to hold another public hearing following their completion violated the requirements of ORS 275.335(2). Thrive concedes that while a public hearing is required under ORS 275.335, the statute does not specify that the hearing has to be held after the valuation reports have been completed. But Thrive argues that this is implicit, because holding the public hearing before the public has had an opportunity to see the valuation reports renders the notice and hearing requirements "substantially meaningless." See pg. 17, ll.11-15 of Thrive opening brief.

I think Thrive understates the quality of the public hearings that were held prior to the BOC's decision to move forward with the land exchange. BOC and MHM provide a good description of what happened at the public hearings in their respective briefs which I won't rehash here. Several salient points emerge. In response to concerns

---

[5] Thrive also argues that the BOC was required and failed to hold a hearing when the trade discussed at the public meetings was modified prior to completion of the trade. This argument lacks merit. While the ultimate trade was different than the trade the public commented on, it is important to understand how it was different. Hood River County still received the land from MHM discussed in August of 2021. And MHM didn't receive any land *not* discussed in August of 2021. MHM just received 26 fewer acres of it. ORS 275.335(2) requires notice and public hearing of the *property affected*. The land Hood River didn't trade was not affected by the trade *because it wasn't traded*. It was County land before the public hearings and before the land exchange and remained County land after the land trade.

6

raised at the August 6 hearing the BOC continued the hearing to August 20 to allow the public more time to submit written public comment or make oral public comment. Best interest concerns *and* valuation were discussed. An accurate estimate of the respective value of the properties was provided by the Forest Manager. **RECORD** 001208-001212. Some members of the public weighed in favorably on the valuation. **RECORD** 000196-000199. The public hearing was not a sham.

    I also think Thrive overstates the benefit of completing the valuation reports prior to the public hearing. As previously discussed, valuation was addressed at the public hearings and the BOC made a preliminary decision regarding valuation. Nothing prevented the public from weighing in on the matter, and in fact some members of the public did so. Thrive contends that this public commentary was "substantially meaningless" since the public had not had the opportunity to review the valuation reports beforehand. But how much more meaningful would public comment be after the reports were generated?

    I can imagine three broad categories of public commentary. The first is methodology--what is the proper methodology for assessing the value? This type of commentary can come before the valuation is conducted in the form of advocating for a preferred methodology to be employed; or it can come after the report is completed to argue the merit of the report based on the methodology used. The second category is the qualifications of the agent selected by the BOC to conduct the valuation. Again, that type of commentary can come before the valuation is conducted in the form of advocating for a certain agent or advocating for certain qualifications the agent must possess; or it can come after the report is completed to argue the merit of the report due to criticisms of the agent selected or his/her qualifications. For these two categories of commentary, which timing is more "meaningful", before or after the report is generated? I would argue that these two categories of commentary are more meaningful before the reports are generated because they can influence the content of the reports (if the commentary is adopted) while also serving as a critique of the content of the reports (if the commentary is not adopted). In addition, there is value in having the public commentary before tax money is spent to obtain the reports. Commentary coming after

7

**Exhibit 3 to Second Drake Declaration**
Thrive Hood River v. Loftsgaarden, Case no. 3:22-cv-1981-AR (D. Or.)

Verified Correct Copy of Original 11/14/2023

the reports are completed can only serve the critique function.[6]

For the foregoing reasons I do not agree with Thrive that ORS 275.335(2) must be read the way Thrive wants it to be read to avoid rendering the public hearing requirement "substantially meaningless." But even if I did, this Court is not empowered to advance public policy concerns by reading requirements into a statute that are not actually set forth in the statute. "In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all." **ORS 174.010**. When Oregon courts interpret a statute, "[w]e ascertain the legislature's intentions by examining the text of the statue in its context, along with relevant legislative history and, if necessary, canons of construction."[7] **State v. Cloutier**, 351 Or. 68, 75, 261 P.3d 1234 (2011) (*citing* **State v. Gaines**, 346 Or. 160, 171-73, 206 P.3d 1042 (2009)).

In asking this Court to add a requirement that the hearing take place after the valuation reports have been completed, Thrive asks this court to "insert what has been omitted" from the statute. In my view, to do so would constitute judicial overreach. Thrive's claim on this issue is therefore denied.

## FAIR MARKET VALUE

Thrive notes that in the Real Estate Exchange Agreement (REEA) between the BOC and MHM, the following provision was included governing how the requisite appraisals were to be prepared: "Each land appraisal shall be based on current zoning of the appraised property as of the date hereof…and future changes to the zoning or proposed changes to the zoning shall be ignored." **RECORD**-000263. Thrive argues that '[b]y excluding consideration of proposed or reasonably anticipated zoning changes, the appraised values would reflect values other than (Fair Market Value)." *See*

---

[6] The third category of commentary is descriptive—what do the reports say? Obviously, this type of commentary can only come after the reports are completed, but it strikes me as the least valuable category. Presumably the BOC can read what the reports say.

[7] The parties have not cited, and I have not found any legislative history that is helpful to my analysis. *See* **ORS 174.020(3)** ("A court may limit its consideration of legislative history to the information that the parties provide to the court.").

8

**Exhibit 3 to Second Drake Declaration**
Thrive Hood River v. Loftsgaarden, Case no. 3:22-cv-1981-AR (D. Or.)

Verified Correct Copy of Original 11/14/2023

Petitioner's Opening Brief on the Merits, p. 28, ll. 15-17. From this premise Thrive argues that the BOC misconstrued ORS 275.335(1), which requires that the land exchanged be for equal value.

MHM responds that ORS 275.335 does not require that the County conduct any particular kind of appraisal or evaluation of value in order to determine whether the properties being exchanged are for equal value. Further, MHM analogizes how value is determined in condemnation cases and notes that in those cases hypothetical or speculative zoning changes are not considered. *See* MHM Trial Memorandum, p. 17, l.5 through p. 19, l. 4.

I conclude that MHM has the better argument and find that the BOC did not misconstrue ORS 275.335. But assuming *arguendo* that Thrive is correct--that the provision in the REEA that required future or proposed changes to zoning be ignored during the appraisal process evinced a misunderstanding of the applicable statute--the misunderstanding had no impact on the appraisals. There *were no* proposed or reasonably anticipated zoning changes at the time the appraisals were completed *to* ignore.[8] For the foregoing reasons, Thrive's claim on this issue is denied.

## EQUALIZING CASH PAYMENT

At the closing of the land trade in March of 2002 the County paid MHM the cash sum of $1,038,491.93. **Record**-000845. It is undisputed that this cash payment was meant to "equalize" the disparity in value between the County's parcels of land and MHM's parcels of land. Thrive argues that ORS 275.335 does not authorize the County to pay cash to equalize the land exchange and that equalizing the transfer with a cash payment the County improperly construed the applicable law. Thrive argues for a construction of the statute that forbids cash equalizing payments, and cites legislative history in support of its interpretation of the statute:

> "Rep. George Annala, co-sponsor of the bill, explained to the committee that the purpose of this bill is to permit the county court to consolidate into more suitable units, county forests. He said that the only counties in the State of Oregon that have county forests at the present time are Hood

---

[8] Thrive does not suggest that zoning changes are being considered even now, 22 years later. Indeed, as previously noted, MHM has agreed to trade all of the land it received from Hood River County to the US Forest Service.

9

Verified Correct Copy of Original 11/14/2023

> River and Coos and that Coos County will neither forfeit nor benefit if this bill is passed. Rep. Annala told the committee that Hood River County has approximately 33,000 acres in forest lands, but they are scattered throughout the county and this bill would permit the court to trade. He pointed out that there would be no money involved but that it would not necessarily mean that it would be traded acre for acre but rather that the value of each would have to be considered."

**Committee on Natural Resources**, Minutes of February 2, 1961.

In **State v. Gaines**, 346 Or.160, 206 P.3d 1042 (2009), the Supreme Court set forth the proper methodology for interpreting a statute:

> "We therefore conclude that, in light of the 2001 amendments to ORS 174.020, the appropriate methodology for interpreting a statute is as follows. The first step remains an examination of text and context. But, contrary to this court's pronouncement in *PGE*, we no longer will require an ambiguity in the text of a statute as a necessary predicate to the second step—consideration of pertinent legislative history that a party may proffer. Instead, a party is free to proffer legislative history to the court, and the court will consult it after examining text and context, even if the court does not perceive an ambiguity in the statute's text, where the legislative history appears useful to the court's analysis. However, the extent of the court's consideration of that history, and the evaluative weight that the court gives it, is for the court to determine. The third, and final step, of the interpretative methodology is unchanged. If the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty.
>
> With regard to this changed methodology, we clarify that a party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it. Legislative history may be used to confirm seemingly plain meaning and even to illuminate it; a party also may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute. For those or similar purposes, whether the court will conclude that the *particular* legislative history on which a party relies is of assistance in determining legislative intent will depend on the substance and probative quality of the legislative history itself."

**State v. Gaines**, *supra*, at 171-72 (emphasis in the original).

In light of the foregoing instruction, I conclude that the legislative history cited by Thrive hurts its position more than it helps. Although Rep. Annala made a remark that "no money would be involved," it is hard to put that remark in any meaningful context

10

_Verified Correct Copy of Original 11/14/2023._

given what Thrive presented to this Court. Is the remark an off-hand comment on how he anticipated the legislation to operate? Or was it intended to alleviate some legislator's concern about money being part of a land exchange? And if it was in response to a concern, was the concern about the County receiving money, paying money, or both? Ultimately, is it reasonable to believe there *was* a concern about the County paying money to equalize a land exchange—in other words, to use money to acquire land? Hood River County already *had authority to do that* under ORS 203.010. And under the authority to purchase land under that statute, the BOC was not required to hold a public hearing or determine whether the purchase price was for fair market value or determine whether it was in the best interest of the County or even to immediately incorporate the acquired land into designated county forest. Given the lack of meaningful context, I give very little evaluative weight to the portion of Rep. Annala's statement that Thrive emphasizes.

On the other hand, I give significant weight to what Rep. Annala stated was the *purpose* of the bill—to permit Hood River County to consolidate county forests into more suitable units. "In evaluating competing plausible interpretations of a statute, we are counseled to adopt the construction that is the one closest to what we anticipate the legislature would have intended us to adopt had it confronted the matter… In conducting that inquiry, we are guided by what the legislature or the courts have identified as the broader purpose of the statute. *See, e.g.*, Linn-Benton-Lincoln Ed. V. Linn-Benton-Lincoln ESD, 163 Or App 558, 570, 989 P.2d 25 (1999) ('[A] court should attempt to construe the language of a statute in a manner consistent with its purpose.')" **Godfrey v. Fred Meyer Stores**, 202 Or App 673, 689, 124 P.3d 621 (2005). The broad purpose of the bill was to facilitate land exchanges to permit Hood River to consolidate its forest holdings into more suitable units. That purpose would appear to be entirely undermined if Hood River County was prohibited from using cash to equalize the transaction, because it would be extremely difficult to find two properties of exactly identical value. Given that the legislature put no restrictions on the County's authority to *purchase* land within its boundaries (*see*, **ORS 203.010**), it seems absurd to conclude that the legislature intended to forbid the County from using money to obtain land as part of a land exchange. I therefore conclude that the BOC did not misconstrue ORS

11

275.335 and that a cash equalizing payment was permissible under the statutory scheme.

## REMEDY

The scope of the Court's remedy power in Writ of Review cases is set forth in ORS 34:100: "Upon the review, the court shall have power to affirm, modify, reverse or annul the decision or determination reviewed, and if necessary, to award restitution to the plaintiff, or to direct the inferior court, officer, or tribunal to proceed in the matter reviewed according to its decision." The phrase "to direct the inferior court, officer, or tribunal to proceed in the matter reviewed according to its decision" grants the Court power to remand, with instructions, the challenged decision to the inferior tribunal. **Home Builders Ass'n v. City of West Linn**, 204 Or App 655, 662, 131 P.3d 805, *rev. den.* 341 Or. 80 (2006).

I have denied all of Petitioner's claims on the Writ of Review except one: I cannot discern from the record that the requisite underlying valuation reports were ever presented to the BOC for its review. I will therefore enter a judgment remanding the case back to the BOC to allow it to review the underlying reports in order to determine whether the statutory condition for the land exchange--*i.e*, whether it was for equal value--had been satisfied when he land exchange was approved.[9] The County is directed to confer with the other parties and submit a judgment consistent with this opinion for my signature.

DATED THIS 14th day of November, 2023.

*/s/ John A. Olson*
John A. Olson
Circuit Court Judge

---

[9] Petitioners seek to have this court fully reverse and annul the land trade. As previously noted, the land trade has now been in place for more than 21 years. Hood River County has logged the land and entered into a long-term lease that affects the land which would return to MHM. For its part, MHM has agreed to trade the land that would revert back to Hood River County to the US Forest Service. Adopting Petitioners' preferred remedy would set off a volcanic eruption of litigation. Petitioners' preferred remedy is simply not necessary to "right the wrong" identified here. It is tantamount to treating a common cold with chemotherapy.

12

Exhibit 3 to Second Drake Declaration
Thrive Hood River v. Loftsgaarden, Case no. 3:22-cv-1981-AR (D. Or.)