Jesse A. Buss, OSB No. 122919
Willamette Law Group, PC
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Karl G. Anuta, OSB No. 861423
Law Office of Karl G. Anuta, P.C.
735 S.W. First Ave.
Portland OR 97204
Tel: 503-827-0320
Fax: 503-386-2168
Email: kga@lokga.net

*Attorneys for Plaintiffs Thrive Hood River, Oregon Wild, Sierra Club, Oregon Nordic Club, Friends of Mount Hood, Oregon Kayak and Canoe Club, and Mike McCarthy*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THRIVE HOOD RIVER, OREGON WILD, SIERRA CLUB, OREGON NORDIC CLUB, FRIENDS OF MOUNT HOOD, OREGON KAYAK AND CANOE CLUB, and MIKE McCARTHY,<br><br>Plaintiffs,<br><br>v.<br><br>META LOFTSGAARDEN, Forest Supervisor for the Mt. Hood National Forest, and the UNITED STATED FOREST SERVICE,<br><br>Defendants,<br>and<br><br>MT. HOOD MEADOWS OREG., LLC,<br><br>Defendant-Intervenor. | Case No. 3:22-cv-01981-AR<br><br>**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT and RESPONSE TO GOVERNMENT'S AND MEADOWS' CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## Table of Contents

<u>Page Nos.</u>

Table of Authorities ............................................................................................................. iii

Introduction ........................................................................................................................1

Argument ...........................................................................................................................2

   I.   Conservation Plaintiffs have standing ..............................................................3

   II.  Violations of the Omnibus Act and the APA .....................................................5

        A.    The purpose of the Omnibus Act is to facilitate the exchange of "approximately 770 acres of private land" for "approximately 107 acres of National Forest System land."…………………………………………………………………6

        B.    Meadows formally offered to exchange all of its land, triggering the mandatory full exchange under the Omnibus Act……………………………………………7

        C.    The Clarification Act of 2018 allows for the exchange of reduced acreage only "if necessary to equalize appraised values of the exchange properties."……………..8

        D.    The Forest Service's reliance on a *post hoc* explanation of "necessity" violates the APA…………………………………………..…………………………….....9

        E.    Meadows' breach of the 2005 Settlement Agreement does not constitute "necessity" under the Omnibus Act……………………………………………...10

        F.    Meadows can donate the land to equalize values………………………………..14

        G.    The Court should reject the Forest Service's belated attempt to shore up its flawed appraisals…………………………………………..…………………………..15

   III. Violations of NEPA and the APA ..................................................................18

        A.    The Forest Service violated NEPA when it made a pre-NEPA decision not to record a conservation easement……………………………………………18

        B.    The Forest Service admits that it failed to attach the appraisals to the EIS……...20

        C.    The question of the available combinations of exchange parcels is central to the NEPA alternatives analysis in this case…………………………………………22

Conclusion .......................................................................................................................25

**Table of Authorities**

<u>**Cases**</u>                                                                                                          <u>**Page Nos.**</u>

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002)...........................................4

*Bob Marshall Alliance v. Hodel,* 852 F.2d 1223 (9th Cir. 1988) .................................................22

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...........................................12

*Colorado Wild Public Lands, Inc. v. Shoop*, 2021 U.S. Dist. LEXIS 56706
    (D. Colo. March 25, 2021)................................................................................20, 21, 23, 24

*Envtl. Def. Ctr.  v. Bureau of Ocean Energy Mgmt.,* 36 F.4th 850 (9th Cir. 2022)....................5, 6

*Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000)...........................................8

*Friends of the Earth v. Laidlaw,* 528 U.S. 167 (2000) ..................................................................4

*Hood River Valley Residents' Committee, Inc. v. Board of County Commissioners*
    *of Hood River County,* 193 Or App 485 (2004)...................................................................3

*HRVRC v. Peña*, Case No. 15-1397-BR (D. Or.) ...............................................................4, 6, 7, 8

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977)..................................................4

*Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445 (9th Cir. 2016)...................................6

*Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986) ..........................................................................18

*Just v. City of Lebanon*, 193 Or. App. 132 (2004)..........................................................................3

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)........................................................................3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................................5, 6, 9

*Natural Grocers v. Rollins*, 2025 U.S. App. LEXIS 28547 (9th Cir. Oct. 31, 2025).....................3

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) ..........................5

*Ritidian v. U.S. Dep't of the Airforce*, 128 F.4th 1089 (9th Cir. 2025) ...................................18, 21

*San Luis Valley Ecosystems Council v. U.S. Forest Serv.*, No. 04-CV-01071,
    2009 WL 792257 (D. Colo. Mar. 23, 2009) .......................................................................24

*Secretary of the Interior v. California*, 464 U.S. 312 (1984)............................................................3

*Stand Up for California! v. U.S. Dep't of Interior*, 959 F.3d 1154 (9th Cir. 2020)................18, 19

*Vietnam Veterans of Am. v. CIA*, 791 F.3d 1122 (9th Cir. 2015) ....................................................8

**United States Code**

5 U.S.C. § 706................................................................................................................................12

5 U.S.C. § 706(2)(A) ........................................................................................................................6

42 U.S.C. § 4332.....................................................................................................................18, 23

42 U.S.C. § 4332(2)(C)...................................................................................................................22

**Omnibus Act**

Mt. Hood Cooper Spur Land Exchange Clarification Act of 2018
      (Pub. L. 115-110, 131 Stat. 2270)............................................................................. *passim*

Omnibus Public Land Management Act of 2009 (Pub. L. 111-11, 123 Stat. 1018)
      (together with 2018 Clarification Act, the "Omnibus Act").......................................*passim*

Omnibus Act, Section 1206(a)(1)(C)...........................................................................................6, 8

Omnibus Act, Section 1206(a)(1)(E)(i) ...........................................................................................6

Omnibus Act, Section 1206(a)(2)(A) ...............................................................................................7

Omnibus Act, Section 1206(a)(2)(G)(i)..........................................................................................19

Omnibus Act, Section 1206(a)(2)(H)(i).................................................................2, 9, 10, 11, 15

Omnibus Act, Section 1206(a)(2)(H)(ii)..........................................................................................14

**Regulations**

40 C.F.R. § 1502.14 .......................................................................................................................22

40 C.F.R. § 1502.19 ....................................................................................................16, 17, 20, 21

40 C.F.R. § 1506.6 ...................................................................................................................20, 21

## Introduction

The Forest Service's response does one significant, impermissible, and transformative thing: it explains the Forest Service's decision by pinning the blame for what happened on Mt. Hood Meadows. That is, the Forest Service repeatedly defends its decision to shrink the exchange acreage by pointing to Meadows' *unwillingness* to trade all the lands that the Omnibus Act and the Clean Sweep say should be traded. Thus, it was Meadows—the Forest Service says, and Meadows does not deny—that torpedoed the Clean Sweep. And to the Service, that somehow made it "necessary" for the Forest Service to agree to exchange only a subset of the federal and non-federal lands with Meadows.

As noted, this belated explanation of "necessity" is both impermissible and transformative. *Impermissible* because it reveals a misunderstanding of the law, and because the Administrative Procedure Act (APA) prohibits *post hoc* reasoning that does not appear in an Environmental Impact Statement (EIS) or a Record of Decision (ROD); indeed, the Forest Service's too-late explanation should eliminate any doubt that the Forest Service violated the APA and the Omnibus Act. *Transformative* because—if the Forest Service's accusation against Meadows is true—it means that Meadows materially breached its obligation to pursue the Clean Sweep in good faith under the 2005 Settlement Agreement.

But true or not, there is no set of circumstances wherein the Forest Service can properly rely on an after-the-fact explanation to justify a challenged decision under the APA. And even if the Forest Service could properly rely on *post hoc* explanations, Meadows' refusal to honor the 2005 Settlement Agreement does not constitute "necessity" under the Omnibus Act that would justify a serious deviation from the baseline requirements of that Act. Meadows' bald unwillingness to complete the full exchange is highly disturbing, but that refusal is not the same

as a change that is "necessary to equalize appraised values of the exchange properties," which is what the Omnibus Act provides for.

As explained in Conservation Plaintiffs' Motion for Summary Judgment, as elaborated upon herein, and as now highlighted by the Forest Service's impermissible *post hoc* explanation contained in its Cross-Motion, the Forest Service violated the APA, the Omnibus Act, and NEPA. Accordingly, the Court should grant Conservation Plaintiffs' Motion for Summary Judgment and deny the Forest Service's and Meadows' Cross-Motions.

## Argument

The core problem with the challenged EIS and ROD—and therefore the core of Conservation Plaintiffs' claims—is that those documents do not reflect compliance with the Omnibus Act and the APA. Of central importance here is section 1206(a)(2)(H)(i) of the Omnibus Act, which allows "a lessor area of Federal land or non-Federal land" to be conveyed in the exchange, but only "*if necessary **to equalize appraised values** of the exchange properties*." (Emphasis added).

As explained in Conservation Plaintiffs' Motion, neither the EIS nor the ROD ever confront this "necessity" requirement. That failure has serious negative consequences for the Forest Service's compliance with the APA, the Omnibus Act, and NEPA. Indeed, as discussed further below, the Forest Service's Response and Cross-Motion merely serves to emphasize that non-compliance.

Before turning to the merits, however, Conservation Plaintiffs will first address the one argument Meadows makes that the Forest Service doesn't: standing.

I.     **Conservation Plaintiffs have standing**

The government does not challenge Conservation Plaintiffs' standing. Meadows does—

sort of—but only as to Thrive, McCarthy, and the Sierra Club. ECF 83 at 23-27. Importantly,

Meadows does not challenge the standing of Oregon Wild, Oregon Nordic Club, Friends of

Mount Hood, or Oregon Kayak and Canoe Club. *See id.*

This Court should join the Oregon Court of Appeals in rejecting Meadows' standing

challenge.[1] There should be no question, given the facts, that Thrive, McCarthy, and the Sierra

Club have standing.

As the Ninth Circuit reiterated just last week, standing for one equals standing for all:

> "[W]here (as here) Plaintiffs seek nonmonetary relief under the APA and the scope
> of the relief available does not differ among each Plaintiff[,] it suffices if at least
> one Plaintiff has Article III standing as to each of the claims at issue. *See Secretary
> of the Interior v. California*, 464 U.S. 312, 319 n.3, 104 S. Ct. 656, 78 L. Ed. 2d
> 496 (1984) ('Since the State of California clearly does have standing, we need not
> address the standing of the other [plaintiffs], whose position here is identical to the
> State's.'); *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) ('The general
> rule applicable to federal court suits with multiple plaintiffs is that once the court
> determines that one of the plaintiffs has standing, it need not decide the standing of
> the others.' (citation omitted))."

*Natural Grocers v. Rollins*, 2025 U.S. App. LEXIS 28547 at *23 (9th Cir. Oct. 31, 2025). Even

assuming, hypothetically, that Thrive, McCarthy, and the Sierra Club somehow lacked standing

to bring this lawsuit on their own, Meadows' implicit acknowledgment that most Conservation

Plaintiffs *do* have standing is fatal to its standing challenge. There is, therefore, no need for the

---

[1]     As noted in the McCarthy Declaration, the Oregon Court of Appeals found that
McCarthy had standing to challenge the county land exchange that laid the foundation for the
federal land exchange. ECF 78 at 3; *Hood River Valley Residents' Committee, Inc. v. Board of
County Commissioners of Hood River County,* 193 Or App 485, 502 (2004) ("We conclude that
McCarthy has standing to challenge the land exchange."). Because McCarthy had standing,
Thrive also had standing. *Id.* at 499-500 ("That conclusion [that McCarthy has standing] obviates
the need to discuss whether [Thrive] also has standing. *See Just v. City of Lebanon*, 193 Or. App.
132, 135 n 2, 88 P.3d 312 (2004) (where two parties make identical arguments and one has
standing, court will treat controversy as justiciable).").

Court to reach Meadows' specific standing-related arguments as to Thrive, McCarthy, and the Sierra Club.

Moreover, Meadows should be estopped from arguing that Thrive and McCarthy lack standing because that position contradicts Meadows' position in *HRVRC et al. v. Peña*, Case No. 15-1397-BR (D. Or.) ("*Peña*"). In that closely related litigation involving this same land exchange—and cited by Meadows in its Cross-Motion in this case (ECF 83 at 6, 31 n.4)—Meadows affirmatively argued that Thrive and McCarthy in fact *have* standing to enforce the Omnibus Act:

> "[Thrive] has standing because: (1) it represent[s] members who otherwise would have had standing to sue on their own behalf; (2) the interests at stake are germane to the organizations' purposes; and (3) neither the claims asserted nor the relief requested must require the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 181 (2000); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Biodiversity Legal Found.*, 309 F.3d at 1171. [Thrive] is a party to the [2005] settlement agreement and its members and supporters stand to benefit from the completion of the Land Exchange. Declaration of Polly Wood ('Wood Decl.') ¶¶ 1-10.

> "Mike McCarthy is an individual who has standing to this action. McCarthy Decl. ¶ 12. He is a member of [Thrive] and enjoys the Cooper Spur area and intends to continue do so in the future. *Id.* at ¶¶ 17-19. Mike McCarthy's future ability to gain occupational, aesthetic, scientific, moral, spiritual, and recreational values from visiting and spending time with his family at Cooper Spur will be substantially threatened and diminished without intervention from this Court. *Friends of the Earth, Inc. v. Laidlaw, supra*, 528 U.S. at 183."

*Peña*, Case No. 15-1397-BR, ECF 46 at 22. The Court should reject Meadows' odd and belated apparent change of heart.

In sum, all Conservation Plaintiffs have standing. Standing is fully supported by Conservation Plaintiffs' Motion for Summary Judgment and the associated supporting Declarations. To the extent that it now suddenly contends otherwise, Meadows should be estopped from arguing that Thrive and McCarthy lack standing where Meadows previously

affirmatively represented otherwise to this Court. Moreover, even if, hypothetically, one or several of the Conservation Plaintiffs individually lack standing, others do have standing—and standing for one is standing for all.

## II.     Violations of the Omnibus Act and the APA

The Forest Service argues that the Omnibus Act "nowhere requires" it to make any findings or offer any explanation about why it was "necessary" to deviate from the baseline acreage exchange requirements of that Act. ECF 82 at 47. While technically accurate, that misses the point. The APA—which governs the Forest Service's implementation of the Omnibus Act—does require such an explanation. And it requires it to be in the agency decision documents, not in some later-filed brief created by counsel.

As explained in Conservation Plaintiffs' Motion for Summary Judgment, implementation and judicial enforcement of the Omnibus Act (and NEPA) are governed by the APA. ECF 74 at 14-15. For an agency decision to withstand APA scrutiny the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (internal quotation marks omitted). Critically, an agency's *post hoc* rationalizations for a decision are irrelevant; courts "assess the lawfulness of agency action based on the reasons offered by the agency" **at the time of the decision**, if supported by the whole record. *Id.* at 50; *see also, Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) (rejecting agency justification as *post hoc* where it did not appear "in the EIS itself," even though public could have "piece[d] together" an analysis from other documents in the administrative record); *Envtl. Def. Ctr. V Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ("These reasons

[offered by the agency] fail because they are post-hoc rationalizations not contained in the Final
[NEPA document]. As such, we may not consider them[.]”); and *Japanese Vill., LLC v. Fed.
Transit Admin.*, 843 F.3d 445, 452 (9th Cir. 2016) (explaining that it is the “record of decision
(ROD) that explains the rationale for [an] agency’s decision.”). In short, an agency decision
document that does not adequately explain itself is “arbitrary and capricious” and must be set
aside. 5 U.S.C. § 706(2)(A).

It is through the lens of the APA that Conservation Plaintiffs challenge the EIS and ROD
as noncompliant with the Omnibus Act. That is, in failing to make any finding of “necessity”—
and in failing to offer any associated explanation in its decision—the Forest Service failed to
“examine the relevant data and articulate a satisfactory explanation for its action including a
rational connection between the facts found and the choice made.” *State Farm*, 463 U.S. at 43.

A.    **The purpose of the Omnibus Act is to facilitate the exchange of
“approximately 770 acres of private land” for “approximately 107 acres of
National Forest System land.”**

As a preliminary matter, there should be no dispute about the baseline purpose of the
Omnibus Act. That purpose is to facilitate the exchange of “approximately 770 acres of private
land at Cooper Spur identified as ‘Land to be acquired by USFS’ on the exchange map” for
“approximately 107 acres of National Forest System land in the Mount Hood National Forest in
Government Camp[,] identified as “USFS Land to be Conveyed’ on the exchange map.” *Id.* at §
1206(a)(1)(C) & (E)(i). Thus, the exchange of those lands—in full, not some lesser acreage—is
the entire statutory goal, aim, objective, and target. Every implementation-related provision of
the Act should be interpreted with that baseline goal in mind.

Until recently, Meadows had long accepted that the Omnibus Act calls for full
implementation of the land exchange. In *Peña*, the previous federal litigation related to this

exchange, Meadows joined Thrive in advising this Court of the statutory mandate to complete

the full exchange:

> "Congress directed the Forest Service to consummate the land exchange in order to implement a collaborative settlement agreement that resolves decades of contentious dispute about the future of the North Side of Mt. Hood. In Section 1206(a)(2)(A), Congress directed that the Forest Service 'shall convey' [the acreage in] Government Camp to Mt. Hood Meadows, LLC in exchange for approximately 770 acres of property on the North Side of Mt. Hood that includes a drinking watershed, forestland and prime recreational resources. Dkt. 1, Complaint, Exhibit 2; Joint Statement of Agreed Upon Facts ('JSAF') ¶ 12, 14 [ECF 38]."

*Peña*, ECF 46 at 8-9.

As described below, nothing, including the Clarification Act of 2018, modified the

above-described purpose of the Omnibus Act. Thus, the goal of the Omnibus Act has always

been to exchange **all** of the federal property for **all** of the non-federal property, if valuations

made that possible.

### B.     Meadows formally offered to exchange all of its land, triggering the mandatory full exchange under the Omnibus Act

Section 1206(a)(2)(A) of the Omnibus Act states that "if Mt. Hood Meadows offers to

convey to the United States all right, title, and interest of Mt. Hood Meadows in and to the non-

Federal land, the Secretary shall convey to Mt. Hood Meadows all right, title, and interest of the

United States in and to the Federal land." As it expressly told this Court during the *Peña* case,

Meadows satisfied that condition long ago: "Mt. Hood Meadows offered to convey its property

to the Forest Service, as set forth in Section 1206(a)(2)(A), on June 8, 2009. JSAF ¶ 23 [ECF

38]." *Peña*, ECF 46 at 10. Indeed, Meadows did exactly that. Its June 8, 2009, letter to the Forest

Service reads as follows:

> "[Meadows] hereby offers to convey to the United States all its right, title and interest in the non-Federal land defined in Section 1206(a)(1)(E) of the Omnibus

Public Land Management Act of 2009 ('the Act') in exchange for the Federal land defined in Section 1206(a)(1)(C) of the Act[.]"

AR-19543.

Upon receipt of Meadows' letter, the Forest Service confirmed on June 18, 2009, that Meadows' "offer of conveyance triggers a legislatively mandated land exchange under the Act, Sec. 1206, Land Exchanges, (a)(2)(A) Conveyance of Land." AR-19547.

In the *Peña* case, Meadows represented to this Court—correctly—that once Meadows made its unconditional offer on June 8, 2009, to convey to the Forest Service "all" of its interest in the non-federal lands, the Forest Service was required to convey "all" of its interest in the federal lands to Meadows:

> "The statutory provision at issue here plainly created a mandatory duty through its command that the Forest Service 'shall convey' the identified Federal lands and that the trade 'shall be completed.' Dkt. 1, Complaint, Ex. 2 at 28 (Sec. 1206, Land Exchanges, (a)(2)(A), Conveyance of Land and (a)(2)(F), Deadline). ' 'The term 'shall' is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary.' ' *Vietnam Veterans of Am. v. CIA*, 791 F.3d 1122, 1135 (9th Cir. 2015) (quoting *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000))."

*Peña*, ECF 46 at 24. So far, so good. Thus, in 2009, Meadows was implementing the 2005 Settlement Agreement, and the Forest Service recognized its mandatory duties under the Omnibus Act.

### C.    The Clarification Act of 2018 allows for the exchange of reduced acreage only "if necessary to equalize appraised values of the exchange properties."

To recap: by mid-2009 everyone agreed that Meadows had offered all of the non-federal lands in exchange for the federal lands, thus triggering the full (and mandatory) land exchange under the Omnibus Act. But by 2018, the land exchange still wasn't completed. That's when Congress passed the Clarification Act of 2018, which made minor adjustments to the Omnibus

Act without changing its overarching goal, namely: to facilitate the full transfer of the non-federal and federal acreage.

Of central importance to this case is section 1206(a)(2)(H)(i), which the Clarification Act added to the Omnibus Act. That section allows "a lesser area of Federal land or non-Federal land" to be conveyed in the exchange, but only "*if necessary to equalize appraised values of the exchange properties*." *Id.* at § 1206(a)(2)(H)(i) (emphasis added).

Of course, by the time the Clarification Act was adopted in 2018, Meadows had already agreed to transfer "all" of its interests in the non-federal land, AR-19543, and the Forest Service was already obligated by the Omnibus Act to convey "all" of its interests in the federal land. So the exchange acreage could only be reduced *if* the Forest Service explained how the reduction was "necessary **to equalize appraised values** of the exchange properties" under section 1206(a)(2)(H)(i). (Emphasis added).

That explanation does not exist in the EIS or ROD, which is a violation of the APA and the Omnibus Act. That explanation now does exist in the Forest Service's Response and Cross-Motion for Summary Judgment—but that is legally too little, too late.

### D.     The Forest Service's reliance on a *post hoc* explanation of "necessity" violates the APA

It is well-established that a Court reviews agency decisions for APA compliance based on the reasons offered by the agency below, *not* on reasons offered or explained for the first time in court. Those are impermissible *post hoc* explanations under *State Farm* 463 U.S. at 50. And that is what the Forest Service has improperly attempted here.

The Forest Service repeatedly points out in its Response and Cross-Motion that it was Meadows that refused to complete the full exchange as contemplated by the 2005 Settlement

Agreement and the Omnibus Act, despite Meadows' prior offer to do so. ECF 82 at 23 n 8 (explaining that "Meadows did not offer to convey all its non-Federal land at Cooper Spur"); *id.* at 28 (explaining that Meadows "did not offer to convey" all non-federal lands); *id.* at 33 ("the non-Federal land ultimately included in the exchange are those that Mt. Hood Meadows offered to convey"); *id.* (Meadows "did not offer" certain non-federal lands); *id.* at 44 (same); *id.* at 49 ("Mt. Hood Meadows was not interested in" conveying all of its land).[2]

Despite those claims, the Forest Service still refuses to acknowledge that it was required—under the APA and the Omnibus Act—to make (and adequately explain) a finding of necessity as to value equalization in the EIS or ROD. Instead, the Forest Service uses its Response and Cross-Motion to point to Meadows' apparent refusal to make the agreed-upon full trade of land and thereby to suggest that it *did* properly analyze and apply the "necessity" requirement. The Court should reject this impermissible *post hoc* argument, which was not made in the EIS or ROD.

### E.    Meadows' breach of the 2005 Settlement Agreement does not constitute "necessity" under the Omnibus Act

Even if Meadows' refusal to fulfill its prior offer to trade all the property on the north side had been properly raised in the EIS or ROD (and it wasn't), as a matter of law the Forest Service cannot merely point to Meadows' refusal to convey all of its land as justifying a reduction in exchange acreage. The Omnibus Act only allows a reduction "if necessary to equalize appraised values." *Id.* at § 1206(a)(2)(H)(i). Accommodating Meadows' breach of the

---

[2]    Conservation Plaintiffs previously suspected that Meadows was largely to blame for the reduction in exchange acreage. The ROD, however, merely states—vaguely—that the Forest Services' decision "honors our cooperative engagement with Mt. Hood Meadows and reflects the agreement between the Forest Service and Mt. Hood Meadows regarding an appropriate area of lands to be exchanged as necessary to equalize appraised values." AR-50376.

2005 Settlement Agreement does not qualify under that standard.

As noted above, in 2009 Meadows formally offered "all" of its north slope lands in exchange for "all" of the Forest Service's available lands in Government Camp. AR-19543. As all parties recognized, that action triggered the full and mandatory land exchange contemplated by the Omnibus Act. In 2018, the Clarification Act amended the Omnibus Act to allow a reduction in exchange acreage, but only in very limited circumstances: "if necessary **to equalize appraised values**." *Id.* at § 1206(a)(2)(H)(i) (emphasis added). A mere finding of "necessity" is not sufficient; for an acreage reduction to be permissible—that is, for the Forest Service to have authority to agree to it—the "necessity" must be *driven by* the equalization of values. That is not what occurred here, nor is that the justification now offered by the Forest Service.

If the Forest Service's Response and Cross-Motion does nothing else, it makes crystal clear that the reason for the reduced acreage is Meadows' recalcitrance, **not** the need to equalize values of the exchange parcels. *See, e.g.,* ECF 82 at 23 n 8, 28, 33, 44, 49. And although Meadows' has not yet expressly thrown itself under the bus, neither has it denied the Forest Service's allegations. Indeed, by incorporating the Forest Service's arguments as its own (ECF 83 at 41—"Federal Defendants' summary judgment briefing" is expressly "incorporate[d] by reference"), Meadows tacitly admits that its refusal to trade the Clean Sweep lands is the driving force behind the significant reduction in exchange acreage.

Unable to deny that its actions are inconsistent with the 2005 Settlement Agreement, and perhaps feeling the pressure from the Forest Service's repeated accusations, Meadows pivots. Incredibly, instead of trying to explain that it is in compliance with the 2005 Settlement Agreement, Meadows goes straight to arguing *that it is no-longer bound by that agreement*. It does so, impermissibly, through extra-record testimony offered by Matthew Drake.

Meadows has submitted two declarations from Mr. Drake in this proceeding. The first one was submitted to support Meadows' Motion to Intervene. ECF 11 (motion to intervene); ECF 12 (first Drake declaration). The second one was submitted with Meadows' Response and Cross-Motion. ECF 84 (second Drake declaration). Both Drake declarations include multiple documentary attachments. *See* ECF 12; ECF 84.

Neither declaration can be considered on the merits of this APA case because they (and many of their attached documents) are not part of the Administrative Record (AR) in this case. 5 U.S.C. § 706 (in APA cases courts "shall review the whole record[.]"). The "whole record" means "the full administrative record that was before the [agency decisionmaker] at the time he made his decision." *Citizens to Preserve Overton Park*, *Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). As this Court well knows, that AR has already been filed by the Forest Service in this case (several times). And none of those AR's included the Drake declarations. Accordingly, the Court should disregard both Drake declarations.

Even if the Drake declarations were part of the AR, and thus could be considered on the merits, those declarations do not demonstrate that Meadows is free to ignore its obligations as set forth in the 2005 Settlement Agreement. In both declarations Mr. Drake accuses Thrive of supposedly breaching the 2005 Settlement Agreement by making public statements about the land exchange in August 2020 and in January 2021. ECF 12 at 10-11, ¶¶ 15-16; ECF 84 at 7, ¶ 10. Conservation Plaintiffs disagree that the cited statements would constitute breaches. But, perhaps more to the point, by that time Meadows had already materially breached the 2005 Agreement by refusing to trade all of its properties to the Forest Service. *See* ECF 82 (Forest Service's Cross-Motion) at 28.

In the first declaration Mr. Drake complains about Thrive's alleged "breaches," but then moves on to other issues. In his second declaration, he goes much further. Citing those "breaches" and a provision of the 2005 Settlement Agreement that allows the parties to terminate the agreement under some circumstances, **Mr. Drake then declares his opinion that "the parties to the 2005 Settlement Agreement are no longer bound by its terms[.]"** ECF 84 at 7, ¶ 10. In other words, Mr. Drake, a signatory to the 2005 Settlement Agreement and the head of Mt. Hood Meadows—also a signatory—has now declared that he feels free to ignore that very Agreement (which is at AR-48635-49).

Conservation Plaintiffs strongly disagree. The 2005 Settlement Agreement remains operative and binding.[3] But the important point for present purposes is that the Forest Service cannot cite to Meadows' *refusal to comply* with the Omnibus Act—that is, Meadow's refusal to trade all of the non-federal lands—to *justify compliance* with the "if necessary to equalize appraised values" limited exception built into the Omnibus Act.[4] That is a tautological argument, and it has nothing to do with the necessity of equalizing the exchange values. In this way, the Forest Service's decision to proceed with only a partial land exchange is arbitrary, capricious, and not in accordance with law, in violation of the APA and the Omnibus Act.

---

[3]    The agreement does have a termination clause, AR-48646 ("[A]ny party may terminate this Agreement after giving 30 days' written notice."), but it requires going through a mandatory dispute resolution process. *Id.* And further, principles of equity and contract law prohibit Meadows from terminating the 2005 Settlement Agreement after it has received the benefit of the bargain. But that is an issue for another day.

[4]    Under the Forest Service's logic, if Meadows had refused to exchange all but one acre of the non-federal lands, the government would have been obligated to reduce the exchange acreage and make the exchange anyway in the interest of "equalizing appraised values." But that is obviously not the point of the Omnibus Act; *maximizing* the exchange acreage is the point.

**F.    Meadows can donate the land to equalize values**

In their Motion for Summary Judgment, ECF 74 at 36, Conservation Plaintiffs noted that

the proposed drastic reduction in the exchange acreage was not "necessary" to equalize values

under the Omnibus Act because Meadows could always donate some or all of the difference in

value to the government. Indeed, the Omnibus Act specifically contemplates such a donation:

> "If, after payment of compensation or adjustment of land area subject to exchange
> under this Act, the amount by which the appraised value of the land and other
> property conveyed by Mt. Hood Meadows under subparagraph (A) exceeds the
> appraised value of the land conveyed by the [Forest Service] under subparagraph
> (A) ***shall be considered a donation*** by Mt. Hood Meadows to the United States."

*Id.* at section 1206(a)(2)(H)(ii) (emphasis added)." In opposing that argument, the Forest Service

asserts that "there is no evidence that Mt. Hood Meadows had any interest in donating to the

government." ECF 82 at 49; *see also id.* at 31 (describing a potential donation by Meadows as "a

business/economic judgment by Mt. Hood Meadows and not within the discretion of the Forest

Service."). Not so.

In fact, the 2006 amendment to the 2005 Settlement Agreement specifically calls for

Meadows to donate property/value to the Forest Service in the event that the non-federal lands

are valued higher than the federal lands, which is precisely the case here:

> "**Meadows Donation to the Trade.** In order to equalize the values of the properties
> being traded, Meadows ***shall*** donate property to the U.S. Forest Service. The
> difference in monetary valuation between all properties Meadows receives from the
> Forest Service in Government Camp versus all properties conveyed to the Forest
> Service by Meadows on the North side of Mt. Hood ***will be donated*** to the U.S
> Forest Service in the form of property[.] The actual monetary value of the donation
> is $1,725,000[.]"

AR-48651 (First Amendment to Settlement Agreement) (emphasis added). A donation of

$1,725,000 is more than enough to cover, for example, the $1,054,540 valuation difference that

would result from one of the exchange configurations described by Conservation Plaintiffs in

their Motion for Summary Judgment. *See* ECF 74 at 36.

The Forest Service never explained in either the EIS or the ROD why a donation from Meadows was not feasible, and it is way too late to try and offer that explanation now. But in any event, a donation from Meadows would render a significant exchange acreage reduction "unnecessary" under section 1206(a)(2)(H)(i) of the Omnibus Act. For this additional reason, the challenged decision is arbitrary, capricious, and contrary to law in violation of the APA and the Omnibus Act.

**G.    The Court should reject the Forest Service's belated attempt to shore up its flawed appraisals**

In their Motion for Summary Judgment, Conservation Plaintiffs raised a variety of challenges to the Forest Service's appraisals of the federal and non-federal lands. ECF 74 at 37-45. Those challenges, which will not be repeated here, are based upon detailed written reviews of the federal appraisals by Donald R. Palmer, MAI, of Appraisal & Consulting Group, LLC. *See id.* at 40; AR-47789-865.

The Forest Service and Meadows respond to Conservation Plaintiffs' appraisal challenges by citing to an after-the-fact "Consulting Report" prepared by Mr. Maloy (the same individual that prepared the appraisals themselves). The report, which Mr. Maloy notes "is *not* intended to comply with USPAP Standards or UASFLA," AR-49584 (emphasis added), was prepared "to assist the agency in responding to objections regarding the appraisals." AR-49583. Indeed, Mr. Maloy's Consulting Report is dated March 30, 2021, one week after Conservation Plaintiffs submitted their formal objections—including Mr. Palmer's extensive written criticisms of the Maloy appraisals—to the Forest Service. AR-47757-865.

The Forest Service and Meadows characterize the dispute about the appraisals as a "battle

of the experts" (ECF 82 at 51) in which this Court must defer to the agency. It is not a battle of

the experts. In fact, in his Consulting Report, Mr. Maloy *agrees* with Mr. Palmer that the

appraisals contain material errors and unsupported assumptions.

But first, it's important to note that the Forest Service *apparently failed to provide Mr.*

*Maloy with a copy of Mr. Palmer's written appraisal review*, even though the Forest Service had

received a full copy the week before. *See* AR-47757 (March 22, 2021, objections from

Conservation Plaintiffs). It seems that, rather than giving Mr. Maloy an actual copy of Mr.

Palmer's written criticism for his review, the Forest Service instead gave Mr. Maloy a series of

general prompts, or summarized questions, for his response. *See* AR-49582-91 (series of bolded

prompts, followed by Mr. Maloy's answers). This clearly frustrated Mr. Maloy, who wrote in the

Consultant Report that "If someone else has reviewed my appraisal, [his analysis] should be

provided [to me] for examination or his comments should be ignored as hearsay."). If, as this

statement clearly suggests, Mr. Maloy did not in fact conduct a full review of Mr. Palmer's

extensive criticism, then Mr. Maloy's after-the-fact Consultant Report cannot be relied upon as a

credible rebuttal document.

Despite the above-described limitations of Consultant Report, Mr. Maloy still managed to

agree with some of Mr. Palmer's main criticisms. For example, when asked if he had failed to

follow professional appraisal standards in documenting his sales comparables, Mr. Maloy

admitted that his appraisal was missing certain key information. AR-49587 (describing the error

as "inadvertent"). Mr. Maloy found the error significant enough that he attached multiple pages

of missing necessary information to the Consulting Report as an "Appendix." *See id.*; AR-

49592-96 (Appendix/Addenda, labeled "Revised Sale Comparable Information"). But again, that

is too little, too late, since full appraisals must be submitted with the EIS. *See* 40 C.F.R. §

1502.19. And in any event, Mr. Maloy specifically noted that his Consultant Report is *not* part of the appraisal. AR-49582-84. Thus, the "Revised Sale Comparable Information" should be disregarded.

Similarly, when confronted with a methodological error that resulted in the significant under-valuation of the federal property at Government Camp, Mr. Maloy *admitted* that the information he relied on in the appraisal was deficient. While defending his methodology as based on "information known at that time," he nonetheless admitted that, had he reviewed additional information that revealed the true nature and available use of the applicable parcels, "we could have been more precise" in valuing the Government Camp lands. AR-49587.

The upshot is that all parties appear to agree that Mr. Maloy's valuation of the Government Camp properties were, *in fact*, artificially low. The only apparent difference between the parties' positions on this issue is that the Forest Service and Meadows believe the artificially low valuation is acceptable, while Conservation Plaintiffs recognize that such appraisal errors violate the APA.

Most of the other appraisal errors identified by Mr. Palmer and advanced by Conservation Plaintiffs in their Motion for Summary Judgment are simply not addressed by Mr. Maloy's Consultant Report—most likely because he was never provided with the full Palmer review. Accordingly, even if this is a "battle of the experts," it is a battle where the Forest Service and Meadows have dropped their swords. For these reasons and those explained in Conservation Plaintiffs' Motion for Summary Judgment, the appraisals violate the APA and the Omnibus Act.

### III.    Violations of NEPA and the APA

#### A.    The Forest Service violated NEPA when it made a pre-NEPA decision not to record a conservation easement

The Forest Service argues that it did not have to follow NEPA in relation to the decision to—or not to—record a conservation easement to protect wetlands. The Forest Service claims that is because the Omnibus Act "specifically allowed the Forest Service and Mt. Hood Meadows the option to 'mutually agree' on a specific conservation easement." ECF 82 at 35. The conservation easement, the Forest Service says, was therefore a "joint decision with Mt. Hood Meadows that was to be finalized by a specific date as opposed to being a matter left open to future NEPA process." *Id.*

There are several errors with that argument. First, NEPA pronounces that "Congress authorizes and directs that, to the fullest extent possible . . . public laws of the United States shall be interpreted and administered with the policies [that NEPA] set[s] forth." 42 U.S.C. § 4332; *Ritidian v. U.S. Dep't of the Airforce*, 128 F.4th 1089, 1114 (9th Cir. 2025). The Ninth Circuit has interpreted this "congressional mandate" as a "direction to 'make as liberal an interpretation as we can to accommodate the application of NEPA.'" *Id.*

The Ninth Circuit has recognized only two circumstances in which an agency need not comply with NEPA's procedural requirements, namely: (1) where doing so would create an "irreconcilable and fundamental conflict" with the substantive statute at issue, and (2) where a substantive statute "displaces" NEPA's procedural requirements. *Id.* (citing *Stand Up for California! v. U.S. Dep't of Interior*, 959 F.3d 1154, 1163-64 (9th Cir. 2020)). The first of these NEPA exemptions applies only where an irreconcilable and fundamental statutory conflict is "clear and unavoidable." *Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir. 1986). The second

exemption applies where an alternative statute "displaces" NEPA's procedural requirements by "creat[ing] a[] comparable process for ensuring environmental protection." *Stand Up for California*!, 959 F.3d at 1165.[5]

Neither circumstance is present here, so the Forest Service must comply with NEPA when deciding whether to record a wetland conservation easement. While it's true that Congress left it up to the Forest Service and Meadows to decide whether to record a conservation easement—and what the parameters of that easement might be—nothing in the Omnibus Act purports to exclude that decision from the NEPA alternatives analysis, and there is no "irreconcilable and fundamental" conflict between the Omnibus Act and NEPA. Indeed, the language of the Omnibus Act is fully consistent with the Forest Service's proper performance of its NEPA obligations because the Omnibus Act *specifically requires* the conservation easement decision to be made "in accordance with applicable law." *Id.* at § 1206(a)(2)(G)(i). Of course, NEPA is "applicable law," so whether or not to record a conservation easement should have been considered as part of the NEPA alternatives analysis.

Nor is there any applicable statute that "displaces" NEPA by creating "a comparable process for ensuring environmental protection." *Stand Up for California*!, 959 F.3d at 1165. NEPA *is* the statute that applies here to ensure environmental protection.

Nor can the Omnibus Act's 120-day deadline be used to excuse noncompliance with NEPA. ECF 82 (Forest Service's Motion) at 35. The entire land trade *itself* is subject to a 16-

---

[5]    The Forest Service and Meadows are certainly aware of the Ninth Circuit caselaw discussed in this paragraph. Yet neither of them raised it, let alone applied it to this case. They should, therefore, be estopped from arguing in favor of its application for the first time on reply.

month statutory deadline,[6] but nobody thinks that the Forest Service could have simply ignored NEPA once that deadline passed. So, too, with regard to the conservation easement decision.

As explained above and in Conservation Plaintiffs' Motion for Summary Judgment, *see* ECF 74 at 28, the Forest Service violated NEPA when it made a pre-NEPA decision not to record a wetland conservation easement. That decision should have been considered as part of the NEPA alternatives analysis.

### B.    The Forest Service admits that it failed to attach the appraisals to the EIS

The Forest Service fully admits that it did "not attach[] the appraisals to the final EIS[.]" ECF 82 (Service's Cross-Motion) at 37. That should be the end of the discussion, because as outlined in Conservation Plaintiffs' Motion, ECF 74 at 29-30, NEPA requires that to have occurred. Nonetheless, the Forest Service claims that appraisals are "economic valuation documents, not environmental-effects reviews," ECF 82 at 37, and that as a result NEPA's requirement to include "material prepared in connection with the EIS," "material substantiating any analysis fundamental to the [EIS]," and "material relevant to the decision," 40 C.F.R. § 1502.19, somehow does not apply. They are wrong on this point.

The Forest Service cites *Colorado Wild Public Lands, Inc. v. Shoop*, 2021 U.S. Dist. LEXIS 56706 (D. Colo. March 25, 2021) ("*Shoop*"), as supporting its position. ECF 82 at 37. It does not. First, *Shoop* did not involve—like Conservation Plaintiffs' claim does—a challenge under 40 C.F.R. § 1502.19. Instead, *Shoop* involved a challenge under 40 C.F.R. § 1506.6. *Id.* at *26. That separate regulation requires agencies to "provide public notice of . . . the availability

---

6    Omnibus Act, § 1206(a)(2)(F) ("Deadline for Completion of Land Exchange") ("It is the intent of Congress that the land exchange under this subsection shall be completed not later than 16 months after the date of enactment of this Act.")

of *environmental documents* so as to inform those persons and agencies who may be interested or affected by their proposed actions," and to "solicit appropriate information from the public" in response. *Shoop* at *26 (emphasis added). Reasoning that appraisals are not "environmental documents" under the express language of 40 C.F.R. § 1506.6, the *Shoop* court found that the withholding of appraisals did not violate that particular regulation. *Id.*

But the success of Conservation Plaintiffs' claim under 40 C.F.R. § 1502.19 does not depend on whether the appraisals are "environmental documents" under a different regulation. Instead, the inquiry here is whether the appraisals qualify under the broad definition of "material prepared in connection with the EIS," "material substantiating any analysis fundamental to the [EIS]," and "material relevant to the decision." *Id.* And of course, as explained in Conservation Plaintiffs' Motion for Summary Judgment, the appraisals clearly meet that test. *See* ECF 74 at 29-30. Therefore, since the Forest Service prepared an appendix to the EIS, it was required to include the full appraisals in that appendix under 40 C.F.R. § 1502.19 and *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA statute "*guarantees* that all relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.") (emphasis added).

And despite the Forest Service's suggestion otherwise (*see* ECF 82 at 38-39), as explained above nothing in the Omnibus Act modifies or eliminates the Forest Service's NEPA obligations. *See generally Ritidian*, 128 F.4th at 1114-20.

In sum, the Forest Service's failure to include the appraisals in the appendix to the EIS violated the NEPA statute and the NEPA regulations applicable to the Forest Service for this decision.

**C.**     **The question of the available combinations of exchange parcels is central to the NEPA alternatives analysis in this case**

In opposing most of Conservation Plaintiffs' NEPA claims, the Forest Service and Meadows both make the same odd argument in various permutations. For example, the Forest Service argues that anything related to "[p]roperty valuation," including the appraisals and the various ways the exchange values can be equalized, "is environmentally neutral and *outside the scope of NEPA*." ECF 82 (Service's Motion) at 26 (emphasis added). Similarly, Meadows argues that Conservation Plaintiffs' NEPA claim is "wholly disconnected from consideration of environmental effects, [NEPA's] entire premise." ECF 83 (Meadows' Motion) at 36.

These arguments and those like them all seek to convince the Court that any discussion of the appraisals—and any consideration of the various ways the exchange parcels can be equalized based on those appraisals—is irrelevant. Since the entire EIS is focused on the exchange of parcels, those arguments are quite wrong, and especially so with regard to the requirements governing the NEPA alternatives analysis.

The NEPA alternatives analysis, in which an agency evaluates all "reasonable" alternatives, is the heart of an EIS. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14; *see also Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1228 (9th Cir. 1988) (alternatives analysis is "an integral part of the statutory scheme."). But there is nothing in NEPA—and neither the Forest Service nor Meadows has cited any authority—creating an exception to the required reasonable alternatives analysis where the "environmental effects" of all possible alternatives have been disclosed (or, in this case, allegedly disclosed) by reference to extremes. *See* ECF 82 (Service's Cross-Motion) at 29 (arguing that the Service "considered the environmental effects of both an 'all-for-all' alternative and a no-action alternative," which supposedly constitutes the "broadest range of alternatives and resulting effects" that could have been analyzed). But by that logic, the

action alternative that the Forest Service *actually chose* could have been excluded from the alternatives analysis because it does not lie at either extreme. So even where environmental effects have been disclosed—or are similar between various alternatives—reasonable alternatives between extremes must still be considered so long as they offer significantly different means to satisfy the agency's identified purpose and need.

Nowhere is this more obvious than in a land exchange case like this one, where the government must consider and decide which of a variety of parcels of land will belong to the public, and which will belong to a private owner. *These decisions matter environmentally—and therefore consideration of the various alternatives matters—because the alternatives involve the most basic question of environmental values: who will own, and therefore control, the land?* It is absurd to describe these questions as "purely economic" and therefore outside the scope of NEPA. *See, e.g.,* ECF 82 (Service's Cross-Motion) at 32; *see also id.* at 26, 34, 36-37.

To support its bid to convince this Court that appraisal and valuation questions are irrelevant to NEPA, the Forest Service again cites *Shoop*, this time for the proposition that NEPA "cannot be reasonably understood as encompassing of parity in the value of the parcels to be exchanged." ECF 82 at 26. But that cherry-picked quotation misses the point; of course NEPA does not itself require exchange values to be equal—that is the job of other statutes, like FLPMA or the Omnibus Act.

And importantly, unlike this case, *Shoop* was not a NEPA alternatives analysis case. The full quotation from *Shoop* is helpful here:

> "[NEPA,] 42 U.S.C. § 4332(c), the statute that gives rise to 40 C.F.R. § 1508.27, is expressly concerned with actions that 'affect[ ] the quality of the human environment.' *This refers to a component of a physical environment* and cannot be reasonably understood as encompassing of parity in the value of the parcels to be exchanged."

*Shoop* at *28 (emphasis added). If the plaintiff in *Shoop* had challenged the NEPA alternatives analysis as failing to consider a reasonable range of exchange configurations, that *would* have implicated "a component of a physical environment" because the land itself is a "physical environment." But that's not what happened in *Shoop.* Here, where the NEPA alternatives challenge does implicate the physical environment—specifically, which physical environments are traded, owned, and controlled—*Shoop* simply does not apply.

Neither does *San Luis Valley Ecosystems Council v. U.S. Forest Serv.*, No. 04-CV-01071, 2009 WL 792257 (D. Colo. Mar. 23, 2009), aid the Forest Service. The government cites that opinion—which is about attorney fees, not NEPA—for the proposition that "appraisal values are 'completely irrelevant to the NEPA claim.'" ECF 82 at 26. What the Forest Service doesn't say is that in that case the plaintiff had actually *prevailed* on its NEPA claim. And when the court in that case mentioned that "appraisal values" and "the terms of the Forest Plan" were "irrelevant to the NEPA claim," it did so only in passing and—more importantly—only in the context of deciding whether to award fees for time spent on plaintiff's failed FLPMA claims. *San Luis Valley* at *6.

Nothing in *San Luis Valley* suggests that appraisals *cannot* be relevant to a NEPA claim. The opinion merely notes that the appraisals weren't relevant in *that* case. But where, as here, the appraisals—and the downstream equalization of value considerations—implicate the available and reasonable range of alternatives, they absolutely **are** relevant to the NEPA claim.

For the reasons set forth above and in Conservation Plaintiffs' Motion for Summary Judgment, the Forest Service failed to analyze or consider the appraisals in the EIS and failed to consider a reasonable range of alternatives that would fulfill the purpose and need of equalizing the values of the exchange lands. Those failures violate the APA and NEPA.

## Conclusion

For the reasons set forth above and in their Motion for Summary Judgment, Conservation Plaintiffs respectfully request that the Court grant summary judgment in their favor on Claim 1 (Violations of NEPA and the APA), Counts 1–4, and Claim 2 (Violations of the Omnibus Act/Clarification Act and the APA), Counts 1, 3, and 4, from its First Amended Complaint, ECF 4, and vacate the Forest Service's ROD and EIS.

Respectfully submitted this 4th day of November 2025.

  /s/ Jesse A. Buss
Jesse A. Buss, OSB No. 122919
Willamette Law Group, PC
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

  /s/ Karl G. Anuta
Karl G. Anuta, OSB No. 861423
Law Office of Karl G. Anuta, P.C.
735 S.W. First Ave.
Portland OR 97204
Tel: 503-827-0320
Fax: 503-386-2168
Email: kga@lokga.net

*Attorneys for Plaintiffs*