**STEPHEN J. ODELL, OSB #903530**
MARTEN LAW LLP
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone:  (503) 241-2648
E-mail: sodell@martenlaw.com
  *Attorney for Defendant-Intervenor Mt. Hood Meadows OREG., LLC*

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| THRIVE HOOD RIVER; OREGON WILD; SIERRA CLUB; OREGON NORDIC CLUB; FRIENDS OF MOUNT HOOD; OREGON KAYAK AND CANOE CLUB; and **MIKE MCCARTHY**, | Case No. 3:22-cv-01981-AR |

**THRIVE HOOD RIVER; OREGON WILD; SIERRA CLUB; OREGON NORDIC CLUB; FRIENDS OF MOUNT HOOD; OREGON KAYAK AND CANOE CLUB;** and **MIKE MCCARTHY**,

Plaintiffs,

v.

**META LOFTSGAARDEN;** and **UNITED STATES FOREST SERVICE**,

Defendants,

and

**MT. HOOD MEADOWS OREG., LLC,**

Defendant-Intervenor.

Case No. 3:22-cv-01981-AR

**DEFENDANT-INTERVENOR MT. HOOD MEADOWS'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE ADMINISTRATIVE PROCEDURE ACT (ECF no. 83)**

**Oral Argument Requested**

**TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………1

I.  PLAINTIFFS THRIVE, McCARTHY, & SIERRA CLUB HAVE ALL FAILED TO GENERATE A GENUINE ISSUE ON ANY MATERIAL FACTS NECESSARY TO ESTABLISH STANDING TO PURSUE THEIR CLAIMS ........................................ 5

II.  THE EXCHANGE COMPLIES FULLY WITH THE EXCHANGE LEGISLATION ................................................................................................................. 10

  A.  Neither the Primary Underlying Purpose Nor the Text of the Exchange Legislation Reflects Plaintiffs' Self-Styled & Self-Interested "Clean Sweep" Mandate…………11

  B.  Plaintiffs' Proffered Interpretation of Section 1206(a)(2)(H)(i) of the Clarification Act Is Inherently Flawed Because It Is Based on a Single Phrase Stripped of All Context………………………………………………………………………………15

  C.  The Provision to Treat Any Volitional Conveyance by Meadows in Excess of that Needed to Equalize Values as a Donation to the U.S. Does Not Undermine the Validity of the Configuration of the Federal Exchange on which the Parties Agreed as Necessary to Equalize Values per the Explicit Authority in the Exchange Legislation………………………………………………………………………………22

  D.  The Forest Service Followed All Requisite Procedures in Approving the Appraisals on which the Federal Exchange Was Based & Mere Disagreements that Plaintiffs' Appraiser Has as to How He May Have Performed the Appraisals Do Not Render Them Arbitrary & Capricious or Inconsistent with Applicable Professional Standards………………………………………………………………………………..23

III.  PLAINTIFFS' NEPA CLAIM REMAINS WHOLLY DISCONNECTED FROM ENVIRONMENTAL EFFECTS & RECENT LEGAL DEVELOPMENTS………..31

  A.  The Forest Service Was Not Arbitrary & Capricious in Fulfilling its Statutory Obligation in its Consideration of Reasonable Alternatives in the Final EIS………………………32

  B.  The Clarification Act's 120-Day Deadline Indisputably Would Not Have Allowed the Forest Service to Consider the Wetland Conservation Easement in the EIS…………..33

  C.  Plaintiffs' Claim that the Federal Exchange Should Be Set Aside Because the Appraisals they Were Provided were not Attached to the EIS Is Meritless & Harmless…………..35

CONCLUSION ...................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Davis v. FEC*, 554 U.S. 724 (2008) ................................................................................. 7

*Department of Homeland Security v. Regents of Univ. of California*, 140 S. Ct. 1891 (2020).... 24

*Flint Ridge Dev't Co. v. Scenic Rivers Ass'n*, 426 U.S. 776 (1976) ............................................. 34

*Hood River Valley Residents' Cmte. v. Board of Cnty. Comm'rs of Hood River Cnty.*, 193 Or.
   App. 485 (2004) ................................................................................................................. 6

*HRVRC v. Bd. of Cnty. Comm'rs of Hood Rvr. Cnty.*, case no. A184961 ................................... 22

*HRVRC v. Pena*, case no. 15-1397-BR (D. Or.) .......................................................................... 9

*Kensington Apt. Props., LLC v. Loanvest Ix, LP*, 2025 WL 1201427 (9th Cir. Apr. 25, 2025)..... 9

*League of Oregon Cities v. State of Oregon*, 334 Or. 645 (2002) ................................................ 6

*Lewis v. Casey*, 518 U. S. 343 (1996) .......................................................................................... 6

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2008) ..................................................... 8

*Natural Grocers v. Rollins*, 2025 WL 3040145 (9th Cir. Oct. 31, 2025) ................................. 6, 7

*New Hampshire v. Maine*, 532 U.S. 742 (2001) .......................................................................... 9

*North Cascades Conserv. Council v. Forest Serv.*, 136 F. 4th 816 (9th Cir. 2025) ................... 33

*Russell Country Sportsmen v. Forest Serv.*, 668 F.3d 1037 (9th Cir. 2011) .............................. 33

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025) ..................... 32, 33, 34

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................................................... 7

*Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) ...................................................... 7

*United States v. Hook*,195 F. 3d 299 (7th Cir. 1999) .................................................................. 9

*Utsey v. Coos Cnty.*, 176 Or. App. 524 (2001) ........................................................................... 6

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) ..................................... 16

*Wilderness Soc'y v. Tyrrel*, 918 F.2d 813 (9th Cir. 1990) ......................................................... 16

**Constitutional Provisions**

U.S. Const., Art. III., Sec. 2 ......................................................................................................... 6

**Statutes & Acts of Congress**

5 U.S.C. § 706(2) .................................................................................................................. 17, 24

5 U.S.C. §§ 701-06 ..................................................................................................................... 23

42 U.S.C. § 4332(2)(C) ............................................................................................................... 33

43 U.S.C. § 1716 .................................................................................................................. 14, 21

43 U.S.C. § 1716(a) .................................................................................................................... 14

43 U.S.C. § 1716(b) ............................................................................................................. 14, 17

Lewis & Clark Mt. Hood Wilderness Act, Subtitle I.C., Secs. 1201-07 of Omnibus Public Land
   Management Act of 2009, Pub. L. 111-11 (Mar. 30, 2009) ............................................ *passim*

Mt. Hood Cooper Spur Land Exchange Clarification Act, Pub. L. 115-110 (Jan. 10,
   2018). ............................................................................................................................ *passim*

**Congressional Materials**

162 Cong. Rec. H3488 (June 7, 2016) ........................................................................ 12
162 Cong. Rec. H3488-89 .......................................................................................... 13
163 Cong. Rec. H1331 (June 7, 2016) ...................................................................... 13
S. Rpt. 110-172 (Sept. 17, 2007) .............................................................................. 12

**Regulations**

40 C.F.R. § 1502.19 .................................................................................................... 35

**Federal Register Publications**

90 Fed. Reg. 10,610 (Feb. 25, 2025) .................................................................. 32, 35

**INTRODUCTION**

Plaintiffs' rather truncated summary judgment reply comprises a curious scattershot mix of responses to a select and relatively small subset of the arguments Defendants presented in their opening summary judgment briefing, some novel takes on arguments Plaintiffs made in their own opening brief, and a wholesale abandonment of quite a few others, all the while compounding and doubling down on the errors and oversights that plagued their opening brief. Before delving into the particular problems that invalidate specific arguments in Plaintiffs' reply, Defendant-Intervenor Mt. Hood Meadows OREG., LLC ("Meadows" or "MHMO") first summarizes five foundational flaws that permeate and collectively undermine all of Plaintiffs' claims and entitle Meadows and Federal Defendants to summary judgment in full in this action.

Virtually all of Plaintiffs' fundamental flaws derive in one way or another from their muddled, out-of-context, and myopic construction of the Exchange Legislation that governs the Government Camp-Cooper Spur land exchange at issue in this action ("Federal Exchange"). First, at the broadest scale, Plaintiffs continue to completely confuse and conflate the Exchange Legislation itself, consisting of Section 1206 of the Lewis & Clark Mt. Hood Wilderness Act ("Mt. Hood Wilderness Act" or "Act," §§ 1201-07 of Omnibus Public Land Management Act of 2009, Pub. L. 111-11 (Mar. 30, 2009)), as amended by the Mt. Hood Cooper Spur Land Exchange Clarification Act ("Clarification Act"), Pub. L. 115-110 (Jan. 10, 2018), with a 2005 Settlement Agreement among themselves, Meadows, and Hood River County to which the Forest Service is not even a party and that was designed to resolve wholly disparate state court proceedings still pending in the Oregon Court of Appeals. Not only is the 2005 Settlement Agreement therefore wholly irrelevant to resolution of Plaintiffs' claims, but this Court lacks jurisdiction to engage in judicial review of or to enforce its terms. Instead, under the limited

waiver of sovereign immunity in the Administrative Procedure Act ("APA") by which Plaintiffs invoke judicial review, this Court's exclusive purview is to review the Forest Service's approval of the Federal Exchange for compliance with the Exchange Legislation and the other statute on which Plaintiffs base their claims, the National Environmental Policy Act ("NEPA"). Plaintiffs' flaw in this regard blithely overlooks the fact the Congress could have simply directed the Forest Service and Meadows to execute the 2005 Settlement Agreement. It demonstrably did not.

Second, Plaintiffs' claims are hobbled by their persistent error in failing to recognize that, given the way the Exchange Legislation as actually enacted is framed, it can only be effectuated with the assent of Meadows. That is, the exchange prescribed by the Exchange Legislation is subject to a series of conditions, the most fundamental of which is that Meadows must agree to its final configuration and terms – and that, without such agreement, neither the exchange nor the significant public benefits it triggers into effect can be realized. As Meadows explained in its opening brief, the initial Exchange Legislation bill as introduced in 2006 did direct a mandatory exchange of all of the federal properties for all of the non-federal properties referenced in the 2005 Settlement Agreement, but that iteration was superseded by the legislation that the Congress eventually adopted, which categorically establishes that the Federal Exchange is conditioned upon MHMO's volitional acceptance--of its ultimate configuration and its terms.

Third, Plaintiffs' claims also badly miss the mark because they are founded on the misguided understanding that the purpose of the Exchange Legislation revolves entirely around the Federal Exchange instead of the broader public benefits at its core, namely designation of 1710 acres of additional Wilderness and establishment of a 2700-acre Crystal Springs Watershed Special Resources Management Unit ("WSRMU") to ensure clean drinking water for Hood River County residents. Moreover, the Exchange Legislation expressly provides that these

significant conservation benefits only take effect upon completion of the Federal Exchange. Notwithstanding that Defendants highlighted these valid primary purposes of the Exchange Legislation in their opening papers, Plaintiffs continue to completely and perhaps conveniently fail to acknowledge them, or the undeniable fact that they would be wholly forgone if Plaintiffs were to secure the remedy they seek of having this Court set aside the Federal Exchange.

Fourth, the foundation on which Plaintiffs' claims is based is unsound because it wholly fails to account for the critical role of the Federal Land Policy and Management Act ("FLPMA"), which the Exchange Legislation expressly provides the Federal Exchange is to be carried out in accordance with, except as otherwise provided.  Plaintiffs nevertheless forgo even citing FLPMA in their reply, let alone attempt to explain how it interrelates to and can be read harmoniously with the Exchange Legislation to support their preferred, contorted interpretation.  This oversight is vitally relevant to interpretation of the Exchange Legislation both because of FLPMA's equalization cap and its direction that the Forest Service consider the broader public interest.

Finally, even within the more specific confines of the Exchange Legislation itself, Plaintiffs fundamentally err due to their failure to interpret its key provision that largely lies at the core of this case, Sec. 1206(a)(2)(H)(i) ("Clause (H)(i)"), in its full and appropriate context. Mores specifically, in their Reply Plaintiffs repeatedly and incompletely cite only the middle portion of clause's text, namely that "a lesser area of Federal or non-Federal land may be conveyed if necessary to equalize appraised values of the exchange properties," see Pls.' SJ Reply at 2, 9, 10, & 11, without once addressing the fuller context of the entire provision that is essential to a proper interpretation.  That fuller context includes three additional elements that render Plaintiffs' proffered interpretation an absolute non-starter.  One such element is the overarching prefatory qualifier, "[n]otwithstanding subparagraph (A)," the subparagraph that

provides the foundational direction for the Forest Service to carry out the Federal Exchange in the first instance. The "notwithstanding" qualifier in Clause (H)(i) therefore works to supersede any portion of Sec. 1206(a)(2)(A) inconsistent with the clause. A second critical element Plaintiffs largely overlook is that the authorization in Clause (H)(i) for the Forest Service and Meadows to engage in an exchange allowing conveyance less than all parcels is granted "without limitation," signifying an intent to confer the greatest possible extent of discretion. The third element Plaintiffs ignore provides that the reduced exchange authorized by Clause (H)(i) is expressly made "subject to the approval of" both the Forest Service and MHMO. Read in light of all these elements and its full language, once the appraisal valuations rendered it necessary to engage in a reduction of the complete set of parcels depicted on the map referenced in the Original Act, Clause (H)(i) confers maximal flexibility to the Forest Service and Meadows to work out an exchange of whichever configuration of parcels would be necessary to satisfy FLMPA's equalization standard and met with their mutual approval. This is precisely what the Forest Service and Meadows did and is reflected in the Federal Exchange at issue in this case.

Plaintiffs' Reply also makes a critical error in trying to salvage its standing argument. Although it recites the proposition that a court need not examine the standing of all plaintiffs if a single, appropriately representative plaintiff establishes its standing to bring all the claims and seek all the relief at stake in a case, it ignores other firmly established propositions that standing is not dispensed in gross and must be established for each claim and form of relief sought. Given the contradictory and internally inconsistent injuries on which Plaintiffs rely and the disparate elements of ultimate relief they seek, it is therefore incumbent on the Court to examine whether Plaintiffs Thrive and McCarthy have independently met their standing burden, separate from other Plaintiffs who rely on alleged injuries arising from the conveyance of federal property.

Finally, Plaintiffs' Reply contains nothing that enables them to meet their burden to establish that the Forest Service's analysis of environmental effects under NEPA was arbitrary and capricious in any manner whatsoever, especially in light of the deference such analysis is due under the Supreme Court's recent opinion in the *Seven County Infrastructure Coalition* case.

I.   PLAINTIFFS THRIVE, MCCARTHY, & SIERRA CLUB HAVE ALL FAILED TO GENERATE A GENUINE ISSUE ON ANY MATERIAL FACTS NECESSARY TO ESTABLISH THEIR STANDING TO PURSUE THEIR CLAIMS.

In its opening brief, MHMO explained that Plaintiffs Thrive, McCarthy, and Sierra Club have failed to carry their burden of creating a genuine issue of material fact with respect to any of the three requisite elements necessary for them to establish standing to pursue their claims and relief they seek in this action.  MHMO's Op. Brf. at 17-21 (ECF no. 83).  Rather than directly address any of the points Meadows systematically put forth to demonstrate these three specific Plaintiffs lack standing, however, Plaintiffs instead simply try to evade or elide them altogether, through two maneuvers, neither of which is successful or sound.  Pls.' SJ Reply at 3-5.

First, Plaintiffs engage in a complete non-sequitur by contending that this Court should find that Plaintiffs Thrive, McCarthy, and Sierra Club have standing to pursue their claims in this action because the Oregon Court of Appeals determined that McCarthy had standing in his challenge to the wholly distinct 2002 land exchange between Meadows and Hood River County ("County Exchange") that he continues to pursue in state court.  Id. at 3 & n.1.  This contention is invalid on its face and shot through with spurious reasoning.  As an initial matter, standing is distinct not only from case to case, but also claim to claim, and thus, just because a plaintiff is found to have established standing to pursue one or more claims in a discrete case does not mean that it is forever absolved from ever having to meet its burden to establish its standing to bring distinct claims in a different case, even if tangentially related.  *See Lewis v. Casey*, 518 U. S.

343, 358, n.6 (1996) (standing is not "dispensed in gross"). In addition, as MHMO explained in

its opening brief, the need for a plaintiff to establish standing in federal court derives from the

limitation on federal courts' jurisdiction to actual cases and controversies in article III of the U.S.

Constitution, which obviously does not apply to state courts. U.S. CONST., Art. III., Sec. 2.

Rather, as the Oregon Court of Appeals has explained, standing in Oregon courts "is in no way

driven by federal law, [but rather] is driven by a well-developed body of state constitutional

jurisprudence," and thus does not, and could not, implicate or provide support for standing in

federal court. *See Utsey v. Coos Cnty.*, 176 Or. App. 524, 552 (2001); L*eague of Oregon Cities

v. State of Oregon*, 334 Or. 645, 657-62 (2002). Finally in this regard, Plaintiffs' position

actually does nothing other than serve to confirm MHMO's standing challenge given that, as

MHMO explained in its opening brief, the injuries that Mr. Carthy avers he will sustain from the

Federal Exchange at issue in this litigation virtually all derive from his loss of the ability to use

the lands the County conveyed to Meadows as part of the County Exchange in 2002. MHMO's

Op'g Brf. at 26. But these are the very alleged injuries on which the Oregon Court of Appeals

was relying in finding that Mr. McCarthy has standing to pursue his claims in the pending state

court litigation that challenges the County Exchange. *Hood River Valley Residents' Cmte. v.

Board of Cnty. Comm'rs of Hood River Cnty.*, 193 Or. App. 485, 502 (2004).

Second, Plaintiffs argue that it is of no moment that Thrive and Mr. McCarthy have not

independently established their standing to pursue the claims and relief they seek because

MHMO has not challenged the standing of the remainder of Plaintiffs and, they contend,

"standing for one equals standing for all." Pls.' SJ Reply at 3-4. In support of this argument,

Plaintiffs cite the recent Ninth Circuit opinion of *Natural Grocers v. Rollins*, 2025 WL 3040145

(9th Cir. Oct. 31, 2025), which they assert absolves them of their need to even attempt to support

the standing of Plaintiffs Thrive, McCarthy, and Sierra Club.  Plaintiffs' reading of Natural

Grocers is overly facile and cannot be sustained given that they overlook several other essential

principles that govern standing in federal courts.  For one thing, even though Plaintiffs rightfully

note that MHMO judiciously limited its standing challenge to Plaintiffs Thrive, McCarthy, and

Sierra Club, the reviewing court has "an independent obligation to assure that standing exists,

regardless of whether it is challenged by any of the parties," as *Rollins* itself expressly prescribes.

*Id.* at *23 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).  Moreover, as

*Rollins* also elucidates, the rule that a federal court need not address the standing of all plaintiffs

once it finds one of them does only applies to APA claims if "the scope of the relief available

does not differ among each Plaintiff."  *Id.*  This gives rise to another fundamental proposition

Plaintiffs ignore in their unduly simplistic argument, which is that a plaintiff must demonstrate

standing for each claim "he seeks to press and for each form of relief that is sought."  *Davis v.*

*FEC*, 554 U.S. 724, 734 (2008); *see also Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433,

439 (2017) (at least one plaintiff must have standing to seek each form of relief requested).

　　These complementary principles undermine Plaintiffs' position and collectively mean

they cannot get off the hook to meet their burden to establish standing with respect to each form

of relief they seek merely by pointing out that Meadows does not challenge the standing of a

subset of Plaintiffs and waving metaphorical pixie dust.  Standing is not "dispensed in gross" and

each distinct subgroup of Plaintiffs bears the burden to show they have satisfied its prerequisites.

　　Abiding by all of the foregoing foundational principles governing federal standing is

particularly important in this case where a portion of the relief that Plaintiffs seek is nothing less

than vacating the Forest Service's approval of the congressionally prescribed Federal Exchange,

as well as enjoining the agency from implementing it unless it takes the form they insist on of a

"Clean Sweep," *see* Amended Complaint at 20-21, even though the exchange has literally been in the works for a decade and a half and will produce a bounty of public benefits upon its final execution. MHMO's Op'g Brf. at 1-2 & 16-17. Two key elements this Court would need to weigh in the context of determining whether to grant such extraordinary relief are whether Plaintiffs have met their burden to establish that, without such injunctive relief, they would suffer irreparable injury and the equities favor such relief as well. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2008). As MHMO explained in its opening brief, Plaintiffs fall into two distinct subgroups when it comes to the standing injuries they allege – those upon which Thrive and McCarthy rely involve claimed injuries arising from a wholly speculative new development by Meadows of a destination resort following the Federal Exchange; and those upon which the remaining Plaintiffs rely involve alleged injuries arising from the loss of access to the federal land currently within the Mt. Hood National Forest the Forest Service will convey to Meadows under the Federal Exchange. MHMO's Op'g Brf. at 18. At a minimum, therefore, the Court needs to determine whether at least one Plaintiff in the first category as well as at least one Plaintiff in the second group have standing so that it would be in position to know which alleged injuries fit within the scope of those it would be appropriate to consider in evaluating the above-described elements of relief that Plaintiffs seek. Illustrative of the stark distinction in this context is the fact that Plaintiffs in the second category who rely upon alleged injuries arising from conveyance of the westerly federal parcel under the Federal Exchange would actually have their injuries exacerbated under the ultimate "Clean Sweep" outcome Mr. McCarthy demands, under which both of the federal parcels referenced in the Original Act would pass out of federal ownership. *See* Declaration of Mike McCarthy at ¶¶ 12, 20, & 22 (Dkt. #78). It would therefore

not be appropriate under these circumstances for the Court to allow Thrive and Mr. McCarthy to

"piggy-back" off of the scope of standing it may find the other Plaintiffs have established.

Third, in another exercise of unsound legal legerdemain, Plaintiffs seek to be relieved of

their obligation to establish standing because they argue MHMO should simply be judicially

estopped from arguing that Thrive and Mr. McCarthy lack standing. Pls.' SJ Reply at 4.

Plaintiffs contend estoppel should be applied because in the earlier action in this Court that

involved the entirely distinct remedy of seeking to compel the Forest Service to complete the

Federal Exchange, vis-a-vis seeking to set it aside as Plaintiffs pray for in the current action,

MHMO joined in a summary judgment brief asserting that it, Thrive, and Mr. McCarthy all had

standing to seek the former type of relief. *Id.* (citing *HRVRC v. Pena*, case no. 15-1397-BR (D.

Or.), ECF no. 46 at 22). As noted above, however, the fact that a party has standing in one case

does not automatically confer standing on that same party in a wholly separate proceeding, and

thus, the notion that MHMO has allegedly taken contradictory positions is meritless on its face.

Moreover, judicial estoppel is an equitable doctrine within the sound discretion of the court and,

although its application is not susceptible of being reduced to a simple rule, it typically is

informed by three principal criteria, including that the latter position of the party against whom

the doctrine is sought to be invoked must be "clearly inconsistent" with its prior position. *New

Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *United States v. Hook*,195 F. 3d 299,

306 (7th Cir. 1999)). The absence of this criterion is sufficient of itself to defeat invocation of

the doctrine. *Kensington Apt. Props., LLC v. Loanvest Ix, LP*, 2025 WL 1201427, slip op. at *3

(9th Cir. Apr. 25, 2025). Plaintiffs' judicial estoppel argument is nothing but a red herring.

Finally, it must be noted that in their Reply Plaintiffs completely fail to address the other

major purpose that animated Meadows's decision to challenge the standing of Plaintiffs Thrive

and McCarthy, which was to correct and clarify the record for the Court and thereby provide an accurate and complete basis on which it could evaluate their standing. MHMO's Op'g Brf. at 18 & 19 n.2. In that regard, it is highly notable that Plaintiffs utterly fail to even attempt to rebut or counter any of MHMO's corrections and clarifications of the record. Left wholly unrebutted and unaddressed, the Court therefore needs to accept all of MHMO's factual representations.

Particularly in that light, the Court should grant summary judgment against Plaintiffs Thrive, McCarthy, and Sierra Club due to their failure to meet their burden to establish standing.

II.    THE EXCHANGE COMPLIES FULLY WITH THE EXCHANGE LEGISLATION.

In seeking to buttress in their Reply their claim that the Forest Service's approval of the Federal Exchange violates the Exchange Legislation, Plaintiffs rattle off a mishmash of points that they assert somehow stack up to entitle them to summary judgment, all the while skipping over entirely the argument at the heart of their opening brief as to that claim which contended that the Exchange Legislation allows a reduction only in either the federal or non-federal lands as depicted on the maps referenced in the original Act, but not both. Pls.' SJ Reply at 5-17. This abrupt casting aside of such a central argument to which Plaintiffs devote nary a mention in their reply brief is highly notable, as it would seem to indicate that they decided to simply abandon it or, at the very least, were unable to rebut or meaningfully respond to Defendants' compelling counterarguments. *See* MHMO's Op'g SJ Brf. at 21-25; Fed. Defs.' Op'g SJ Brf. at 33-38.

Instead, the arguments that Plaintiffs proffer in their Reply in support of their claim that the Federal Exchange violates the Exchange Legislation (1) effectively double down on their "Clean Sweep" position that Defendants systematically dismantled in their opening summary judgment papers and (2) shift to make their principal arguments revolve around whether there was any "necessity" that the Federal Exchange not include all the federal and non-federal lands

depicted on the maps referenced in the Original Act and, if so, whether the Forest Service had a

duty to make explicit findings of any such necessity in the Government Camp-Cooper Spur Land

Exchange Final Environmental Impact Statement ("EIS") or Record of Decision ("ROD"). Pls.'

Op'g SJ Brf. at 23-24; Pls.' SJ Reply at 8-15. MHMO will address the arguments Plaintiffs make

in each of these subcategories, none of which overcome the flaws it exposed in its opening brief.

    A.  <u>Neither the Primary Underlying Purpose Nor the Text of the Exchange Legislation
Reflects Plaintiffs' Self-Styled & Self-Interested "Clean Sweep" Mandate</u>.

Plaintiffs continue to remain fixated on the misguided notion that the Exchange

Legislation was designed to effectuate the 2005 Settlement Agreement or at least to compel the

Forest Service and Meadows to engage in a property exchange that included conveyance of all

federal lands for all non-federal lands as depicted on the map referenced in the Original Act,

which they characterize as the "Clean Sweep." Pls.' SJ Reply at 6-8. But this view reflects a

fundamental confusion and insupportable conflation on the part of Plaintiffs between the 2005

Settlement Agreement that sought to resolve the ongoing state court litigation by which Plaintiffs

challenge the County Exchange with the Exchange Legislation itself, a critical misunderstanding

that fatally skews Plaintiffs' Exchange Legislation claim. Indeed, this Court has no jurisdiction

under the APA to review or enforce the 2005 Settlement Agreement as that act only authorizes

judicial review of federal agency actions, and the Forest Service is not a party to the agreement.

Nor are the more specific arguments Plaintiffs present in their Reply of any merit, either.

First, Plaintiffs contend that the "baseline purpose" of the Exchange Legislation was to

facilitate an exchange comprising their self-proclaimed "Clean Sweep." Pls.' SJ Reply at 6-7.

But as Meadows explained in its opening summary judgment brief, the overall purpose of the

Exchange Legislation was never about mandating such a "Clean Sweep," a term that never

appears in the legislation or any of its legislative history, and indeed, was not even specifically

tethered to the Federal Exchange at all, which was added during a later iteration of the bill. MHMO's Op'g Brf. at 3-4 & &6. Instead, its impetus was to craft a "Mt. Hood Legacy" bill that, as described in the legislative report of the Senate Energy and Natural Resources Committee with jurisdiction over the bill that eventually became the Original Act, was designed principally "to designate certain land on Mount Hood, Oregon, as wilderness, to designate certain rivers as components of the National Wild and Scenic Rivers System, to designate the Mount Hood National Recreation Area, and to otherwise improve Federal land management in and around the Mount Hood National Forest." S. Rpt. 110-172 at 14 (Sept. 17, 2007). Plaintiffs continue to wholly overlook these broader public benefits the Mt. Hood Wilderness Act was designed to serve, as well as any mention of its legislative history, in both of their summary judgment briefs.

As for the Clarification Act that amended the Original Act, its primary and wholly bipartisan purpose was to clarify and hone the legislative direction prescribing the exchange and in so doing, add significant degrees of discretion and flexibility for the exchange parties to facilitate their completion of the Federal Exchange in light of the substantial frustration that had built up given that five years had already passed since the initial intended completion deadline in the original act. Rep. Walden (R-OR) gave voice to this purpose when the precursor bill to the Clarification Act came to the House floor for a near-unanimous vote in the 114th Congress:

> The [Act] that ultimately passed the Congress was a little different than what Representative BLUMENAUER and I started with because we feared this very result could happen, that it would be delayed for years and years and years because we have seen it happen before. Be that as it may, we are here today, 7 years later, after the Congress had told the agency to get this done in 16 months, which should be all the time that is necessary. Seven years later, we are back with a second piece of legislation, confirming the mediation, working this through so that we can get this exchange done thoughtfully, completely, and finally get this done.

162 Cong. Rec. H3488 (June 7, 2016).

Rep. Blumenauer (D-OR) followed up with remarks confirming that purpose, as follows:

> [i]t was really one of my most positive experiences in two decades of congressional service, zeroing in with the stakeholders—Native Americans, environmentalists, local government—trying to figure out the best protections for a very complicated area that is within easy driving distance of 4 million people. There were many strains and stresses and multiple stakeholders….
>
> As he said, part of the delicate balance that was achieved was an opportunity for us to deal with this land exchange. It was a win-win situation for a variety of the stakeholders. It obviously is better for the environment. It settled long-simmering disputes that served nobody's interest but had actual potential for negative outcomes.
>
> This land exchange was part of what was envisioned. This was not just a bipartisan effort with my friend, the gentleman from Oregon (Mr. WALDEN), and myself. It was then[-]Senator Smith and Senator WYDEN, and now Senator MERKLEY and Senator WYDEN have been partners in this. It is frustrating that we get to the point where it requires legislation to do something that was an integral part of this agreement.
>
> I am proud to join my friend in urging support for it. We want to get this passed and be able to capitalize on the vision that we worked so hard on to protect the mountain and all of the attendant interests.

162 Cong. Rec. H3488-89.

Then, at a more granular level, upon passage of the Clarification Act, Rep. McClintock, then-Chair of the U.S. House Subcommittee on Federal Lands, explained that one of the conveyance conditions the bill modified from the Original Act involved "equalization of values of the exchange properties."  163 Cong. Rec. H1331 (June 7, 2016).  These modifications, set forth in Clause (H)(i), served to expand significantly the discretion of the exchange parties – the Forest Service and Meadows – in achieving equalization.

Thus, Plaintiffs' notion that the animating purpose of the Mt. Hood Wilderness Act or even the more specific Exchange Legislation subsumed within it, was to federally codify the 2005 Settlement Agreement or accomplish their preferred "Clean Sweep" is completely baseless.

Second, Plaintiffs contend that MHMO's initial offer to exchange all its non-federal lands depicted on the map referenced in the Original Act should somehow be construed as a strait-

jacket that forecloses any variation from the terms of that initial offer.  Pls.' SJ Reply at 7-8.  This

position ignores and is undermined both by the conditions the Congress expressly placed on the

prescribed exchange in the Exchange Legislation as well as the explicit terms of the Agreement

to Initiate ("ATI") into which the Forest Service and MHMO entered *following* MHMO's initial

offer.  As for the Exchange Legislation, the conditions of most relevance to Plaintiffs' claim in

this regard include the following, with the applicable provision of the act set forth in parentheses:

• providing that execution of the Federal Exchange is wholly volitional on the part of MHMO[1]

(Sec. 1206(a)(2)(A)), which is especially notable given that an earlier version of the bill had

directed a mandatory exchange of all federal properties for all non-federal properties depicted in

the map referenced in the Act, H.R. 5025, Sec. 802(a) & (b), 109th Cong. (Mar. 28, 2006);

• requiring compliance with Section 206 of FLPMA, 43 U.S.C. § 1716, including the public

interest criteria in Sec. 206(a) and equalization criteria in Sec. 206(b) (1206(a)(2)(H)(i)(A);

• if appraisal valuations render it necessary to complete the exchange such that it encompasses

less than all the properties depicted in the map referenced in Sec. 1206(a)(2)(A) of the Original

Act in order to meet FLPMA's equalization criteria, granting the Forest Service and Meadows

even greater discretion to jointly approve an exchange of lesser area, "without limitation,"

expressly notwithstanding the direction in Sec. 1206(a)(2)(A) (Secs. 1206(a)(2)(H)(i)).

    The ATI is wholly consonant with the Exchange Legislation, as it expressly authorizes

both the Forest Service and Meadows to withdraw from the exchange process at any time prior to

---

[1] Plaintiffs' fundamental misapprehension of the Exchange Legislation is further reflected by its assertion that MHMO purportedly engaged in a "refusal to comply with the Omnibus Act."  Pls.' SJ Reply at 13.  This assertion is off-base both factually and legally, as the Act only imposes legal duties on the Forest Service, not Meadows.  And even the Forest Service's overarching duty in the Act to convey all or a portion of the federal lands referenced in the legislation is contingent on MHMO's ongoing willingness to ultimately convey all or a portion of its non-federal lands under one or more configurations that meet the necessary equalization criteria.

execution of a binding exchange agreement.  AR20482.  This understanding is further reflected in the exhibits to the ATI, which describe in detail the respective properties that Meadows and the Forest Service "will consider exchanging," AR20485 & AR20494, as well as in the Forest Service's earliest interpretations of the Exchange Legislation.  AR19538-40 & AR20304.

What the foregoing unequivocally establishes is that the Forest Service's obligation to carry out the Federal Exchange and the triggering of all the myriad public benefits conditioned on its completion was expressly subject to Meadows's willingness to approve of its final configuration.  The "Clean Sweep" straitjacket that Plaintiffs continue to seek to impose upon the exchange parties can thus be seen as reflecting nothing more than what they apparently fervently wish the Exchange Legislation had mandated rather than what it actually does prescribe, which the administrative record unequivocally shows the Forest Service scrupulously followed.

B.  Plaintiffs' Proffered Interpretation of Section 1206(a)(2)(H)(i) of the Clarification Act Is Inherently Flawed Because It Is Based on a Single Phrase Stripped of All Context.

Plaintiffs eventually get around themselves to conceding in their Reply that the Exchange Legislation does not actually mandate the "Clean Sweep" for which they so feverishly contend throughout most of their moving papers, acknowledging that Clause (H)(i) of the Clarification Act confirmed that the Exchange Legislation does not mandate such a result.  Pls.' SJ Reply at 8-9.  But even then, Plaintiffs cannot bring themselves to grapple with the full breadth of Clause (H)(i) and instead repeatedly take a single phrase out of context from the very middle of the provision that contains multiple elements that must be read as part of a united whole.  The entirety of the clause, which Plaintiffs never recite or acknowledge, provides as follows:

> *Notwithstanding [Sec. 1206(a)(2)(A)]*, in addition to or in lieu of monetary compensation, **a lesser area of Federal land or non-Federal land may be conveyed if necessary to equalize appraised values of the exchange properties**, *without limitation*, consistent with the requirements of this Act *and subject to the approval of the [Forest Service] and [Meadows]*.

Sec. 1206(a)(2)(H)(i) (AR42881) (emphases supplied). To clarify, the phrase emphasized in bold is the one Plaintiffs continually recite while ignoring the entire remainder of the clause, including the critically important elements it contains as emphasized in italics.

On the basis of their facially incomplete reading of Clause (H)(i), Plaintiffs make a series of arguments turning on allegations that the Federal Exchange as approved by the Forest Service is inconsistent in one way or another with the "necessity" phrase that they pluck out and improperly construe in a vacuum. None of Plaintiffs' contentions along these lines have merit.

First, Plaintiffs make the procedural argument that the Forest Service violated Clause (H)(i) because it allegedly did not explain in the EIS or ROD how the Federal Exchange satisfies the duty Plaintiffs contend the clause imposes to give such an explanation in those documents. This argument suffers from numerous flaws. As an initial matter, neither the statutory language Plaintiffs cite, nor any other language in the Exchange Legislation, imposes such an explanatory duty. Sec. 1206(a)(2)(H)(i). Moreover, as the Forest Service noted in its opening brief, it has long been black-letter law that courts are not free to impose procedural duties beyond those explicitly imposed by relevant statutes. Fed. Defs.' Op'g SJ Brf. at 39 (citing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524-25 (1978); *Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 838 (9th Cir. 1990)). Even insofar as the Forest Service may need to consider relevant factors in a more generic sense pursuant to the APA in arriving at a decision, Plaintiffs' argument still misses the mark given its misguided insistence that such consideration must be manifest in either the EIS or ROD. But as Plaintiffs themselves concede in another part of their Reply, the Court's review of that broader consideration is to be undertaken on the basis of the "whole record," not simply the EIS and ROD. Pls.' SJ Reply at 12 (stating that the "whole record" for purposes of the APA means "the full administrative record that was before the [agency

decisionmaker] at the time he made his decision"); *see also* 5 U.S.C. § 706(2) (in exercising judicial review pursuant to the APA, courts "shall review the whole record").  Finally, Plaintiffs misrepresent the record in any event, as in the ROD the Forest Service offered a proper necessity determination in stating that its decision to approve the Federal Exchange "reflects the agreement between the Forest Service and Mt. Hood Meadows regarding an appropriate area of lands to be exchanged *as necessary to equalize appraised values*."  AR50376 (emphasis supplied).

Next, Plaintiffs only compound their unjustified legal overreach in their efforts to conjure up a "necessity"-themed violation of the Exchange Legislation by arguing that the Forest Service seeks to rely on an improper post-hoc explanation that ostensibly appears only in Federal Defendants' opening summary judgment brief.  Pls.' SJ Reply at 9-10.  This argument is both invalid on its face given that the Forest Service does not rely solely on its litigation briefing to establish the clear need for the reduced acreage to be conveyed in the Federal Exchange, and also fails at a more fundamental level because the alleged "post-hoc explanation" that Plaintiffs cite represents a gross mischaracterization of how the exchange's ultimate configuration was reached.

With respect to the necessity for a reduced-acreage exchange, the factors evincing its existence are replete throughout the record.  Indeed, they are evident on the face of the appraisals themselves, which show that the difference between the valuation of the non-federal properties exceed the total valuation of the federal properties by nearly $3.5 million, well outside the 25 percent of the federal property value equalization cap in Sec. 206(b) of FLPMA that is expressly incorporated into the Exchange Legislation in Sec. 1206(a)(2)(B).  *Compare* AR43764 (non-federal appraisal) *with* AR44251 (federal appraisal).  This by itself triggered into effect Clause (H)(i) that expressly grants the Forest Service and Meadows the authority to mutually approve an exchange configuration of lesser acreage than all the properties depicted on the map referenced

in the original Act that reflects the need to meet FLPMA's equalization criteria one way or another, notwithstanding Sec. 1206(a)(2)(A) and "without limitation." Sec. 1206(a)(2)(H)(i). The above-referenced explanation the Forest Service provided in the ROD is wholly consonant with this direction. AR50376. Moreover, the notion Plaintiffs proffer that the Forest Service is seeking to improperly rely only the post-hoc rationalization of its litigation counsel in briefing this case to furnish an explanation as to the necessity underlying the reduced-acreage Federal Exchange that indisputably achieves the requisite equalization criteria is belied by the simple fact that virtually all of the pages that Plaintiffs cite from that briefing in turn include extensive references to the administrative record. Fed. Defs.' Op'g SJ Brf. at 15 n.8, 20, 25, 36 & 41 (collectively citing AR28267, AR49930, AR49931-32, AR49932, AR49935, & AR50376).

Plaintiffs' argument in this vein further misses the mark because it turns on a fundamental mischaracterization of the record. That is, Plaintiffs seek to portray the final configuration of the Federal Exchange as a manifestation of Meadows's alleged "recalcitrance" and a "take it or leave it" refusal to accept any other configuration. Pls.' SJ Reply at 9-11. The record demonstrably reflects that this characterization is a far cry from events as they actually transpired. As MHMO explained in its opening brief, the final configuration of the Federal Exchange was the byproduct of a monthslong conferment in which it cooperatively and in good faith engaged with the Forest Service once the parties had the final property valuations from the 2019 appraisals in hand. MHMO's Op'g SJ Brf. at 12-17. This process kicked off with both parties' preparing sets of equalization proposal alternatives for consideration and discussion in February 2020, and indeed, the option of achieving the necessary equalization by having the United States convey only the western federal parcel and not the eastern one near Government Camp and having Meadows retain the mostly developed Panhandle was initially represented in the first series of options the

Forest Service laid out for the parties' conferment.  AR45290.  The vacuousness of Plaintiffs'

suggestion in this vein is thrown into even starker relief upon considering that, of the initial

equalization proposals, it was one that Meadows proposed that would have achieved exchange of

the largest amount of acreage although, to make it work, Meadows would have needed to secure

several minor Property Line Adjustments within the Panhandle that it did pursue, but eventually

had to scrub due to Thrive's opposition.  *See* discussion at MHMO's Op'g SJ Brf. at 13-14.

Neither do the snippets from Federal Defendants' opening brief that Plaintiffs cite support

their contorted characterization.  Pls.' SJ Reply at 9-10.  Plaintiffs misconstrue such excerpts by

confusing the straightforward and correct *legal proposition* the Forest Service recognized

throughout its administrative process that Meadows's approval and acceptance of the final

contours of the Federal Exchange was needed in order to consummate the Federal Exchange as

prescribed by the Congress with Plaintiffs' wholly insupportable *factual allegation* that Meadows

simply dictated terms to the Forest Service when it came to arriving at those contours.  Plaintiffs'

strained factual narrative of the record is further and squarely undermined by the Forest Service's

explicit finding in the ROD that the Federal Exchange "honors our cooperative engagement with

[MHMO] and reflects the agreement between the Forest Service and [MHMO] regarding an

appropriate area of lands to be exchanged as necessary to equalize appraised values."  AR50376.

Thus, Plaintiffs over-the-top hyperventilations in their Reply seeking to construe Federal

Defendants' opening brief as allegedly containing some new "significant, impermissible, and

transformative" concession, Pls.' SJ Reply at 1-2, can be boiled down to the simple fact that

Meadows was willing to approve, jointly with the Forest Service, the configuration of the

Federal Exchange as adopted in the ROD following a cooperative process with the agency.

Plaintiffs' suggestions to the contrary should be seen as a desperate and unavailing effort to find some novel eleventh-hour tack to rescue their unfounded Exchange Legislation claim.[2]

Finally, Plaintiffs seek to parlay their faulty premise in this regard – that Meadows ostensibly refused to consider any other configuration of the Federal Exchange than the one the Forest Service ultimately approved – into yet another flawed argument that the configuration was therefore somehow unnecessary to achieve the requisite equalization of values. Pls.' SJ Reply at 10-13. This argument can be disposed of in short order. First, it inherently fails because it is based on a faulty factual interpretation of the administrative record. It is further based on a wholesale misinterpretation of the Exchange Legislation for, as also laid out above, the Forest Service's authority to reduce the exchange acreage in Clause (H)(i) is not solely linked to its need to equalize values, as that much had already been granted in Sec. 1206(a)(2)(B) of the Original Act, but such authority is further granted "without limitation," subject to joint approval with MHMO, and notwithstanding the properties depicted on the maps referenced in the original Act. As Meadows explained in its opening brief, this is about a capacious a grant of authority as the Congress could have crafted to confer upon the agency.[3] MHMO's Op'g SJ Brf. at 2-3 & 24.

---

[2] As a result, Plaintiffs' related assertion that, by incorporating by reference Federal Defendants' summary judgment briefing insofar as it is consistent with its own, MHMO "tacitly admits that its refusal to trade the Clean Sweep lands is the driving force behind the significant reduction in exchange acreage," Pls.' SJ Reply at 11, is patently erroneous. For one thing, for the reasons set forth in the body of its brief, MHMO does not consider there to be any meaningful daylight between its position and Federal Defendants' regarding how the final configuration of the Federal Exchange as the Forest Service approved it was reached. For another, to whatever minimal extent the Forest Service's perspective on that narrative may differ from MHMO's, Meadows incorporated Federal Defendants' arguments only insofar as consistent with its own, an explicit condition that Plaintiffs self-servingly omit. MHMO's Op'g SJ Brf. at 35.

[3] Meadows would further note in this context that this does not mean, as Plaintiffs assert, that the Forest Service would have had to approve the Federal Exchange even if MHMO had only been willing to approve a configuration involving conveyance of just one acre of its non-federal lands depicted on the map referenced in the Original Act. Pls.' SJ Reply at 13 n.4. First, this assertion

Finally, a brief word is in order in response to some of the other frivolous and superfluous assertions that Plaintiffs ply into their argument in their Reply in this regard.  First, Plaintiffs assert that MHMO has sought to impermissibly rely upon the two declarations of Matthew Drake (ECF nos. 12 & 84), the President of MBD Development, LLC, the Manager of Meadows.  Pls.' SJ Reply at 11-12.  But even a cursory review of MHMO's filings indisputably reveals that it has only cited either of Mr. Drake's Declarations in support of its intervention motion and to rebut Plaintiffs' standing.  *See* MHMO's Mot. to Intervene (ECF no. 11); MHMO's Op'g SJ Brf. at 17-21.  Second, Plaintiffs launch into a rambling diatribe about alleged breaches of and the putative ongoing efficacy of the 2005 Settlement Agreement.  Pls.' SJ Reply at 12-13.  As MHMO has previously noted, this is a red herring of the first order, as the 2005 Settlement Agreement is not at issue in this case, is not a federal action over which this Court has any jurisdiction to review or enforce, and is not what the Congress prescribed the Forest Service to execute in the Exchange Legislation.  Moreover, Plaintiffs also toss out the wholly unwarranted contention that *Meadows* has refused to comply with the Exchange Legislation.  Pls.' SJ Reply at 13.  This goes to show

---

ignores another provision inserted into the Clarification Act that was designed to work in concert with Clause (H)(i) that requires the appraisals to assign a separate value to each discrete parcel ("tax lot") explicitly "to allow for the equalization of values." Sec. 1206(a)(2)(D)(ii). This means at a minimum that the Federal Exchange would have needed to be broken down into one of the various configurations of discrete appraised parcels on both sides that would be needed to achieve an equalization of values consistent with Sec. 206 of FLPMA. Indeed, this interpretation is borne out by how Meadows and the Forest Service approached the equalization options that each brought to the table during their cooperative conferment that was designed to arrive at a final configuration. See, e.g., AR44664-70; AR44677-83; AR45289-45323; AR49571-81. Moreover, as noted elsewhere, the Exchange Legislation also expressly conditioned the Forest Service's approval of the Federal Exchange on fulfillment of the public land-exchange duties of Sec. 206 of FLPMA, which requires agency consideration of various "public interest" factors as well as equalization parameters, and nothing in the record suggests that either of these could have been met under a one-acre exchange. Finally, this hyperbolic hypothetical is not in fact what the exchange parties did in conferring on and agreeing to the final configuration that was necessary to equalize the values for the Federal Exchange in a manner that met with their joint approval, and thus, the Court need not divert its attention to wander down such a rabbit hole.

just how off-base Plaintiffs' construction of the Exchange Legislation is, for Meadows is not subject to that legislation's strictures, the Forest Service is. As MHMO explained above, a precursor to the bill that became the Exchange Legislation was crafted to mandate Meadows to convey its non-federal property, but the final version makes clear its participation in the Federal Exchange is wholly volitional; it is the Forest Service who is directed to complete the Federal Exchange if all of the legislation's conditions are met.

   C.   The Provision to Treat Any Volitional Conveyance by Meadows in Excess of that Needed to Equalize Values as a Donation to the U.S. Does Not Undermine the Validity of the Configuration of the Federal Exchange on which the Parties Agreed as Necessary to Equalize Values per the Explicit Authority in the Exchange Legislation.

In a final variation of Plaintiffs' myriad arguments that rely overtly or implicitly on the 2005 Settlement Agreement, Plaintiffs contend that the configuration of the Federal Exchange the Forest Service and MHMO jointly approved that achieved the necessary equalization of values was nevertheless allegedly unnecessary because that agreement putatively mandates that Meadows donate property equal to $1.725 million to the United States. Pls.' SJ Reply at 14-15. As an initial matter, MHMO would reiterate yet again the undeniable proposition that the Court has no jurisdiction to review or enforce the 2005 Settlement Agreement. Instead, in reviewing Plaintiffs' claims brought pursuant to the APA in this case, the operative legal direction is the Exchange Legislation that the Congress enacted and entirely supplants the 2005 Settlement Agreement, and that legislation, as even Plaintiffs appear to acknowledge in their briefing, makes any such donation to the U.S. in connection with the Federal Exchange wholly discretionary. *Id.* at 14. In any event, the 2005 Settlement Agreement is by its own terms no longer operative given that the state court litigation it was designed to settle is indisputably no longer abated. *HRVRC v. Bd. of Cnty. Comm'rs of Hood Rvr. Cnty.*, case no. A184961 (docket showing case is pending available at https://trportal.courts.oregon.gov/portal/court/3d764b2a-2faa-4613-aac6-

7da3b06325f4/case/a75768d6-2dac-4a93-971c-f61d50439854).  More specifically, Paragraph 5 of the agreement expressly provides that all of the parties' obligations under its terms are expressly conditioned upon ongoing abatement of the state court proceedings (or extensions of time for the parties to make court filings) and that, until completion of the Exchange, "if any party determines that the manner in which the Lawsuits are abated or delayed is inadequate to meet their needs, the obligations set forth herein will not bind any party."  AR 16035.[4]

> D. <u>The Forest Service Followed All Requisite Procedures in Approving the Appraisals on which the Federal Exchange Was Based & Mere Disagreements that Plaintiffs' Appraiser Has as to How He May Have Performed the Appraisals Do Not Render Them Arbitrary & Capricious or Inconsistent with Applicable Professional Standards</u>.

In seeking to shore up their claim that the appraisals on which the Federal Exchange are based do not comply with the Exchange Legislation in their Reply, Plaintiffs inexplicably continue to wholly ignore, as they did in their opening brief, the operative documents at the crux of this Court's review, namely the Forest Service's appraisal reviews (AR44560-89 & AR 44590-44636).  Pls.' SJ Reply at 15-17; Pls.' Op'g SJ Brf. at 27-35.  This follows necessarily because Plaintiffs seek review of their claims pursuant to the APA, 5 U.S.C. §§ 701-06, which, as noted previously, exclusively authorizes review of *federal* actions, not those of private parties.  More specifically, the Court's role is to examine the Forest Service's review findings that the appraisals providing valuations for the Federal Exchange were prepared in compliance with the requisite Uniform Appraisal Standards for Federal Land Acquisitions ("USAFLA" or "Yellow Book") and United States Professional Appraisal Standards ("UASPAP") solely to determine

---

[4] Plaintiffs contrarily argue that the 2005 Settlement Agreement is operative and binding because it has a termination clause any party may invoke and that MHMO has not done so.  Pls.' SJ Reply at 13 & n.3.  But this confuses whether the agreement's obligations remain binding on the parties, which is indisputably no longer the case per the express terms of Paragraph 5 given that the state court proceedings are again active, and whether the agreement has been formally terminated.  Meadows is simply pointing out the obvious that the former scenario now obtains.

whether or not they are "arbitrary and capricious" within the meaning of the APA. MHMO's Op'g SJ Brf. at 26-28. The upshot is that if Plaintiffs cannot meet their burden to establish that such findings are arbitrary and capricious, their claim fails. 5 U.S.C. § 706(2)(A). This is bedrock administrative law, and Plaintiffs' failure to even seek to satisfy it is fatal to their claim.

Nor could Plaintiffs establish that the Forest Service's findings in its appraisal review are arbitrary and capricious even if they had properly sought to do so. The Supreme Court has advised that the APA's "arbitrary and capricious" standard is a decidedly narrow one under which a reviewing court is not to substitute its own judgment for the agency's, but instead is simply to assess whether the agency has considered relevant factors and its decision does not reflect a clear error of judgment. *Department of Homeland Security v. Regents of Univ. of California*, 140 S. Ct. 1891, 1905 (2020). If so, the Court's inquiry is at a close and it need not, and indeed should not, be drawn into a *de novo* examination of whether it or another independent appraiser believes the underlying appraisals pass muster. Again, that the Forest Service found so in a manner that was not arbitrary and capricious under the APA is the only relevant inquiry.

And under that rubric, even a quick review of the Forest Service's appraisal reviews shows there can be little doubt that their findings are more than sufficient to pass over the decidedly deferential "arbitrary and capricious" bar. Each of the reviews is systematically organized into five sections: (1) summary; (2) description of its purpose, scope, and intended use; (3) the reviewer's analysis, comments, and conclusions; (4) the reviewer's assumptions and limiting conditions; and (5) the reviewer's certifications. AR44561 & AR44591. The first three sections are broken down further to address each of the larger parcels included within each appraisal, as well as the "Value of the Whole" reflecting the collective value of all the federal or non-federal parcels. AR44562-71 (Government Camp West Larger Parcel); AR44572-81

(Government Camp East Larger Parcel); AR44582 (Value of the Whole for the Government

Camp Parcels); AR44593-44611 (Cooper Spur Panhandle Larger Parcel); AR44612-26 (Cooper

Spur Timberland Larger Parcel); AR44627-28 (Value of the Whole of the non-federal parcels

and Contributory Value by Tax Lot, as required by Sec. 1206(a)(2)(D)(ii)).  In conducting his

reviews, the Forest Service's Senior Review Appraiser was careful to follow the agency's

detailed regulations governing appraisal reviews at 36 C.F.R. § 254.9, and Plaintiffs do not assert

otherwise.  The Review Appraiser explained that the purpose of his review assignment was

specifically to judge the appraisal reports' "compliance with the issued appraisal instructions,

[UASFLA], and [USPAP] and to develop a credible opinion of the adequacy of the data and

appropriateness of the analysis of the data relative to the final conclusions."  See, e.g., AR44567

& AR44604.  The Review Appraiser also confirmed that he personally inspected the subject

exchange properties, as well as the comparable sales properties, by vehicle and on foot.  See,

e.g., AR44568, AR44578, AR44605, AR44622.  On the bases of his thorough analysis, the

Review Appraiser made the following specific conclusions for each element of the appraisals he

reviewed:  (1) the completeness of the appraisal under review is adequate; (2) the data and

adjustments in the appraisal under review are adequate and relevant; (3) the appraisal methods

and techniques used are appropriate; and (4) the analyses, opinions, and conclusions in the

appraisal under review are appropriate and reasonable.  AR44571, AR44581, AR44582,

AR44611, AR44626, AR44628.  Given those findings, the Forest Service's Senior Review

Appraiser approved both the federal and non-federal appraisals for use as the basis for use in the

Federal Exchange and achieving equalization of values.  *Id.*; AR44561 & AR44592.  Again,

nowhere in their briefing do Plaintiffs mention, let alone challenge, the Forest Service's Senior

Reviewer's findings to this effect, nor does their hired-gun appraiser ever reference the reviews.

Moreover, not only do Plaintiffs continue to avoid even acknowledging the existence of the Forest Service's thorough and well-prepared appraisal reviews, for the most part their Reply also ignores the gravamen of Defendants' opening brief arguments entirely, instead seeking to cavalierly dismiss them by erroneously distilling them as relying essentially entirely on the Consulting Report the appraisals' author, Donald Maloy, prepared, and trying to pass them off as all boiling down to quibbles reflecting a "battle of the experts." Pls.' SJ Reply at 15-17. Perhaps this is because Plaintiffs were unable to come up with any credible arguments that could show that the Forest Service's appraisal reviews are "arbitrary and capricious." Regardless of the reason, Plaintiffs' failure to even attempt to meet their burden means they have not satisfied their burden on their appraisal claim and of itself entitles Defendants to summary judgment.

Moreover, the discussion above clearly establishes that Defendants' arguments do not exclusively, nor indeed to any substantial degree whatsoever, rely on Mr. Maloy's Consulting Report. Indeed, the Forest Service was under no legal or regulatory obligation to ask Mr. Maloy to respond to Plaintiffs' critiques of his appraisals. Nor, as noted above, do those critiques address the operative findings of the Forest Service in its appraisal reviews. The agency had in hand the appraisal reviews its Senior Review Appraiser had prepared in accordance with Forest Service regulations, and that is all it needed to proceed with the Federal Exchange. The agency went above and beyond in requesting that Mr. Maloy prepare the report to assist it in being able to more carefully and thoroughly respond to Plaintiffs' objections to the Draft ROD, and to make sure the appraisals on which the Federal Exchange are based complied with all applicable legal and professional requirements and were otherwise sound. AR47629-87.

Even then, the characterizations Plaintiffs make of Mr. Maloy's Consultation Report and the aspersions they cast at it are unfounded, misleading, or altogether inapposite. For example,

Plaintiffs state that the Consultation Report was not intended to comply with USPAP standards or UASFLA, Pls.' SJ Reply at 15, but this is entirely beside the point, as the salient issue is whether Mr. Maloy's appraisals did so comply, which, as explained above, the Forest Service expressly found they did after their Senior Review Appraiser performed a thorough review. AR44561 & AR44592.  Plaintiffs next try to manufacture some hay out of the fact that Mr. Maloy's Consultation Report is dated one week prior to the date that Thrive submitted to the Forest Service its objections to the Draft ROD to which it appended Mr. Palmer's serial critiques of Mr. Maloy's appraisals (at AR47789-47865).  Pls.' SJ Reply at 15.  But this is thoroughly and expressly debunked by the record, which shows that all but one of Mr. Palmer's five letters in which he laid out varying sets of critiques at Thrive's behest were in fact included in the packet of materials Mr. Maloy was asked to review for his Consultation Report, as was Thrive's separate itemization of concerns with the appraisals.[5]  AR47629, AR47630-39, & AR47645-54, & AR47667-72.  Nor, contrary to Plaintiffs' characterizations and allegations, does Mr. Maloy ever come close to agreeing with any of Mr. Palmer's criticisms of his work.  See Pls.' SJ Reply at 16-17.  As an example, Mr. Maloy indicates that, "in the production process of the final reports, some Adobe Acrobat pages inadvertently hid the line" providing confirmation of the details for the comparable sales on which his appraisals relied, and he therefore supplied the

---

[5]  One of the voluminous exhibits attached to Thrive's objections to the Draft ROD constitutes a narrowly focused supplemental letter Mr. Palmer prepared at Thrive's request that addresses only the analysis and verification of sales Mr. Maloy analyzed in his appraisal of the Panhandle Property.  AR47841-65.  But this last-minute critique was not provided to the Forest Service in 2020 when Plaintiffs were provided the 2019 appraisals and submitted Mr. Palmer's original critique letters to the agency, but is dated almost a full year later and after the Mt. Hood Forest Supervisor had already sent his fifth appraisal request to Mr. Maloy to address all of the issues and information the Forest Service had timely received that raised concerns with his appraisals.  AR47629.  Thus, Plaintiffs' efforts to suggest that Mr. Maloy was not allowed the opportunity to review any of Mr. Palmer's critiques based on this discrete addendum that they tossed into their objections at the eleventh hour is insupportable and should not be countenanced.

complete pages in an appendix to his Consultation Report.  AR49587.  Plaintiffs try to blow this printing glitch into a mountain-sized admission by Mr. Maloy that his appraisals were missing "certain key information."  Pls.' SJ Reply at 16.  Moreover, the Forest Service confirmed with Mr. Maloy that he "verified the sales used as comparables with knowledgeable parties to the transactions" and that it had provided corrected sale data sheets supplying this information prior to approving the challenged Federal Exchange.  AR49837.  Plaintiffs further assert without foundation that Mr. Maloy conceded to making a "significant methodological error."  Pls.' SJ Reply at 17.  But again, this is debunked by the very first line of Mr. Maloy's response in his Consultation Report when he unequivocally states the allegation "is not true" and follows up by noting that "[a] professional reviewer utilizing Standard 3 of USPAP could have resolved this question with a phone call" given that, "at the time of appraisal, responses to our verification requests indicated the comparable sales to be fully usable."  AR49587.  Mr. Maloy goes on to explain that a recent survey completed for one of the comparable sales used for the federal appraisal did reflect a reduction in the ultimate buildable number of lots, but that he accounted for the unavailability of that more precise information at the time of his appraisal by properly giving it "less weight."  AR49587.  The infinitesimal size and tendentious nature of these issues Plaintiffs have opted to highlight in their Reply shows just how futile their arguments are.

Finally, it must be noted that Plaintiffs do not even attempt in their Reply to rebut or otherwise rehabilitate the serious problems with Mr. Palmer's review critiques that MHMO outlined in its opening brief, which should therefore be accepted as valid and of themselves serve to seriously undermine those critiques.  *See* MHMO's Op'g SJ Brf. at 29-30.  Nevertheless, the more recent round of Plaintiffs' attacks on Mr. Maloy's work in their Reply expose certain additional concerns with the abbreviated, drive-by reviews Mr. Palmer prepared for Thrive.

Thus, MHMO feels compelled to offer at least a sampling of the flaws and shortcuts reflected in Mr. Palmer's review of the federal properties (AR47645-54), all of which relate in one way or another to his failure to comply with USPAP standards, notwithstanding his representation that the review was "intended to conform" to such standards.  First, Mr. Palmer did not identify within his scope of work (AR47645) any indication that it was designed to include development of his own independent opinion of value, in contravention of USPAP Standards Rule 3-2(c) (AR48315).  By not including development of an opinion of value in the work scope, Mr. Palmer was therefore let off the hook from the standards of analytical rigor required when providing an opinion of value, and thus failed to meet the very standards applicable to the Maloy appraisal at which he was lobbing potshots.  USPAP Standards Rule 4-2(i)(iii), Comments to Standards Rule 4-2, and Standards Rule 2-2(a)(viii) (AR48319 & 48311).  Mr. Palmer may think that he can evade compliance with these USPAP requirements by framing his opinion as a "range of values."  This cannot cure the non-compliance, but only underscores his review's back-of-the-envelope, less stringent methods and conclusions.  Second, Mr. Palmer openly admits he never visited the properties that are the subject of the federal appraisal or the comparable sale sites.  AR47651; *see also* AR47645 (noting he has visited the "area" 5-10 times over the past 10 years).[6]  But actual, contemporary physical inspection of the federal properties is especially important because of the myriad development challenges they present due to difficult access issues, areas of steep terrain, public trail easements, and extensive wetlands.  *See, e.g.*, AR44285-87 & AR44295-96 (description of site); AR43170 & AR43171 (topographic and wetlands maps).  Third, as MHMO explained in its opening brief, Mr. Palmer committed serious

---

[6] Mr. Palmer makes the same concession that he did not visit the non-federal properties or associated comparable sale sites for purposes of conducting his review of Mr. Maloy's non-federal appraisal, either.  AR47630 & AR47636.

computational error in reviewing Mr. Maloy's Comparable Sale No. 3 in support of his federal appraisal, MHMO's Op'g SJ Brf. at 29-30, which Plaintiffs leave wholly unrebutted in their reply brief. Adjusted to correct and account for the critical errors Mr. Palmer committed, his review actually serves to confirm Mr. Maloy's conclusion of value. *Id.* Finally, Mr. Palmer makes a critical error in his analysis of the highest and best use of the F-1 Forestland by treating it as if it were an isolated piece of forestland on which a home is located without appreciating the synergism of value arising from the combination with the C-1 commercially zoned property it surrounds. AR 47833-34. The F-1 property serves as an integral part of a "larger parcel" that supports and enhances the value of the commercial use in the C-1 parcel, as Mr. Maloy properly recognizes in his appraisal as part of his "Highest and Best Use" analysis. AR43808; AR43810. Mr. Palmer apparently acknowledges this enhancement in part by projecting the value of 80 acres of the F-1 land to be in the thousands of dollars per acre (AR47632), but then reduces his estimate for the remaining 76 acres to $300 an acre without any cogent explanation (AR47633).

Thus, not only are Mr. Palmer's critiques of Mr. Maloy's appraisals highly dubious, the Court should not lend any credence to Mr. Palmer's broadly framed valuation opinions, either.[7]

---

[7] It is worth noting that Mr. Palmer also failed to obtain critical net usable area information about Mr. Maloy's Comparable Sale No. 2. AR47649. The litany of errors that pervade Mr. Palmer's review of the federal lands subject to appraisal renders them unsound and uncreditable. Given that established baseline, another reason is revealed as to why his review of the non-federal properties should be given virtually no weight by the Court as well. To explain, Mr. Palmer concludes "Adjusted Values" for those properties as follows (at AR47699):
• House and 156.37 Acres                      $1,574,000
• Cooper Spur Inn and revenue departments  $1,550,000 to $1,800,000
• Timber Land                                 $3,300,000

Utilizing Mr. Palmer's lowest estimate of value for the Cooper Spur Inn, the foregoing pieces of property would have a total value of $6,424,000. Adding the $798,240 value of the Cooper Spur Ski Area Leasehold Improvements and Personal Property, AR43837 (whose value Palmer does not bother to address), results in a total Cooper Spur Property valuation (at the low end) of $7,222,240. Because the federal properties are valued at $5,658,500, the Cooper Spur properties

The record contains ample evidence to rebut or put into proper context the other alleged flaws Mr. Palmer recounts in his review.  The bottom line for purposes of this Court's review is that none of them come close to establishing that the Forest Service's findings that Mr. Maloy's 2019 appraisals are in compliance in all material respects with UASFLA and USPAP are arbitrary and capricious, and thus, Plaintiffs' appraisal count must be rejected on the merits.

### III.  PLAINTIFFS' NEPA CLAIM REMAINS WHOLLY DISCONNECTED FROM ENVIRONMENTAL EFFECTS & RECENT LEGAL DEVELOPMENTS.

In a variation of the theme that runs throughout their Reply, the arguments that Plaintiffs present regarding their NEPA claim either largely ignore or fail to respond in any meaningful fashion to the points in Defendants' opening briefs or, more puzzlingly, simply decline to follow up whatsoever on positions for which they vigorously advocated in their own opening brief.  In this latter category, Plaintiffs' Reply completely omits any reference to their two NEPA counts regarding the Forest Service's Purpose and Need Statement in the EIS.  See Pls.' Op'g SJ Brf. at 11-15.  Like the other arguments their Reply leaves on the cutting-room floor, apparently Plaintiffs have opted to abandon these counts too.  At the same time, Plaintiffs make the lead NEPA argument in their Reply a novel and much-expanded reconstitution of what essentially

---

would still be $1,563,740 more valuable. This is 27.6 percent more than the value of the federal properties, still beyond the 25 percent range allowed for monetary equalization by FLPMA.  As a result, equalization of values would still necessitate exclusion of the Panhandle Property (the house and 156.37 acres, plus Cooper Spur Inn, which total $3,124,000 in value) and the Government Camp eastern parcel (valued at $1,899,200) from the Federal Exchange.  This would also result in the remaining non-federal properties being $338,940 more valuable than the Government Camp western parcel (Timber Land plus Ski Area Leasehold Improvements and Personal Property minus Government Camp West) ($3,300,000 + 798,240 - $3,759,300 = $338,940).  Thus, even using the values of the Cooper Spur properties valued at the lowest, most advantageous numbers in Mr. Palmer's review from Plaintiffs' perspective, precisely the same configuration of properties would obtain as the Federal Exchange that Plaintiffs challenge.  Consequently, even under Mr. Palmer's own analysis, his critiques involving the Panhandle Property (AR47841-65) can be seen as effectively totally irrelevant to this Court's review of Plaintiffs' appraisal claim given that this property is not included within the Federal Exchange.

was a minor footnote to their third NEPA count asserting that the Forest Service should have

considered an alternative in its EIS focused on reservation of the discretionary wetland

conservation easement that they have now transformed into a new claim that the Forest Service

allegedly somehow improperly jumped the gun by determining no such conservation easement

would be a part of the Federal Exchange by the 120-day statutory deadline.  Pls.' SJ Reply at 18-

20.  Most glaringly and mystifyingly, nowhere in the NEPA section of their Reply do Plaintiffs

attempt to grapple with the implications of or even cite the Supreme Court's recent landmark

NEPA decision of *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025), or

rescission of the NEPA implementing regulations of the Council on Environmental Quality

("CEQ") on which their NEPA claim at least in part relies.  90 Fed. Reg. 10,610 (Feb. 25, 2025).

These rudimentary missteps alone significantly undermine the validity of the NEPA arguments

in Plaintiffs' Reply, but Meadows will nevertheless highlight a few other more specific flaws.

    A.   The Forest Service Was Not Arbitrary & Capricious in Fulfilling its Statutory
           Obligation in its Consideration of Reasonable Alternatives in the Final EIS.

Meadows and the Forest Service systematically dismantled Plaintiffs' third NEPA count

asserting that the Forest Service failed to consider a reasonable range of alternatives in carrying

out its NEPA analysis for the Federal Exchange.  MHMO's Op'g SJ Brf. at 33-34; Fed. Defs.'

Op'g SJ Brf. at 21-28.  In a vain attempt to rehabilitate this count in their Reply, Plaintiffs

largely seek to double-down on their arguments that the EIS should have specifically delineated

and addressed virtually every last permutation of the inordinate number of the various potential

property exchange permutations without ever countering the salient points that NEPA is

designed for disclosure and consideration of environmental effects and that all such effects of

every single possible permutation is undeniably encompassed by the "all-for-all" action

alternative the Forest Service did thoughtfully and carefully consider in the EIS.  Pls.' SJ Reply

at 22-24.  The thrust of Plaintiffs' Reply arguments on this front therefore are wholly unavailing because they fail to establish how consideration of any additional alternatives in detail was necessary for the Forest Service to satisfy its NEPA duty to consider environmental effects of the Proposed Action and any feasible alternatives that the EIS did not, in fact, already amply address.  42 U.S.C. § 4332(2)(C).  Indeed, they fail to cite even one such effect.

Plaintiffs seek to divert attention from their failure in this regard by alleging that Defendants fail to cite any authority for their position.  Pls.' SJ Reply at 22.  But that allegation is readily disproven given that MHMO relied on the most relevant authority, statutory language, as well as *Seven County*, in which the Court went out of its way to note that selection of feasible alternatives to consider in an EIS is a NEPA issue on which an agency possesses substantial deference and is to be given "substantial deference" on review.  *Seven Cnty.*, 145 S. Ct. at 1512.  In addition, a recent Ninth Circuit opinion relies on this very principle to conclude that the Forest Service did not need to consider another alternative in detail given that it was encompassed by another alternative the environmental effects of which the agency did specifically address.  *North Cascades Conserv. Council v. Forest Serv.*, 136 F. 4th 816, 828 (9th Cir. 2025); *see also Russell Country Sportsmen v. Forest Serv.*, 668 F.3d 1037, 1049 (9th Cir. 2011)(on same logic, ruling agency did not need to circulate a supplemental NEPA document, as "there is very little reason to believe the [modified proposal ultimately adopted] will have environmental impacts that the agency has not already considered," confirming that is the touchstone for NEPA analysis).

B.  <u>The Clarification Act's 120-Day Deadline Indisputably Would Not Have Allowed the Forest Service to Consider the Wetland Conservation Easement in the EIS</u>.

As noted above, Plaintiffs use their Reply to present a new spin on the argument in their opening brief that the Forest Service should have considered an alternative that would have included reservation of the discretionary wetland conservation easement.  Now they seek to

convert that argument into one alleging that the Forest Service improperly made a decision on the easement before considering its projected environmental effects in its EIS. Like its original iteration that was without merit, the new formulation fares no better, for two primary reasons.

First, it ignores that the Exchange Legislation provides that reservation of the wetland easement was a decision not solely within the Forest Service's authority. Indeed, it expressly provides that the wetland easement, like various other elements of the Exchange Legislation, was subject to the mutual agreement of the Forest Service and MHMO. Sec. 1206(a)(2)(G)(i). As the Supreme Court recently reaffirmed, an agency does not have an obligation under NEPA to consider environmental effects that fall outside its remit. *Seven Cnty.*, 145 S. Ct. at 1516.

More importantly, an express condition of that subparagraph of the Exchange Legislation mandates that, "in order to take effect, the conservation easement shall be finalized not later than 120 days after enactment" of the Clarification Act. Sec. 1206(a)(2)(G)(ii). The discretionary conservation easement therefore needed to be finalized by around April 10, 2018, nearly three years before the Forest Service was able to complete the EIS. AR45822. Under well-established Supreme Court case law, this type of legislatively mandated time frame represents a direct conflict under which an agency's NEPA duty must give way. *Flint Ridge Dev't Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 789-91 (1976). Plaintiffs attempt to avoid this ineluctable result by contending that under this binding precedent, the Forest Service could have simply ignored NEPA altogether once the congressionally "intended" 16-month deadline for completing the exchange passed. Pls.' SJ Reply at 19-20. But this is simply a futile effort to divert attention away from the fact that the Forest Service did prepare a thorough and detailed EIS here. That overarching deadline merely expressed the Congress's intent on the time frame for the Federal Exchange's completion in any event. Sec. 1206(a)(2)(F). But Plaintiffs' argument does give

Meadows the opportunity to reemphasize that the Congress did signal its intent that the Federal Exchange be completed, and that its significant attendant public benefits begin to be realized, more than 15 years ago, and thus Meadows firmly believes that Plaintiffs' claims effectively quibbling over the marginalia of an exchange that has long had the unanimous support of the entire Oregon congressional delegation be cast aside so that it can, finally, be completed.

C.   Plaintiffs' Claim that the Federal Exchange Should Be Set Aside Because the Appraisals they Were Provided were not Attached to the EIS Is Meritless & Harmless.

In their Reply Plaintiffs completely ignore and fail to respond to the two unassailable arguments that MHMO made in its opening brief that knock the legs out from under their fourth NEPA Count, namely that the CEQ implementing regulation on which the count is based, 40 C.F.R. § 1502.19, has been rescinded, 90 Fed. Reg. 10,610 (Feb. 25, 2025), and that any error would be harmless in any event because the record indisputably establishes that Plaintiffs were provided the appraisals.  Pls.' SJ Reply at 20-21; MHMO's Op'g SJ Brf. at 34.  MHMO's arguments therefore remain just as unassailable as they were when they first made them.

**CONCLUSION**

For the foregoing reasons and those in their opening summary judgment papers, as well as the arguments in Federal Defendants' summary judgment briefing that Meadows incorporates by reference insofar as it is consistent with its own, and on the basis of the administrative record, the Court should dismiss Plaintiffs Thrive, McCarthy, and Sierra Club for lack of standing and grant summary judgment in full to Defendant-Intervenor Meadows and Federal Defendants.

Respectfully submitted this 5th day of December 2025.

s/ Stephen J. Odell
Stephen J. Odell
MARTEN LAW LLP
Attorney for Defendant-Intervenor Mt. Hood Meadows OREG., LLC